Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

THE NORTHWESTERN MUTUAL LIFE INSURANCE:     12 Civ. 2514 (PKC)(HBP)
COMPANY,                                      :

                            Plaintiff,        :

          - against -               :

STEVEN LITT and TRACY COPPLE-LITT,        :

                         Defendants.      :

------------------------------------------------------------------ x

## DEFENDANT STEVEN LITT'S DEPOSITION DESIGNATIONS PURSUANT TO RULE 29 OF THE COMMERCIAL DIVISION OF THE SUPREME COURT

Pursuant to Rule 29 of the Commercial Division of the Supreme, defendant Steven Litt hereby designates and submits the following deposition testimony for use at trial.

### Deposition of Gail C. Junemann conducted November 20, 2012

| Page and Line of Designated Testimony |
| --- |
| 5:4-25 |
| 6:6-25, 7:1-25, 8:1-25, 9:1-12 |
| 9:19-25, 10:1-4 |
| 10:9-14 |
| 10:17-25, 11:1-25, 12:1-10 |
| 12:20-25, 13:1-25, 14:1-5 |
| 14:10-25, 15:-1-25, 16:1-25, 17:1-25, 18:1-7, |
| 18:13-25, 19:1-21, |
| 19:25, 20:1-23 |
| 21:7-14 |
| 21:18-25, 22: 1-17 |

| Page and Line of Designated Testimony |
|---|
| 23:2-25, 24:1-5 |
| 25:21-25, 26:1-25, 27:1-25, 28:1-9 |
| 28:23-25, 29:1-25,  30:1-8 |
| 30:13-15 |
| 30:17-25, 31:1-25, 32:1-25, 33:1-25, 34:1-18 |
| 34:25, 35:1-25, 36:1-25, 37:1-25, 38:1-25, 39:1-22 |
| 40:7-22 |
| 41:6-25, 42:1-19 |
| 42:25, 43:1-25, 44:1-25, 45:1-25, 46:1-3 |
| 46:15-25, 47:1-25, 48:1-25, 49:1-25 |
| 51:20-25, 52:1-25, 53:1-25, 54:1-25, 55:1-25, 56:1-6 |
| 56:13-25, 57:1-25, 58:1-11 |
| 58:23-25, 59:1-8 |
| 59:13-25, 60:1-25, 61:1-25, 62:1-6 |
| 62:10-25, 63:1-25, 64:1-25, 65:1-25, 66:1-18 |
| 66:22-23 |
| 70:20-25 |
| 72:16-22 |
| 73:25, 74:1-4 |
| 78:1-5 |
| 80:4-12 |
| 81:9-16 |
| 82:2-7 |
| 83:14-17 |
| 83:22-25, 84:1-18 |
| 84:23-25, 85:1-4 |
| 86:21-25, 87:1-25, 88:1-13 |
| 89:8-21 |

| Page and Line of Designated Testimony |
|---|
| 91:7-25, 92:1-25, 93:1-25, 94:1 |
| 94:4-25, 95:1-15 |
| 98:2-5 |
| 99:1-25 |

```
1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3     --------------------------------------------------------

      THE NORTHWESTERN MUTUAL LIFE
4     INSURANCE COMPANY,

5                  Plaintiff,

6             vs.        Case No. 12 Civ. 2514(PKC)(HBP)

7     STEVEN LITT and
      TRACY COPPLE-LITT,
8
                  Defendants.
9
      --------------------------------------------------------
10

11              Deposition of GAIL C. JUNEMANN

12             Tuesday, November 20, 2012

13

14                    9:20 a.m.

15                       at

16             Mallery & Zimmerman, S.C.
               731 North Jackson Street
17               Milwaukee, Wisconsin

18

19

20

21

22

23

24

25        Reported by Dawn M. Lahti, RPR/CRR
```

1            Deposition of GAIL C. JUNEMANN, a witness

2      in the above-entitled action, taken at the instance

3      of the Defendants, pursuant to the Federal Rules of

4      Civil Procedure, before Dawn M. Lahti, RPR,

5      Certified Realtime Reporter, and Notary Public,

6      State of Wisconsin, at 731 North Jackson Street,

7      Milwaukee, Wisconsin, on the 20th day of November,

8      2012, commencing at 9:20 a.m. and concluding at

9      12:20 p.m.

10   A P P E A R A N C E S:

11            NORTHWESTERN MUTUAL, by
                Mr. C. Claibourne Greene
12            720 East Wisconsin Avenue
                Milwaukee, Wisconsin 53202
13            Appeared on behalf of Plaintiff.

14            SATTERLEE STEPHENS BURKE & BURKE, LLP, by
                Mr. Walter A. Saurack
15            230 Park Avenue, Suite 1130
                New York, New York 10169
16            Appeared on behalf of Steven Litt.

17            LAW OFFICE OF RICHARD S. PESKIN, by
                Mr. Richard S. Peskin
18            6 East 39th Street, 6th Floor
                New York, New York 10016
19            Appeared on behalf of Tracy Copple-Litt.

20

21

22

23

24

25



```
 1                    E X A M I N A T I O N

 2
      BY MR.  SAURACK                          4
 3    BY MR.  PESKIN                          69
      BY MR.  SAURACK                         94
 4    BY MR.  PESKIN                          95
      BY MR.  SAURACK                         97
 5

 6

 7

 8                      E X H I B I T S

 9    EXHIBIT NO.                      PAGE MARKED

10    1  Southern District Subpoena          11
      2  Wisconsin Subpoena                  11
11    3  Memo of 9/26/11                     12
      4  Replica Policy                      14
12    5  Application for Insurance           17
      6  Letter to Life Benefits Area        18
13    7  Facilitator Guide                   26
      8  Student Guide to Beneficiary & Title 33
14    9  Inforce Policies                    37
     10  Summary of Financial Representatives 47
15        Assigned
     11  E-mail of 3/3/09                    50
16   12  Full-Time Special or Soliciting Agent's
          Contract                           53
17   13  1.5 Policy Changes                  55
     14  Designation of Beneficiaries by Owner 60
18        Form
     15  Life Insurance Annual Policy Statement 63
19   16  Gil Elmaleh Inquiry {TR:4}{P}
     17  John Blumberg Inquiry               67
20   18  E-mail of 7/2/12                    67
     19  Letter of 10/13/11                  90
21

22   (Original exhibits retained by Attorney Saurack.
     Copies of exhibits attached to Original transcript
23   and copies.)

24

25
```



GRAMANN
REPORTING

*Innovation • Expertise • Integrity*

```
1              TRANSCRIPT OF PROCEEDINGS
2              GAIL C. JUNEMANN, called as a witness
3         herein, having been first duly sworn on oath, was
4         examined and testified as follows:
5                   EXAMINATION
6    BY MR. SAURACK:
7    Q    Good morning.
8    A    Morning.
9    Q    My name is Walter Saurack.  I represent one of the
10        defendants in the case, Steven Litt.  I just have a
11        few basic instructions I'd ask you to follow.
12                  One is the court reporter is
13        recording your testimony, so all of your answers
14        have to be verbal, okay?
15   A    (Nods.) Yes.
16             MR. PESKIN:   It's a trick question.
17   BY MR. SAURACK:
18   Q    And if you don't understand a question, please let
19        me know, and I'll rephrase it, okay?
20   A    Yes.
21   Q    And if you don't understand a question because you
22        can't hear it, let me know that as well.
23   A    Yes.
24   Q    If you need a break, just let us know.  The only
25        caveat on that is there can't be a break between a
```

1    ~~question and answer, but otherwise just let us know~~

2    ~~if you need a break, okay?~~

3    A    Yes.

4    Q    Please state your name for the record.

5    A    Gail Junemann.

6    Q    Where are you currently employed?

7    A    Northwestern Mutual Life.

8    Q    And how long have you been employed there?

9    A    18 years.

10   Q    What's your current position at Northwestern?

11   A    I'm a senior title specialist.

12   Q    And what are your responsibilities in that role?

13   A    The department is called -- the division is called

14        Special Handling Research Center.  In that area if

15        you have assets with our company and are going

16        through a legal situation, our team will take a

17        look at your assets and how they affect -- how the

18        document and other things affect your assets at

19        Northwestern Mutual.

20   Q    What kind of assets are you referring to?

21   A    Like insurance assets.

22   Q    And what other type of tasks do you perform in your

23        capacity as a senior title specialist?

24   A    We read title documents.  We read lawsuits,

25        divorces, bankruptcies, levies.

## Deposition of Gail C. Junemann - November 20, 2012

6

| | | |
|---|---|---|
| 1 | Q | ~~Do you have any underwriting responsibilities?~~ |
| 2 | A | No. |
| 3 | Q | Are you charged with administering any policies or |
| 4 | | procedures at Northwestern? |
| 5 | A | ~~Not usually.~~ |
| 6 | Q | Do you come -- do there come times when you review |
| 7 | | policies and procedures of Northwestern in |
| 8 | | connection with your reviews? |
| 9 | A | Yes. |
| 10 | Q | What other positions have you held at Northwestern? |
| 11 | A | Customer service correspondent, customer service |
| 12 | | representative. |
| 13 | Q | And what were your responsibilities in those roles? |
| 14 | A | To correspond in writing to customers and to answer |
| 15 | | telephone calls. |
| 16 | Q | And what types of inquiries generally were you |
| 17 | | responding to? |
| 18 | A | Any kind of insurance questions, histories, |
| 19 | | payments. |
| 20 | Q | In your current role, are you charged with |
| 21 | | investigating the facts in online disputes? |
| 22 | A | Yes. |
| 23 | Q | What types of disputes? |
| 24 | A | Usually fraud, divorce. |
| 25 | Q | And do you make recommendations based upon your |

| 1 | | investigation? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | Who do you make the recommendations to? |
| 4 | A | Our director. |
| 5 | Q | And who's your director? |
| 6 | A | Carol Stilwell, S-T-I-L-W-E-L-L. |
| 7 | Q | And do you prepare reports concerning your |
| 8 | | findings? |
| 9 | A | Yes. |
| 10 | Q | How long have you worked in your current role? |
| 11 | A | Since 1999. |
| 12 | Q | Do you have any post high school education? |
| 13 | A | Graduate of Marquette University. |
| 14 | Q | And when did you graduate from there? |
| 15 | A | 1993. |
| 16 | Q | What was your degree in? |
| 17 | A | Communications, public relations. |
| 18 | Q | Do you have any other post high school education? |
| 19 | A | No. |
| 20 | Q | Do you have any specific insurance industry |
| 21 | | licenses? |
| 22 | A | Yes. |
| 23 | Q | What licenses do you have? |
| 24 | A | Let me rephrase that.  I have -- I'm not sure it's |
| 25 | | a license, an FLMI license or a designation and |

| | | |
|---|---|---|
| 1 | | ACS.  Those are after my name on my card. |
| 2 | Q | And what do those designations indicate? |
| 3 | A | That I passed a series of tests to understand |
| 4 | | insurance and customer service. |
| 5 | Q | What does FLMI stand for? |
| 6 | A | Fellow Life Management Institute, I think. |
| 7 | Q | And you took a test? |
| 8 | A | 10. |
| 9 | Q | 10 tests, okay.  And you passed all those tests? |
| 10 | A | Yes. |
| 11 | Q | And that -- and that institute specializes in tests |
| 12 | | that relate to life insurance? |
| 13 | A | Yes. |
| 14 | Q | What about ACS?  What does ACS stand for? |
| 15 | A | Associate customer service. |
| 16 | Q | Did you take tests in connection with that |
| 17 | | designation? |
| 18 | A | Yes. |
| 19 | Q | How many? |
| 20 | A | I don't recall. |
| 21 | Q | But you passed those tests? |
| 22 | A | Yes. |
| 23 | Q | You obtained those designations? |
| 24 | A | Yes. |
| 25 | Q | And what type of study did you undertake for that |



| | | |
|---|---|---|
| 1 | | designation? |
| 2 | A | Customer service? |
| 3 | Q | Yes. |
| 4 | A | Basics of life insurance, responding to complaints. |
| 5 | Q | Any other areas? |
| 6 | A | I can't recall. |
| 7 | Q | Do you have -- aside from your study for these |
| 8 | | particular designations, do you have any other |
| 9 | | training with respect to life insurance? |
| 10 | A | No. |
| 11 | Q | Do you have on-the-job training? |
| 12 | A | Yes. |
| 13 | Q | Were you employed at -- was Northwestern your first |
| 14 | | job out of college, or did you have another place |
| 15 | | of employment? |
| 16 | A | I worked for a senator. |
| 17 | | MR. PESKIN:  For what? |
| 18 | | THE WITNESS:  A federal senator. |
| 19 | BY MR. SAURACK: | |
| 20 | Q | So Northwestern's your only insurance-related |
| 21 | | employment? |
| 22 | A | Correct. |
| 23 | Q | Is one of your responsibilities in your current |
| 24 | | position to make determinations or make |
| 25 | | recommendations concerning whether there's coverage |

1          in particular circumstances?

2     A    I give opinion on that.

3     Q    So you give coverage opinions to your director?

4     A    Yes.

5     Q    And does your director ultimately make the decision

6          as to whether there's coverage in the cases that

7          you investigate?

8     A    I don't know that answer.

9     Q    Are you involved with files post litigation?

10    A    Yes.

11    Q    And where are you currently working?

12    A    In Northwestern Mutual Franklin campus.

13    Q    Where is that?

14    A    It's about 17 miles south of here.

15    Q    Do you have any other employees who you supervise?

16    A    No.

17    Q    How many investigators work for your director

18         approximately?

19    A    Our team of -- is four.

20    Q    Is there a particular region which you work?

21    A    I work in the special handling research center.

22    Q    And what is that?

23    A    That's a team that provides special handling for

24         customers.

25    Q    What does that mean?

1   A   What falls into that category are complaints,

2       histories that would fall under our microfiche

3       area, details.

4   Q   Is that special handling department within a larger

5       department?

6   A   Yes.

7   Q   What's the larger department?

8   A   Policy owner services.

9   Q   Who's the head of the policy owner services

10      department?

11  A   Travis Pietrykowski.

12  Q   Is there any particular geographic area in which

13      you handle complaints for?

14  A   All areas of the United States.

15  Q   I'm going to ask the court reporter to mark two

16      documents.  One is a subpoena duces tecum issued

17      from the Southern District of New York.  Another is

18      a subpoena duces tecum issued out of -- they're

19      both testificandum as well out of the Eastern

20      District of Wisconsin.  I'll ask the Southern

21      District one be marked as Exhibit 1 and the

22      Wisconsin subpoena marked as Exhibit 2.

23              (Exhibits 1-2 were marked for

24      identification.)

25              MR. GREENE:  You can ask Ms. Junemann her

```
 1            knowledge of these documents but I can represent
 2            that I believe she's only been provided with the
 3            Southern District's opinion.
 4    BY MR. SAURACK:
 5    Q       I'm going to present to you two documents, one
 6            that's been marked as Exhibit Junemann Exhibit 1,
 7            the other is Exhibit 2.  And tell me if you
 8            recognize those two documents.
 9    A       For Exhibit 1, I recognize everything up to the
10            exhibit.
11    Q       Okay.
12    A       And I don't recognize document 2.
13    Q       I'm going to mark another document.
14                    (Exhibit 3 was marked for
15            identification.)
16    BY MR. SAURACK:
17    Q       I ask you to review that document, and tell me if
18            you recognize it.
19    A       I do not recall document 3.
20    Q       Let's go to Exhibit 1, and you said you recognize
21            the document up to the exhibit, is that right?
22    A       Yes.
23    Q       What is this document?
24    A       It's a subpoena for records.
25    Q       And it was issued to Northwestern Mutual Life
```



```
 1        Insurance Company, is that right?
 2   A    Yes.
 3   Q    Now, I'd ask you to take a look at the fifth page
 4        of the document.  Were you involved at all in
 5        locating documents that were responsive to this
 6        subpoena?
 7   A    No.
 8   Q    I'd ask you to turn to Schedule B on page 8, and if
 9        you could please review these subjects for
10        examination, and just tell me which of the subjects
11        you have knowledge of for purposes of this
12        deposition.
13   A    A, C, D, E, F, G, H, K.
14             MR. GREENE:  And let me just indicate on
15        the record too that as we indicated in our response
16        to the subpoena, we're providing Ms. Junemann to
17        testify about particularly H and K but as it's
18        limited by the response which is to the scope of
19        the financial representative and questions
20        authority to accept the change of beneficiary form
21        on behalf of Northwestern Mutual.
22             So we're not producing Ms. Junemann
23        to talk about -- to respond to the subject for
24        examination as it's stated in the subpoena.
25             MR. SAURACK:  Okay.  For each -- you're
```

```
 1          saying for H and K?
 2                    MR. GREENE:   Correct.
 3                    MR. PESKIN:   Except as to H and K; yes?
 4                    MR. GREENE:   We're providing her to
 5          testify in response to H and K as limited by our
 6          response.
 7                    MR. SAURACK:   I understand.
 8                    (Exhibit 4 was marked for
 9          identification.)
10                    MR. SAURACK:   I'd ask the reporter to
11          mark this as Exhibit 4.   It's a replica policy for
12          David Litt.
13     BY MR. SAURACK:
14     Q    Please take a look at this document.   Do you
15          recognize it?
16     A    Yes, I do.
17     Q    And what is this document?
18     A    It's a replication of the policy that was issued
19          insuring David Litt.
20     Q    What's the policy number?
21     A    16579951.
22     Q    And who's this policy insuring?
23     A    David Litt.
24     Q    And who's the owner of this policy?   On page 3 I
25          direct you to.   It's towards the bottom of page 3.
```

| 1  | A | That's normally not where we look. |
|----|---|---|
| 2  | Q | Okay. |
| 3  | A | At the bottom of page 3 it says the owner is David |
| 4  |   | Litt, the insured. |
| 5  | Q | And what's the policy date? |
| 6  | A | October 7, 2003. |
| 7  | Q | And the total insurance amount? |
| 8  | A | $1,411,369. |
| 9  | Q | And what kind of policy was this? |
| 10 | A | This is a whole life adjustable policy. |
| 11 | Q | What does that mean, generally speaking? |
| 12 | A | It's a mix between permanent and whole life |
| 13 |   | insurance. |
| 14 | Q | What does that mean, a mix between whole life and |
| 15 |   | permanent life insurance? |
| 16 | A | There's a portion of it -- the basic amount of |
| 17 |   | $1,000 is the term portion, and the balance is the |
| 18 |   | adjustable term.  Let me rephrase that.  The basic |
| 19 |   | amount of $1,000 is the permanent insurance and the |
| 20 |   | adjustable term portion of 1,411,396 is the |
| 21 |   | adjustable portion.  So the dividends of a policy |
| 22 |   | over the years will convert part of that 1,411,396 |
| 23 |   | into the permanent basic amount. |
| 24 | Q | And what's the difference between permanent and the |
| 25 |   | adjustable part of the policy? |



| | | |
|---|---|---|
| 1 | A | The permanent amount is considered it can't be |
| 2 | | taken away unless you surrender the policy and it's |
| 3 | | a whole life piece. |
| 4 | Q | How about the adjustable part? |
| 5 | A | The adjustable piece changes every year upon the |
| 6 | | anniversary when the dividend is credited.  Some |
| 7 | | portion of that amount will go into the basic, what |
| 8 | | we call, additions, and the other portion will |
| 9 | | remain term.  That need still needs to be |
| 10 | | converted. |
| 11 | Q | What happens if it's not converted? |
| 12 | A | It can stay outstanding.  If the dividend is less |
| 13 | | than it is the year before, it will convert slower. |
| 14 | Q | This is a replica policy? |
| 15 | A | Yes. |
| 16 | Q | What does that mean, replica policy? |
| 17 | A | It's an exact copy of the physical policy that was |
| 18 | | presented to the owner. |
| 19 | Q | And is this document kept in the regular course of |
| 20 | | business at Northwestern? |
| 21 | A | No. |
| 22 | Q | It was generated in the regular course of business |
| 23 | | at Northwestern? |
| 24 | A | It's created. |
| 25 | Q | Who created this document, if you know? |

| | | |
|---|---|---|
| 1 | A | Jill Markham, I believe. |
| 2 | Q | And who's she? |
| 3 | A | She is a member of the special handling research |
| 4 | | center. |
| 5 | Q | And this is an exact copy of the policy that was |
| 6 | | presented to the insured? |
| 7 | A | Yes. |
| 8 | Q | Are you aware that the insured owner, David Litt, |
| 9 | | eventually died? |
| 10 | A | Yes. |
| 11 | Q | That was on or about 9/11/2011? |
| 12 | A | Yes. |
| 13 | Q | For purposes of your questioning, I will call him |
| 14 | | the decedent.  Okay? |
| 15 | A | Yes. |
| 16 | | (Exhibit 5 was marked for |
| 17 | | identification.) |
| 18 | BY MR. SAURACK: | |
| 19 | Q | I ask this document be marked as Exhibit 5.  Please |
| 20 | | take a look at this document, and tell me if you |
| 21 | | recognize it. |
| 22 | A | This is the application for insurance for David |
| 23 | | Litt. |
| 24 | Q | Is this document kept in the regular course of |
| 25 | | business at Northwestern? |



1   A    It's an electronic version, yes.

2   Q    Where is it maintained?

3   A    In our records department.

4   Q    And according to this application, who did the

5        decedent direct as his direct beneficiary at the

6        time of his application?

7   A    Steven Litt, his brother.

8   Q    Are you aware of whether the decedent was married

9        at the time of his death?

10  A    I'm unaware of that.

11           MR. SAURACK:  Off the record.

12           (Discussion off the record.)

13           MR. SAURACK:  I ask this to be marked as

14       Exhibit 6.

15           (Exhibit 6 was marked for

16       identification.)

17  BY MR. SAURACK:

18  Q    Take a look at what's marked as Exhibit 6.  Do you

19       recognize that document?

20  A    Yes.

21  Q    What is it?

22  A    The first page is a bit illegible.

23  Q    Okay.  Let's flip to the second page.

24  A    This is a letter to our life benefits area

25       regarding David Litt signed by Richard Peskin.

Deposition of Gail C. Junemann - November 20, 2012          19

```
1    Q    And what's attached?

2    A    Attached is a form to change the client information

3         of Mr. Litt.

4    Q    So this is a communication from Mr. Peskin about

5         which he was sending Northwestern a form to attempt

6         to change the beneficiary on the Litt policy?

7    A    I'm not sure what the purpose of it is other than

8         to show us there was a form.

9    Q    And do you know when Northwestern first received

10        this form that's attached to the letter?

11   A    I believe it was September 29, 2011.

12   Q    When did you first review this letter and the form?

13   A    When I was first asked to be deposed on this event.

14   Q    It's your understanding that the completed form

15        attached to the letter was first received by

16        Northwestern on September 29, 2011?

17   A    It appears that way, yes.

18   Q    And if we look -- let's look at the first page of

19        the forms.  This is a change of client information

20        form, is that correct?

21   A    Yes.

22   Q    And that's Northeast Litt claim file 122.  That's

23        the Bates number, right?

24   A    I'm sorry?

25   Q    The Bates number on the document is NE Litt CL file
```



```
 1        122?
 2   A    Yes.
 3   Q    And if you flip to the next page, this is a
 4        designation of beneficiaries by owner for death
 5        proceeds only form?
 6   A    Correct.
 7   Q    That's NE Litt CL file 123?
 8   A    Yes.
 9   Q    And that form keeps going to 126, is that right?
10   A    Yes.
11   Q    Now, if you take a look at 123 -- Bates No. 123, at
12        the bottom of this document there's a space that
13        says for home office use.  Do you see that space?
14   A    Yes.
15   Q    And what is that space for?
16   A    That's a space for Northwestern Mutual to endorse
17        this document as part of the record.  It's
18        accepted.  It's recorded, and it's endorsed by
19        Northwestern Mutual.
20   Q    And what's the purpose of the endorsement on the
21        form?
22   A    Without the endorsement, the form is not
23        appropriate to add to the record.
24   Q    And is a change of beneficiary accepted prior to
25        being endorsed in the space at the bottom of the
```



1    form?

2                    MR. PESKIN:  May I have that read back,

3    please?

4                    (Record read.)

5                    THE WITNESS:  I don't understand the

6    question.

7    BY MR. SAURACK:

8    Q    I'll rephrase.  Does a change of beneficiary amend

9         a policy?

10   A    Yes.

11   Q    Is the policy amended before the form is endorsed

12        by someone at Northwestern in this space at the

13        bottom of page 123?

14   A    When it's accepted, it's endorsed and amended.

15   Q    Is the date of the amendment considered the date

16        that this part of the form is endorsed?

17   A    The date of the acceptance is the signature date.

18   Q    Is the date of acceptance also the date when the

19        amendment becomes effective?

20   A    We don't get it usually on the date that the form

21        is signed.  So it becomes effective as of the date,

22        but the process to create the form on the system is

23        probably a later date.

24   Q    It's effective as a date when it's signed but also

25        has to be signed by someone at Northwestern in this



**Deposition of Gail C. Junemann - November 20, 2012**          22

1        space?

2    A   Yes.

3    Q   And if it's not, the change is not effective?

4    A   Correct.

5    Q   Does Northwestern have a copy of this form that's

6        been endorsed in this space?

7    A   Not on the record.

8    Q   And how do you know that?

9    A   It's not endorsed.  I didn't see it until after the

10       death.

11   Q   Is there any particular person at Northwestern who

12       has to endorse these forms?

13   A   These forms are endorsed by any number of people in

14       the department called -- a division called

15       Beneficiary & Title, which does include our team.

16   Q   Can you endorse these forms?

17   A   Yes.

18   Q   Do you have to also stamp the form when you endorse

19       it?

20   A   No.

21   Q   At some point did you have to stamp the form?

22   A   In past years, yes.

23   Q   When did it become effective that you did not have

24       to stamp the form, if you recall?

25   A   People on our team don't even have a stamp and



1       ~~never did.~~

2   Q   So if you received a form like this, you would

3       endorse it by signing it?

4   A   I would, yes.

5   Q   You'd also date it?

6   A   I would.

7   Q   Is there anything else you would do to the form

8       when you received it?

9   A   I'd send it to file.

10  Q   Where is it filed?

11  A   In record services.

12  Q   You also mentioned that it has to be recorded?

13  A   Yes.

14  Q   What does that mean?

15  A   You have to operate a system that records it,

16      replaces the old beneficiary with the new one.

17  Q   And who handles recording it?

18  A   The Beneficiary & Title division.

19  Q   And how do they record?

20  A   They manually type the changes into the system.

21  Q   So after you endorse it, you send it to them, and

22      then they type it into the system?

23  A   Usually, yes.

24  Q   Is there any other information that's being

25      included in the bottom of this form before you send

```
 1        it to the people who are recording it?
 2   A    No.
 3   Q    Was this change of beneficiary ever recorded at
 4        Northwestern?
 5   A    No.  For the purposes of clarity, let me just say
 6        that we have eliminated having to endorse these
 7        forms as of a certain date.
 8   Q    When was that?
 9   A    A recent date, 2010.
10   Q    Approximately when in 2010?
11   A    I think it was May.
12   Q    As of the date that you received this form in or
13        about September 2011, was it the procedure that you
14        had to endorse a form?
15   A    Yes.
16                 MR. PESKIN:  In 2011 was the question?
17                 MR. SAURACK:  Yeah.
18                 THE WITNESS:  Let me rephrase then.
19                 MR. SAURACK:  Yeah.
20                 THE WITNESS:  Yes, in 2011 we eliminated
21        having to sign the form.
22   BY MR. SAURACK:
23   Q    It was May 2011, correct?
24   A    May 2010, I believe.
25   Q    May 2010 you eliminated the requirement you had to
```


Case 1:12-cv-02514-PKC   Document 31-1   Filed 01/11/13   Page 28 of 62

1    ~~sign~~

2    A    Yes.

3    Q    This was received in 2011, correct, this form?

4    A    This document was received in 2011, yes.

5    Q    Now, I'd ask you to flip to the page Bates 124.

6    A    Yes.

7    Q    And take a look at subparagraph five for the

8         additional beneficiary provisions.

9    A    Yes.

10   Q    That paragraph is entitled Effective Date, correct?

11        I'm sorry, paragraph six.

12   A    Six, yes.

13   Q    And it says, A naming or changing of beneficiary

14        will be made on receipt at the home office with a

15        written request that is acceptable to the company.

16        Correct?

17   A    Correct.

18   Q    And then it says, The request will then take effect

19        as of the date it was signed, is that right?

20   A    ~~Yes.~~

21   Q    Now, after it's been endorsed by an appropriate

22        person and recorded, it becomes effective as of the

23        date when it was signed, is that right?

24   A    Correct.

25   Q    I ask this be marked as 7.



```
 1              (Exhibit 7 was marked for
 2        identification.)
 3   BY MR. SAURACK:
 4   Q    I'd ask you to take a look at what's been marked as
 5        Exhibit 7.  Can you tell me if you recognize that
 6        document?
 7   A    Yes.
 8   Q    What is that document?
 9   A    It's a facilitator guide for updating
10        beneficiaries.
11   Q    What is that document's purpose?
12   A    This is the instructor's manual for a class that's
13        held on teaching people how to update a
14        beneficiary.
15   Q    At Northwestern?
16   A    At Northwestern.
17   Q    And is there a particular person who teaches this
18        class?
19   A    Probably.
20   Q    Okay.  Have you ever attended this class?
21   A    No.
22   Q    What's your familiarity with this document then?
23   A    I produced it for this deposition.
24   Q    And have you referred to it on occasion in the
25        past?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And is this document created in the ordinary course |
| 3 | | of business at Northwestern? |
| 4 | A | Yes. |
| 5 | Q | Is it maintained in the ordinary course of business |
| 6 | | at Northwestern? |
| 7 | A | Yes. |
| 8 | Q | And who is -- who's typically trained per these |
| 9 | | materials? |
| 10 | A | Entry-level customer service representatives. |
| 11 | Q | Now, if you could take a look at Bates page 29, |
| 12 | | okay? |
| 13 | A | Yes. |
| 14 | Q | You see the section entitled Endorsement of the |
| 15 | | Form? |
| 16 | A | Yes. |
| 17 | Q | Now it says, You will have to sign and date the |
| 18 | | home office section at the bottom of the form. |
| 19 | | This indicates that the form is acceptable, the |
| 20 | | designation acceptable, and that we have recorded |
| 21 | | it in our records.  Is that what it says? |
| 22 | A | Yes. |
| 23 | Q | Is this Northwestern's procedure with respect to |
| 24 | | the change of beneficiary forms? |
| 25 | | MR. PESKIN:  Objection.  At what point in |

```
 1      time?
 2                  MR. SAURACK:   As of the time of this
 3      training in March 2008.
 4                  THE WITNESS:   Yes.
 5   BY MR. SAURACK:
 6   Q    Was that the procedure prior to March 2008?
 7   A    Yes.
 8   Q    Was it the procedure between 2005 and 2008?
 9   A    Yes.
10   Q    You said at some point later on, May 2010, the
11        procedure changed, is that right?
12   A    That's right.
13   Q    And then it says, To expedite the endorsement, you
14        will receive a stamp with your signature on it and
15        a date stamp also.   Do you see that?
16   A    Yes.
17   Q    Is that also consistent with Northwestern's
18        procedures during the period of 2005 to May 2010?
19   A    Yes.
20   Q    In fact, those were Northwestern's procedures
21        during the period of 2005 to May 2010?
22   A    Yes.
23   Q    And per these procedures, the change of beneficiary
24        is not effective before it's signed and dated in
25        the home office section by an appropriate person,
```

```
 1          is that right?
 2     A    And accepted, yes.
 3     Q    Now, I'd ask you to turn back to Exhibit 6,
 4          paragraph 10 on Bates page 124.  Do you see the
 5          section --
 6     A    General?
 7     Q    Yes.
 8     A    Yes.
 9     Q    If you go down four bullet points it says, If the
10          terms of this form require the company to determine
11          questions of fact, decisions made by the company
12          based on evidence satisfactory to it will be
13          conclusive and will fully protect the company.  Do
14          you see that?
15     A    Yes.
16     Q    What does that provision mean?
17     A    I'm not sure.
18     Q    It says the company can determine questions of
19          fact, is that right?
20     A    Yes.
21     Q    And that the company's decisions will be conclusive
22          with respect to those determinations?
23     A    Yes.
24     Q    Do you know what areas this provision is applicable
25          to?
```



1   A    One would assume beneficiary provisions.

2   Q    So do you know what it means with respect to

3        beneficiary provisions?

4   A    It has to be acceptable to our company to be

5        approved.

6   Q    Who makes the determination as to whether it's

7        acceptable?

8   A    In general, the Beneficiary & Title area.

9   Q    In this situation, was there a question of fact as

10       to who the beneficiary in the policy was as you

11       received Mr. Peskin's letter?

12  A    I don't know.

13  Q    Who's currently listed as the beneficiary for this

14       policy for Northwestern's records?

15  A    His brother.

16  Q    Can you take a look at the first page of this form

17       -- Strike that.  If you could refer to Bates No.

18       122 in this exhibit.

19  A    Yes.

20  Q    This is a change of client information form?

21  A    Yes.

22  Q    During the period of 2005 to May 2010, was there a

23       particular form that had to be submitted by an

24       insured to change beneficiaries on a policy?

25  A    Yes.

1   Q   If you flip to the next page, 123, is that the form

2       that had to be submitted?

3   A   Yes.

4   Q   If you flip back to 122, was this form an

5       acceptable form for changing beneficiaries?

6   A   This is a form to change client information, not

7       beneficiaries.

8   Q   So if this form was submitted as the change of

9       beneficiary, would it be acceptable to

10      Northwestern?

11   A   No.

12   Q   Now, if you go back to Exhibit 7 and turn to Bates

13      No. 27.  If you look at the second paragraph.

14   A   Yes.

15   Q   It says, The designation can't be written on a

16      Post-it note, personalized stationery or on the

17      back of an envelope.  It must be on one of our

18      forms.  Participant page 8 lists all the forms we

19      will accept to designate a beneficiary.

20   A   Yes.

21   Q   And was that a policy of Northwestern at the time

22      that these training procedures were instituted on

23      March 25, 2008?

24   A   Yes.

25   Q   Has it been the same policy since 2005?

1   A   Since way before that.

2   Q   And if you flip the page, the next page shows forms

3       which are satisfactory for purposes of changing

4       beneficiaries?

5   A   Yes.

6   Q   And if you look at the first form listed as

7       satisfactory, it's 901197?

8   A   Yes.

9   Q   And then if you flip back to Exhibit 6, the

10      document Bates range 123 to 126, is that the 901197

11      form?

12  A   Yes.

13  Q   So this form is a satisfactory form, the 901197

14      form, correct?

15  A   That is.

16  Q   If you look at Exhibit 6, page -- Bates page 122.

17  A   Yes.

18  Q   When did Northwestern first receive this page of

19      the form?

20  A   September 29, 2011.

21  Q   Are acknowledgment letters currently sent to

22      beneficiaries after a beneficiary has been changed

23      on a policy?

24  A   In the normal course of a business right now, if

25      there's been a change to a beneficiary and a

```
 1          paragraph has to be added to a letter, the
 2          acknowledgment will go to the owner to acknowledge
 3          the new beneficiary designation.
 4     Q    And has that been the case since 2005 that letters
 5          acknowledging a change of beneficiary were sent to
 6          the owners of a policy?
 7     A    Since 1998.
 8                    (Exhibit 8 was marked for
 9          identification.)
10   BY MR. SAURACK:
11     Q    I'll ask you to take a look at the documents marked
12          as Exhibit 8 and tell me if you recognize that
13          document.
14     A    Yes.
15     Q    And what is that document?
16     A    This is the student's guide for the same Exhibit 7.
17     Q    So is this a document that students take with them
18          as part of their instruction?
19     A    Yes.
20     Q    And is this -- was this document created in the
21          ordinary course of business at Northwestern?
22     A    Yes.
23     Q    Is it maintained in the ordinary course of business
24          at Northwestern?
25     A    Yes.
```



Deposition of Gail C. Junemann - November 20, 2012          34

| 1 | Q | If you turn to page Bates 708 of this document |
| 2 |   | towards the end. |
| 3 | A | Yes. |
| 4 | Q | Is this a form acknowledgment letter for a change |
| 5 |   | of beneficiary? |
| 6 | A | Yes. |
| 7 | Q | This is the form that typically is sent out when a |
| 8 |   | beneficiaries changed? |
| 9 | A | Yes. |
| 10 | Q | Was an acknowledgment letter ever issued with |
| 11 |   | respect to Mr. Litt's policy? |
| 12 | A | No. |
| 13 | Q | You're aware that as a result of Exhibit 6 being |
| 14 |   | sent to Northwestern, that Northwestern became |
| 15 |   | aware of a dispute between Steven Litt and Tracy |
| 16 |   | Copple-Litt over who was the beneficiary in the |
| 17 |   | policy? |
| 18 | A | Yes. |
| 19 | Q | And eventually Northwestern filed an interpleader |
| 20 |   | complaint in New Jersey? |
| 21 | A | Yes. |
| 22 | Q | Do you understand that complaint was resolved to |
| 23 |   | the extent it involved Northwestern, is that right? |
| 24 | A | Yes. |
| 25 | Q | I'd ask you to turn back to the policy, please. |



| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And I'd ask you to turn to page 14. |
| 3 | A | Our page 14? |
| 4 | Q | It's just page 14 of the policy on the bottom. |
| 5 | A | Yes. |
| 6 | Q | Okay.  If you look at the section entitled By the |
| 7 | | Owner. |
| 8 | A | Yes. |
| 9 | Q | Do you see that? |
| 10 | A | Um-hum. |
| 11 | Q | On this policy the decedent was the owner, is that |
| 12 | | right? |
| 13 | A | Yes, he was. |
| 14 | Q | And per this section, the owner can change or may |
| 15 | | name and change the beneficiaries of death proceeds |
| 16 | | while the insured is living, is that right? |
| 17 | A | Yes. |
| 18 | Q | So the decedent could name and change beneficiaries |
| 19 | | of death proceeds while he was living, is that |
| 20 | | right? |
| 21 | A | Yes. |
| 22 | Q | And then the second provision says that, The owner |
| 23 | | may name and change the beneficiary of death |
| 24 | | proceeds during the first 60 days after the date of |
| 25 | | the death of the insured if the insured just before |

```
 1          his death was not the owner.   No one may change

 2          this naming of a direct beneficiary during this 60

 3          days.   Is that what it says?

 4    A     Yes.

 5    Q     In this situation the owner was the insured, is

 6          that right?

 7    A     That's right.

 8    Q     Describe for me the circumstances in which an

 9          insured would not be the owner of a policy.

10    A     Since 1857 we've had many types of insurance

11          policies created since that date.   In the beginning

12          the insured was the owner, was the payor.   Then

13          when wives were able to be -- have insurance, they

14          became owners of their husband's policies, for

15          example.

16    Q     And also trusts could be an owner of a policy?

17    A     Trusts are owners.

18    Q     So in this circumstance did the decedent have the

19          ability to change the beneficiary after the date of

20          his death?

21    A     No.

22    Q     So a change of beneficiary form had to be received

23          prior to the date of his death?

24    A     Yes.

25                        MR. PESKIN:   Objection.
```

```
 1   BY MR. SAURACK:
 2   Q    Now, if you look at the section of the policy
 3        entitled Effective Date.
 4   A    Yes.
 5   Q    It says, A naming or change of beneficiary will be
 6        received at the home office for a written request
 7        that is acceptable to the company.
 8   A    Yes.
 9   Q    Is that an accurate statement that the naming or
10        change of beneficiary had to be received by the
11        home office to effectuate and change a beneficiary?
12   A    If the form is acceptable, yes.
13   Q    And is there any particular person or department at
14        the home office that had to receive the form?
15   A    It gets directed to the Beneficiary & Title area.
16   Q    And is the provision in 10.2 which says By the
17        Owner, is that provision consistent with
18        Northwestern's policies during the period of 2005
19        to present?
20   A    Yes.
21   Q    How about the effective date section?
22   A    Same.
23               (Exhibit 9 was marked for
24        identification.)
25
```

```
 1   BY MR. SAURACK:
 2   Q    Please take a look at the document marked as
 3        Exhibit 9.  Tell me if you recognize it.
 4   A    Yes, I recognize this.
 5   Q    And what is that document?
 6   A    It's instructions for the field on making changes
 7        to a policy.
 8   Q    What do you mean by the field?
 9   A    Anyone not other than the home office.
10   Q    And how is this document distributed to the field?
11   A    That's unknown to me.
12   Q    Is this -- do you know who created this document at
13        Northwestern?
14   A    Yes.
15   Q    Who?
16   A    I received this from the law department.
17   Q    Do you know who in particular at Northwestern
18        actually drafted this document?
19   A    I don't.
20   Q    Is it maintained in the ordinary course of business
21        at Northwestern?
22   A    I'm not sure how to answer that.
23   Q    Do you know if it was created in the ordinary
24        course of business at Northwestern?
25   A    I'm not sure it was created by Northwestern.
```



1    Q    Do you know who created it?

2    A    No.

3    Q    But these are the policies and procedures that were

4         followed in the field with respect to changing

5         beneficiaries on policies?

6    A    Yes.

7    Q    If you'd take a look at 850.

8    A    Yes.

9    Q    Take a look at Section 1.8.2.1.1, Designated by

10        Policy Owner.

11   A    Yes.

12   Q    Do you see that section?

13   A    I do.

14   Q    Is that section consistent with Northwestern's

15        policies during the period of 2005 to present

16        concerning changing beneficiaries on life insurance

17        policies?

18   A    Yes, it is.

19   Q    And again it says, Beneficiaries may be designated

20        by the policy owner who is the insured.  Is that

21        right?

22   A    Yes.

23   Q    And then, Who is other than the insured during the

24        60-day period following insured's death, right?

25             MR. PESKIN:  You skipped the second



1      ~     point.

2                  MR. SAURACK:   Yeah, but I'm asking a

3      question regarding these two points.

4                  MR. PESKIN:   What's the question?   I

5      missed it.

6                  MR. SAURACK:   I'll rephrase it.

7   BY MR. SAURACK:

8   Q     This section says, Beneficiaries may be designated

9         by the policy owner who is the insured.   Right?

10  A     Yes.

11  Q     Who is other than the insured during the insured's

12        lifetime, correct?

13  A     Yes.

14  Q     This includes, for example, a trust?

15  A     Yes.

16  Q     And then, Who is other than the insured during the

17        60-day period following the insured's death.

18        Correct?

19  A     Yes.

20  Q     And that would include a trust, for example,

21        correct?

22  A     Yes.

23  Q     And it doesn't say that a beneficiary may be

24        changed by the insured during the 60-day period

25        after the insured's death, correct?



1    A    Say that again.

2    Q    It doesn't say that beneficiaries may be designated

3         by the policy owner, by the insured during the

4         60-day period following the insured's death?

5    A    If the insured is not the owner, it can be.

6    Q    If the insured is the owner, then the change in

7         designation has to be made while the insured is

8         alive, correct?

9    A    Correct.

10   Q    And this policy is consistent with that?

11   A    Yes.

12   Q    Here the home office did not receive a request to

13        change the beneficiary on the policy until after

14        the decedent's death, correct?

15   A    Correct.

16   Q    And it first received the change of beneficiary

17        form when it was forwarded to Northwestern by

18        Mr. Peskin in September 2011?

19   A    Correct.

20   Q    And to this date, Northwestern recognizes Steven

21        Litt as the beneficiary on the policy?

22   A    Correct.

23   Q    But has not paid the proceeds of the policy because

24        this dispute arose?

25   A    Yes.



1    Q    Where is the home office located?

2    A    720 East Wisconsin Avenue.

3    Q    In what city?

4    A    Milwaukee, Wisconsin 53201.

5    Q    Has it been located there since 2005?

6    A    Yes.

7    Q    Is there any particular means by which change of

8         beneficiary forms had to be sent to Northwestern

9         during the period of 2005 to the present?

10   A    I don't understand the question.

11   Q    Is there a dedicated fax number?  Is there some

12        procedure by which these forms are supposed to be

13        sent to Northwestern?

14   A    They can be sent to Northwestern in many different

15        ways, by e-mail, by fax, by mail, through the

16        agent's office.

17   Q    And once they're sent by the insured or the agent,

18        what department are they routed to?

19   A    Beneficiary & Title.

20             MR. GREENE:  Can we go off the record for

21        a second?

22             MR. SAURACK:  Sure.

23             (Discussion off the record.)

24   BY MR. SAURACK:

25   Q    With respect to Exhibit 1 and the topic areas that



```
 1        you informed us that you had knowledge of earlier,
 2        you're the witness designated by Northwestern as a
 3        person with knowledge concerning these topic areas?
 4   A    Yes.
 5   Q    And you're testifying on behalf of Northwestern in
 6        that capacity?
 7   A    Yes.
 8   Q    Let's take a look at Exhibit 9.
 9   A    Yes.
10   Q    And I ask you to turn to Bates page 852.
11   A    Yes.
12   Q    This section is entitled Change of Beneficiary on
13        Inforce Policies, is that correct?
14   A    Yes.
15   Q    And does this section indicate where beneficiary
16        designations by owners should be sent to?
17   A    Yes.
18   Q    Where is that?
19   A    Policy Owner Services Department, Beneficiary &
20        Title division.
21   Q    And does this include change of beneficiaries by
22        the owner?
23   A    Yes.
24   Q    Do the individuals who accept the change of
25        beneficiary forms at Northwestern have any
```

```
 1        discretion to accept forms different than those
 2        prescribed in the instructions that you testified
 3        about earlier?
 4    A   Not usually.
 5    Q   So the home office typically only will accept
 6        designation of beneficiaries by owner for death
 7        proceeds only forms?
 8    A   Yes.
 9    Q   And that's during the period 2005 to present?
10    A   Yes.
11    Q   And the written request to change a beneficiary has
12        to be acceptable to the home office?
13    A   Yes.
14    Q   I'd ask you to turn back to the policy, Section
15        1.2.  That's Exhibit 4.  I'd ask you to turn to
16        page 5, Section 1.2.
17    A   Yes.
18    Q   Now, it states here if you go to the third line, A
19        change in the policy is valid only if it is
20        approved by an officer of the company.
21                        Is that an accurate statement during
22        the period of 2005 to present?
23    A   I'm not sure of the scope of that 1.2 entire
24        contract changes.  We have something called policy
25        changes in which someone can decrease their death
```

```
 1        benefit or pay off a loan.  Those would be
 2        considered changes as well.
 3   Q    Would a change of beneficiary be considered a
 4        change on the subsection?
 5   A    I believe it would be.
 6   Q    Do you see the sentence, No agent has the authority
 7        to change the policy or to waive any of its terms?
 8   A    Yes.
 9   Q    Does that also apply to changes of beneficiary?
10   A    Yes.
11   Q    What does that sentence mean, No agent has
12        authority to change the policy or to waive any of
13        its terms?
14   A    An agent can't receive a document of a beneficiary
15        form and process it in their office.  It has to be
16        sent to the home office.
17   Q    And the home office has to process it?
18   A    And approve it.
19   Q    And it doesn't become effective until the home
20        office approves it?
21   A    Correct.
22   Q    Does this mean that an agent cannot change the
23        beneficiary on a contract by him or herself?
24   A    Correct.
25   Q    And what's the purpose for this provision?
```

1  A    Probably to protect the company from agents not

2       understanding the proper method to analyze a

3       beneficiary form.

4              MR. GREENE: Gail, I'll just caution you

5       not to guess or speculate.  If you know, certainly

6       testify to your knowledge, but try and limit it to

7       what your personal knowledge is.

8  BY MR. SAURACK:

9  Q    Do agents receive change of beneficiary training by

10      Northwestern?

11 A    Not to my knowledge.

12 Q    Are you familiar with an individual by the name of

13      Gil Elmaleh?

14 A    I'm sorry?

15 Q    Are you familiar with an individual by the name of

16      Gil Elmaleh?

17 A    Personally, no.

18 Q    Are you familiar with him in the context of this

19      litigation?

20 A    Yes.

21 Q    And who is he with respect to the policy?

22 A    He was the servicing agent at one point in time.

23 Q    And your attorney gave us a document earlier that

24      I'd ask to have marked as Exhibit 10.

25              (Exhibit 10 was marked for



```
 1        identification.)
 2  BY MR. SAURACK:
 3  Q    I'd ask you to take a look at that document and
 4       tell me what it is.
 5  A    It's a summary of what financial representative was
 6       assigned to this contract.
 7  Q    Okay.  And so far as Mr. Elmaleh, does it indicate
 8       when he was the servicing agent on the policy?
 9  A    Yes.
10  Q    And what does it indicate?
11  A    From October 12, 2005 until he left Northwestern
12       Mutual on February 1, 2012.
13  Q    And during that period he was a servicing agent on
14       the contract?
15  A    Yes.
16  Q    Who created this document?
17  A    Jill Markham.
18  Q    And what's her position with Northwestern?
19  A    She's in the special handling research center.
20  Q    And does she report to you?
21  A    No.
22  Q    Did you instruct her to make this chart?
23  A    Yes.
24  Q    And the purpose of this chart is to refresh your
25       recollection concerning when Mr. Elmaleh was the
```

1        servicing agent on the policy?

2    A   Correct.

3    Q   And this chart was created by reference to

4        Northwestern's records?

5    A   Yes.

6    Q   And do you know which records were referred to?

7                    MR. PESKIN:   Which records what?

8                    MR. SAURACK:   Were referred to.

9                    THE WITNESS:   It started with the

10       application record and then a history to determine

11       when the financial representative number changed.

12   BY MR. SAURACK:

13   Q   Did Mr. Elmaleh during the period in which he was a

14       servicing agent have the power or authority to

15       change the beneficiary on the policy?

16   A   No.

17   Q   If he received a change of beneficiary form, he was

18       supposed to send that to the home office?

19   A   Correct.

20   Q   And the home office would review it and determine

21       whether approval was appropriate?

22   A   Yes.

23   Q   In general, do special soliciting agents have any

24       power to change beneficiaries on policies?

25   A   No agents can change a beneficiary.

| | | |
|---|---|---|
| 1 | Q | What is a writing agent in the context of a |
| 2 | | Northwestern life insurance policy? |
| 3 | A | That's the person that sold the insurance. |
| 4 | Q | And Mr. Elmaleh was not that person who sold the |
| 5 | | insurance in this case? |
| 6 | A | He was not that person. |
| 7 | Q | If you look at Exhibit 10, does that indicate who |
| 8 | | sold the insurance? |
| 9 | A | It was co-sold by Mr. Rhodes and Ms. Wexler. |
| 10 | Q | For his work as a servicing agent, did Mr. Elmaleh |
| 11 | | receive any compensation? |
| 12 | A | Unknown to me. |
| 13 | Q | Typically do service agents get compensated if |
| 14 | | they're also not the writing agent? |
| 15 | A | I don't know. |
| 16 | Q | What is a general agent in the context of |
| 17 | | Northwestern life insurance policies? |
| 18 | A | A general agent would be the person who hired the |
| 19 | | agents. |
| 20 | Q | So a general agent would hire a servicing agent, |
| 21 | | for example? |
| 22 | A | Yes. |
| 23 | Q | Does a general agent have authority to change |
| 24 | | beneficiaries on life insurance policies? |
| 25 | A | No. |



| | | |
|---|---|---|
| 1 | | Relationship? |
| 2 | A | Yes. |
| 3 | Q | And it says, General agent shall be an independent |
| 4 | | contractor.  Nothing herein should be construed to |
| 5 | | create the relation of employer and employee |
| 6 | | between the company and a general agent.  Do you |
| 7 | | see that? |
| 8 | A | Yes. |
| 9 | Q | Is that sentence consistent with Northwestern's |
| 10 | | policies and procedures through the period of 2005 |
| 11 | | to present? |
| 12 | A | I don't know. |
| 13 | | MR. GREENE:  And I just want to clarify |
| 14 | | for the record that we're not producing |
| 15 | | Ms. Junemann to talk about this topic area. |
| 16 | | MR. SAURACK:  Okay.  Let's go off the |
| 17 | | record. |
| 18 | | (Discussion off the record.) |
| 19 | BY MR. SAURACK: | |
| 20 | Q | I'd ask you to turn back to Exhibit 8.  Go to Bates |
| 21 | | page 625.  Do you see the section that's entitled |
| 22 | | Recording the Form? |
| 23 | A | Yes. |
| 24 | Q | And in the last line it says, By signing the form |
| 25 | | in the legal capacity, the policy owner authorizes |

Deposition of Gail C. Junemann - November 20, 2012          52

| | | |
|---|---|---|
| 1 | | the transaction and confirms they understand that |
| 2 | | the provisions on the form have become a part of |
| 3 | | the policy contract.  Do you see that? |
| 4 | A | Yes. |
| 5 | Q | And is that statement consistent with |
| 6 | | Northwestern's policies and procedures during the |
| 7 | | period of 2005 to the present? |
| 8 | A | Yes. |
| 9 | Q | And that statement indicates that changes of |
| 10 | | beneficiaries become part of a policy contract |
| 11 | | after they've been recorded and accepted by |
| 12 | | Northwestern, is that correct? |
| 13 | A | Yes. |
| 14 | Q | If you look at the policy again, Exhibit 4.  Do you |
| 15 | | see on page 3 it says, Direct beneficiary, Steven |
| 16 | | Litt, brother of the insured?  Do you see that? |
| 17 | A | Yes. |
| 18 | Q | Do you see David M. Litt, the insured? |
| 19 | A | Yes. |
| 20 | Q | Are those two designations part of the policy? |
| 21 | A | Yes. |
| 22 | Q | If those were changed, it would be an amendment to |
| 23 | | the policy? |
| 24 | A | Yes. |
| 25 | Q | Do you have knowledge of whether special servicing |

```
 1          agents are typically independent contractors
 2          working for Northwestern general agents?
 3    A     That's my understanding, yes.
 4    Q     Is your understanding whether their ability -- do
 5          you have an understanding whether their authority
 6          to act on behalf of Northwestern is limited per the
 7          terms of their contract or their general agents?
 8    A     Yes.
 9    Q     And what types of tasks do special servicing agents
10          typically perform in their relationship with an
11          insured?
12    A     Servicing agents can change addresses, dividend
13          options, payment facilities.
14    Q     Any other items?
15    A     I can't think of the whole list.
16               MR. GREENE:  And we're just speaking in
17          relationship to a life insurance policy, correct?
18               MR. SAURACK:  Yes.
19               (Exhibit 12 was marked for
20          identification.)
21    BY MR. SAURACK:
22    Q     I'd ask you to review a series of documents that
23          have been marked as Exhibit 12, and tell me if you
24          recognize those documents.
25    A     These are unfamiliar to me.
```

| | | |
|---|---|---|
| 1 | Q | Just for the record, what are these documents? |
| 2 | A | Full-time special or soliciting agent's contract. |
| 3 | Q | And I'd just ask you to take a look at paragraph |
| 4 | | five -- |
| 5 | A | Yes. |
| 6 | Q | -- of the page Bates 56, okay? |
| 7 | A | Yes. |
| 8 | Q | Are you there? |
| 9 | A | Um-hum. |
| 10 | Q | It says, Alteration of policies.  It says, Agent |
| 11 | | shall have no power personally or on behalf of the |
| 12 | | company or first party, to waive any forfeiture or |
| 13 | | to alter or discharge or waive any of the terms and |
| 14 | | conditions of any policy or contract.  Do you see |
| 15 | | that? |
| 16 | A | Yes. |
| 17 | Q | Is that statement consistent with Northwestern's |
| 18 | | policies during the period of 2005 to the present? |
| 19 | A | I believe so. |
| 20 | Q | And then if you go back to Exhibit 11, you see |
| 21 | | paragraph five on the page Bates stamped 866? |
| 22 | A | Yes. |
| 23 | Q | It says, Alteration of Policies:  GA shall have no |
| 24 | | power personally or on behalf of the company to |
| 25 | | waive any forfeiture or to alter or discharge or |

```
 1         waive any of the terms and conditions of any policy
 2         or contract.  Is that what it says?
 3    A    Yes.
 4    Q    Is that statement consistent with Northwestern's
 5         policies and procedures during the period of 2005
 6         to the present?
 7    A    I believe so.
 8              (Exhibit 13 was marked for
 9         identification.)
10    BY MR. SAURACK:
11    Q    I'd ask you to take a look at this document, and
12         tell me if you recognize it.
13              MR. GREENE:  Make sure you look at both
14         pages.
15              MR. SAURACK:  There's an attachment?
16         Actually, I'd like to separate the second page and
17         just have the first page marked.  I'll mark that
18         separately, the second page.
19    BY MR. SAURACK:
20    Q    I'd ask you to take a look at the document Bates
21         No. 848 marked as 13.
22    A    Yes.
23    Q    I'd ask you to read Section 1.5.1.1 to yourself.
24    A    Yes.
25    Q    It says, Financial representatives have no
```

```
 1        authority to modify or extend provisions of any
 2        policy and are not to assume that noncontractual
 3        changes will be made.  Is that right?
 4   A    Yes.
 5   Q    And what does that provision mean?
 6   A    They can't modify a policy's provisions.
 7   Q    And when it says financial representatives, is it
 8        also referring to soliciting agents and general
 9        agents?
10   A    I'm not sure.
11   Q    What is this document?
12   A    I'm not sure.
13   Q    Have you ever seen this document before?
14   A    It was produced by law, I believe.
15   Q    So you've never seen this document before?
16   A    I may have.
17   Q    1.5.1.1 is a paragraph that's consistent with
18        Northwestern's policies and procedures in place
19        during the period of 2005 to the present?
20   A    Yes.
21   Q    Do you have any knowledge as to whether Mr. Elmaleh
22        was a financial representative while he was
23        servicing the Litt insurance policy?
24   A    Yes.
25   Q    And was he?
```



```
 1   A    Yes.
 2   Q    Per this policy he had no authority to modify or
 3        extend provisions of the Litt policy?
 4   A    Yes.
 5   Q    He wasn't to assume that noncontractual changes
 6        would be made?
 7                  MR. PESKIN:  Objection.
 8                  MR. SAURACK:  You can answer.
 9                  THE WITNESS:  Yes.
10   BY MR. SAURACK:
11   Q    During the period of 2005 to present, were there
12        any policies in place at Northwestern on changing
13        servicing agents with respect to life insurance
14        policies?
15   A    As to how they are changed?
16   Q    Correct.
17   A    Not to my knowledge.
18   Q    Do you know by what methods a servicing agent can
19        be changed during this period?
20   A    The number of methods.
21   Q    Could you please tell us what those methods are?
22   A    A customer can call in, write in, send something to
23        their financial representative and ask to have a
24        new one.  Their office can call the home office and
25        ask us to change a servicing or writing agent.
```

1   Q   Does -- what's a block transfer form?

2   A   It's a form to remove a financial representative of

3       record and assign another one.

4   Q   Does that form have to be submitted to change a

5       soliciting agent?

6   A   A soliciting or writing agent, yes.

7   Q   How about to change or name a soliciting agent?

8   A   A servicing agent, not necessarily.

9   Q   So to change a writing agent, you'd have to have a

10      block transfer form?

11  A   Yes.

12  Q   And was, to your knowledge, Mr. Elmaleh ever made

13      the writing agent on this policy?

14  A   Yes.

15  Q   When was that?

16              MR. GREENE:  I'm sorry, was the question

17      a writing agent?

18              MR. SAURACK:  Yeah.

19              THE WITNESS:  Would you ask the question

20      again?

21              MR. SAURACK:  Sure.

22  BY MR. SAURACK:

23  Q   Was Mr. Elmaleh ever made a writing agent on this

24      policy?

25  A   No.

Deposition of Gail C. Junemann - November 20, 2012          59

```
1   Q    So at all times he was a servicing agent?
2   A    Yes.
3   Q    And a block transfer form did not have to be
4        submitted to make him a servicing agent?
5   A    Correct.
6   Q    And do you know by what method Mr. Elmaleh was made
7        servicing agent on this policy?
8   A    A home office employee changed it.
9   Q    And do you know how that request was made to that
10       representative to change the servicing agent to
11       Mr. Elmaleh?
12  A    I don't know.
13  Q    But a block transfer form did not have to be
14       submitted to make that change?
15  A    Correct.
16  Q    And changing a servicing agent can be made by
17       verbal instruction?
18  A    Yes.
19  Q    Does it have to be by any particular person?
20  A    No.
21  Q    Do you know whether Northwestern has any writing
22       that effectuated Mr. Elmaleh's appointment of
23       servicing agent on this policy?
24  A    No.
25            (Exhibit 14 was marked for
```