```
 1        identification.)
 2   BY MR. SAURACK:
 3   Q    I ask you to take a look at that document, and tell
 4        me if you recognize it.
 5   A    Yes, I do.
 6   Q    What is that document?
 7   A    It's a letter going out for someone that requested
 8        a beneficiary change.
 9   Q    And who is that letter being sent to?
10   A    Mr. Litt.
11   Q    And what's -- and who is Colleen Mills?
12   A    She's an employee of Northwestern Mutual in the
13        call centers.
14   Q    And what's attached to the letter?
15   A    A beneficiary change form, additional beneficiary
16        provisions, beneficiary information form,
17        instructions, an owner designation, additional
18        provisions, a new owner or payor address change
19        request, designation of beneficiaries by owner
20        form, additional beneficiary provisions,
21        beneficiary information and instructions.
22   Q    Do you have knowledge of whether this letter was
23        sent to Mr. Litt?
24   A    I didn't catch the first part.
25   Q    Do you have knowledge as to whether this was sent
```

| | | |
|---|---|---|
| 1 | | to Mr. Litt? |
| 2 | A | Yes. |
| 3 | Q | It was sent on October 4, 2005? |
| 4 | A | Yes. |
| 5 | Q | And you said that Ms. Mills is in the call center. |
| 6 | | What's the call center? |
| 7 | A | Policy owner services. |
| 8 | Q | What were her responsibilities in the call center, |
| 9 | | if you know? |
| 10 | A | Answer phone calls and supply forms. |
| 11 | Q | And do you have knowledge as to whether this was in |
| 12 | | response to a call by Mr. Litt or someone else? |
| 13 | A | I don't know offhand. |
| 14 | Q | And is this -- the document's kept in the regular |
| 15 | | course of business at Northwestern? |
| 16 | A | Yes. |
| 17 | Q | It was created in the normal course of business at |
| 18 | | Northwestern? |
| 19 | A | Yes. |
| 20 | Q | And you see where it says in the second paragraph |
| 21 | | -- Strike that.  First of all, what's the purpose |
| 22 | | of this letter? |
| 23 | A | It's in response to a request to change a |
| 24 | | beneficiary and include the letter to the owner and |
| 25 | | a form. |

1  Q     And you see the sentence -- the second paragraph

2        says, Your designation will remain unchanged until

3        we hear from you?

4  A     Yes.

5  Q     And why was that sentence in this letter?

6  A     It's an automated letter with that provision in it.

7  ~~Q~~    ~~Why is that provision put in your automated~~

8        ~~letters?~~

9  ~~A~~    ~~I'm not sure.~~

10 Q     But it means until Northwestern receives the change

11       of beneficiary designation because his current

12       designation would remain unchanged, is that what it

13       means?

14 A     Yes.

15 Q     Do you have any knowledge as to whether Mr. Litt

16       ever responded to this letter?

17 A     We didn't receive a form back.

18 Q     And you're unaware of any other writing in response

19       to Ms. Mill's letter?

20 A     No.

21 Q     Does Northwestern send any policy statements to its

22       insureds?

23 A     Yes, annually.

24 Q     Do you know if they sent them to Mr. Litt?

25 A     Yes, they did.



```
 1                    (Exhibit 15 was marked for
 2         identification.)
 3   BY MR. SAURACK:
 4   Q     I'd ask -- after you've looked at that series of
 5         documents, I ask you to tell me whether you
 6         recognize those documents.
 7   A     Yes.  These are annual policy statements sent to
 8         the owner.
 9   Q     And when you say "the owner," you mean David Litt?
10   A     Yes.
11   Q     And they're for 2010, 2009, 2008, 2007, 2006, 2005,
12         2004, correct?
13   A     Correct.
14   Q     And these life insurance annual policy statements
15         were sent to Mr. Litt?
16   A     Yes.
17   Q     And they were sent on or about the date listed in
18         the statement?
19   A     About 20 days before that date.
20   Q     So for example, on the October 20, 2010, statement,
21         approximately when would that have been sent?
22   A     October 1, 2010.
23   Q     And who sends out these statements?
24   A     They're automated.
25   Q     And what types of information do they convey to the
```

1       insured?

2   A   They call this a summary of what's happened in the

3       year, and it includes the owner, the beneficiary,

4       the loans, cash value, policy number.

5   Q   Are these documents generated in the ordinary

6       course of business at Northwestern?

7   A   Yes.

8   Q   And who generates them?

9   A   They're automated.

10  Q   So there's -- is there an operations unit that

11      sends these out?

12  A   I really don't know.

13  Q   And is a copy then maintained in the ordinary

14      course of business at Northwestern?

15  A   Yes.

16  Q   Now, what do these statements indicate so far as

17      the direct beneficiary on the policy?

18  A   Direct beneficiaries are listed as Steven Litt.

19  Q   And he's Mr. Litt's brother, correct?

20  A   Yes.

21  Q   If the beneficiary had been changed, would that

22      have been indicated on these annual statements?

23  A   The name would have changed under direct

24      beneficiary.

25  Q   There's also an indication on all these statements

1         that says for changes to your personal information,

2         address, owner beneficiary or service questions,

3         call 1-800-388-8123, correct?

4    A    Very popular number.

5    Q    And tell me what that number is to.

6    A    To the call centers at policy owner services

7         department.

8    Q    Is that the unit that Ms. Mills was in?

9    A    Yes.

10   Q    And if someone called this number, was asking about

11        a change of beneficiary, would they be directed to

12        any particular person?

13   A    If they had a complicated designation for a

14        beneficiary, they would have been transferred over

15        to Beneficiary & Title.  Otherwise the call center

16        representatives can handle the beneficiary change

17        without issues.

18   Q    How are they instructed to handle changes of

19        beneficiary in the normal circumstance?

20   A    They listen to the caller, and if it's the owner,

21        they ask him who they would like to name as the

22        beneficiary.  They complete the form.  They send it

23        out to the owner along with the letter.

24   Q    And is that a letter similar to the one that's been

25        marked as 14?

1   A   Yes.

2   Q   So 14 is an example of what would be sent in

3       response to a call to this number?

4   A   Yes.

5   Q   And could the owner change the beneficiary over the

6       phone with the call center?

7   A   No.

8   Q   So the forms in Exhibit 14 would have to be sent

9       back to the home office before a beneficiary could

10      be changed on the policy?

11  A   It has to be received in the home office.

12  Q   And on the first one it says that Gil is your

13      financial representative.  Do you see that?

14  A   Yes.

15  Q   This is the 2010 one.

16  A   Yes.

17  Q   And it also says that in 2009, correct?

18  A   Yes.

19  Q   And then it does not say that in 2008 and before

20      that, is that right?

21  A   It's at the bottom.

22  Q   Okay.  And that goes back until 2006, right?

23  A   Correct.

24              (Exhibit 16 was marked for

25      identification.)



```
 1          him to finish his question to make it easier on the
 2          court reporter.
 3   BY MR. PESKIN:
 4     Q    Have you testified before -- at examinations before
 5          trial in depositions such as this?
 6     A    Yes.
 7     Q    How often?  How many times would you say?
 8     A    15.
 9     Q    Are you considered an officer of the company?
10     A    No.
11     Q    Do you hold any insurance licenses?
12     A    No.
13     Q    You're not licensed for life and health?
14     A    No.
15     Q    Have you taken the courses to become licensed for
16          life and health?
17     A    No.
18     Q    And you're not a licensed agent obviously?
19     A    No.
20     Q    Are your duties primarily involved on the life side
21          of the business as opposed to the disability side?
22     A    Yes.
23     Q    And the same answer would apply if I asked you as
24          to life versus annuities?
25     A    Yes.
```



1   here testifying regarding?  Generally speaking,

2   Ms. Junemann is here to testify about Northwestern

3   Mutual's policies and procedures as it relates to

4   the changing of beneficiaries and the changing of

5   servicing agents.

6           She went through the subjects of her

7   examination by letter in which she is competent to

8   testify.  I indicated that she is being produced to

9   testify about H and K only as it relates to the

10  authority of a general agent or a soliciting agent

11  to accept a change of beneficiary form on behalf of

12  Northwestern Mutual, not about the general nature

13  of her relationship itself.

14          MR. PESKIN:  Okay.

15  BY MR. PESKIN:

16  Q   Ms. Junemann, you understand that the life

17      insurance policy is actually a contract between

18      the --

19  A   Yes.

20  Q   -- between the policy owner and Northwestern on the

21      other hand?

22  A   Yes.

23  Q   And you also understand, do you not, that the

24      policy owner is not bound by internal training

25      manuals that Northwestern puts out to its field?



1    A    I don't understand the question.

2    Q    The policy owner is not bound by internal field

3         documents that the -- that the client isn't aware

4         of or has never seen to the extent they may vary or

5         modify the terms of the contract?

6    A    I'm not sure what the policy owner understands.

7    Q    The policy owner is not party in any way to

8         internal memoranda of Northwestern Mutual that it

9         puts out to its field reps, correct?

10   A    Correct.

11   Q    Are you familiar in your 18-year experience at

12        Northwestern with the most common reasons people

13        change beneficiaries?

14   A    Yes.

15   Q    Can you -- what's the basis of your knowledge as

16        to -- as to the most common reasons people change

17        beneficiaries to their policies?

18   A    They have change of life circumstances where they

19        get married or divorced or there's a death in the

20        family.

21   Q    Have you seen any studies or charts as to the

22        varying circumstances under which policy owners

23        might change their beneficiaries?

24   A    No, I have not.

25   Q    Can you describe for us the Northwestern Mutual

1       network, the general agency system?

2   A   It's exclusive to Northwestern Mutual, so that

3       agents are hired by a contractor, and they're not

4       employees of Northwestern Mutual.

5   Q   And it's a general agency system?

6   A   I'm not sure.

7   Q   Well, you know that there are general agents?

8   A   Yes.

9   Q   And that they run general agencies?

10  A   Yes.

11  Q   And you're familiar with district agencies?

12  A   Yes.

13  Q   And would that system be referred to as the

14      Northwestern Mutual network?

15  A   Yes.

16  Q   And would general agencies or district agencies

17      under the general agencies be considered network

18      offices of Northwestern?

19  A   Yes.

20  Q   So let's refer to the policy itself which is marked

21      as Exhibit 4.  I'd like to bring your attention to

22      Section 10.  I think you testified that you were

23      familiar with the policy terms and specifically

24      Section 10 with regard to beneficiaries, correct?

25  A   Yes.



1    A    Yes.

2    Q    Is there anything else that's required in order for

3         a change of beneficiary form to be acceptable by

4         the company?

5    A    Yes.   It has to be received in the home office.

6    Q    And where does it say that?

7              MR. GREENE:   Where in this document or

8         where at all?

9              MR. PESKIN:   Well, let's start with this

10        document.   Because this is the document as we've

11        established that indicates what is required for it

12        to be acceptable by the home office.

13             MR. SAURACK:   Objection to

14        characterization.

15             THE WITNESS:   If you could look at

16        document 30 in Exhibit 7 in the first paragraph,

17        determine if the designation on the front of the

18        form is acceptable.

19   BY MR. PESKIN:

20   Q    That's the basis for your testimony that in order

21        for the form to be acceptable, it has to be

22        received at the home office?

23             MR. SAURACK:   Objection to form.   You're

24        only asking with respect to this one document,

25        correct?

1        many pages it is, what the content is regarding

2        that issue.

3   BY MR. PESKIN:

4   Q    All right.  Let me ask this then.  Would it be fair

5        to say that your comment that acceptability of a

6        policy change form included the necessity of it

7        being received at the home office is based on your

8        reading of the -- or let me ask you what it's based

9        on.

10  A    General knowledge.  It has to be acceptable in the

11       company to be received -- after it's received, it

12       has to be accepted by the company to be recorded,

13  Q    Right.  So the receipt at the home office is more a

14       timing issue or an effective issue as opposed to

15       the acceptability of the form on its face?

16                MR. SAURACK:  Objection to form.

17                MR. PESKIN:  Is that correct?

18                THE WITNESS:  I don't know.

19  BY MR. PESKIN:

20  Q    Okay.  Let's look at the participant manual.  It's

21       Exhibit 8.  And again, on Bates stamp 623, it

22       indicates that the -- under course overview, that

23       the goal of the training is to provide you with the

24       knowledge and skills you will need to accurately

25       process and analyze incoming beneficiary forms.



1    A     Yes.

2    Q     And on 632, it again lists the same required data

3          that's necessary that we just went through on

4          the -- from the facilitator guide, those five

5          points, policy number, insured's name, direct

6          beneficiary, contingent beneficiary and the owner's

7          signature, is that correct?

8    A     And the date.

9    Q     And the date.  Agreed.  Now, you testified that the

10         first time Northwestern received the forms that

11         were attached to the letter that I sent to Debbie

12         Luther was after September 29, 2011.  How do you

13         know that?

14   A     I reviewed the fax date at the top of the page, and

15         I reviewed our case tracker electronic note system.

16         There wasn't an event before that date.

17   Q     So if the forms were sent in and hypothetically

18         didn't contain all of the required information that

19         would be acceptable to the company and they were

20         rejected and sent back, would that be reflected in

21         the records that you searched?

22   A     Yeah --

23               MR. SAURACK:  Objection to form.

24               THE WITNESS:  -- the electronic notes

25         would reflect that.



1   BY MR. PESKIN:

2   Q   Now, you had testified that the date of the

3       acceptance of a change of beneficiary form, the

4       date it becomes effective in the system is some day

5       later than the date it was signed?

6   A   It becomes effective the date it's signed, but it's

7       not recorded until after the date it's signed.

8   Q   So it becomes effective on the date that it's

9       signed?

10  A   Correct.

11  Q   Do you know why Northwestern made the change in

12      2010 and no longer required endorsements to policy

13      change forms?

14  A   I do.

15  Q   And what's the reason for that?

16  A   We're going paperless.

17  Q   So after 2011, how did the process change with

18      regard to -- with regard to no longer requiring

19      endorsements?

20  A   The process changed because we have a system in

21      place now electronically that will create the form

22      and the letter and send it out with a bar code, and

23      when it is returned, the bar code matches it up

24      now.  The person records it.  It's sent to file all

25      electronically, so there's no hands involved any

1         longer.

2    Q    So examining the change of beneficiary form, which

3         is part of the document marked Exhibit 6 containing

4         Bates numbered 1, 2, 3, did you have the

5         opportunity to examine that form to determine

6         whether in its current form it would meet the

7         criteria to be acceptable to the company?

8                   MR. SAURACK:  Objection to form.

9                   THE WITNESS:  The form itself filled out

10        like it is right here?

11   BY MR. PESKIN:

12   Q    Yes.

13   A    That would be acceptable to the company.

14   Q    And so when you received the form in September of

15        2011, if it was acceptable to the company, why

16        wasn't it recorded?

17   A    Because the insured was already dead.

18   Q    And if he had died in the period between the time

19        he sent the form in and when it was recorded, would

20        it have been recorded?

21   A    It would have.

22   Q    And can you point to the -- the basis for your

23        testimony that because he was deceased at the time

24        the form was received, it wasn't recorded?

25                  MR. SAURACK:  Could you repeat that,



1        please?
2                        (Record read.)
3                THE WITNESS:  Our documents say that to
4        have a change of beneficiary, the client must be
5        alive.
6  BY MR. PESKIN:
7    Q   Okay.  Where are you referring to that it says
8        that?
9    A   The contract.
10   Q   Can we go to the specific provision of it?
11   A   I think we covered that in testimony already.
12   Q   But I'd like to ask you questions on it.
13   A   Okay.  Do you want to direct me to where you want
14       me to look?
15   Q   In the contract, is it -- is what you're referring
16       to Section 10?
17   A   I'm referring to the replica Exhibit 4, Section 10,
18       yes, While the Insured is Living on 10.2.
19   Q   Well, is it your testimony that the owner didn't
20       name the beneficiary while he was living?
21   A   When he died, we didn't know he had named a
22       different beneficiary.
23   Q   And would your testimony be any different if you
24       knew that the change of beneficiary form was in the
25       hands of the agent at the time he died?

1          MR. SAURACK:  Object to the form.

2          THE WITNESS:  I couldn't say that.

3     That's handled by the life benefits area where they

4     pay death claims.

5          MR. PESKIN:  Could you read back the

6     question and answer?

7          (Record read.)

8  BY MR. PESKIN:

9  Q    Do you see on Exhibit 6, page 124 -- Bates stamped

10      124 at the bottom of the page where it says

11      amendment to policy provisions?

12 A    Yes.

13 Q    And under A, this applies to older policies with

14      policy numbers before 48 million -- 4,000,800?

15 A    Yes.

16 Q    And the amendment being made under paragraph two of

17      that provision says that the policy is amended to

18      provide that a payment plan for death proceeds will

19      take effect on the date of death of the insured if

20      it is elected and the election is received at the

21      home office while the insured is living.  Do you

22      see that?

23 A    Yes.

24 Q    So in that specific instance with regard to payment

25      plans for death benefits, the company is amending



```
 1        older policies to require receipt at the home
 2        office while the insured is living.  Yes?
 3   A    I'm not sure.
 4   Q    What do you understand that amendment to mean?
 5   A    What that says to me is a payment plan is something
 6        directed by the owner.  You can name a payment plan
 7        as part of your beneficiary's designation.  For
 8        example, a beneficiary could be your spouse, and
 9        you could designate a payment plan so that the
10        spouse gets $500 a week until the expiration of all
11        the value.
12                 This paragraph is talking about that
13        kind of a payment plan that you have to direct that
14        before your death if you want a payment plan.
15   Q    Well, I don't mean to be argumentative, but it
16        doesn't say that you have to sign it before your
17        death.  It says that it has to be received at the
18        home office before his death.
19   A    And I couldn't tell you whether a payment plan has
20        to be signed by anyone.  I don't know.
21   Q    Okay.  There is no provision in the contract, is
22        there, that says that a change of beneficiary form
23        signed by the owner must be received by the home
24        office while the insured is still living?
25   A    I believe there is.
```

1   Q   And it was that provision that we were just talking

2       about?

3   A   No, something separate.

4   Q   Where would it be?

5   A   It would take me some research to --

6   Q   In the policy?

7   A   Um-hum, or on the form.  We have it somewhere.

8   Q   I would -- I think that's important enough to take

9       some time to look at.

10                  MR. GREENE:  Do you want her to take a

11      break and review the materials to see if she can

12      find a place where she's referencing?

13                  MR. PESKIN:  Yes, I think it would be

14      very helpful.

15                  THE WITNESS:  I might not have all the

16      materials here.

17                  MR. GREENE:  I guess the question is if

18      you -- if there's a place in the policy or the

19      other materials that you've been presented with

20      today, which is what you're thinking of.

21                  THE WITNESS:  Well, in conjunction with

22      this designation in Section 10, the naming or

23      change of a beneficiary will be made on receipt at

24      the home office of a written request that is

25      acceptable to the company.



1    BY MR. PESKIN:

2    Q    Right.  So we have a written request that's

3         acceptable to the company by your testimony?

4    A    Yes.

5    Q    So that says that that change of beneficiary form

6         will be the naming -- sorry -- Strike that.  That

7         paragraph says that the change of beneficiary form

8         will be made on receipt at the home office of a

9         written request acceptable to the company, and we

10        have a change of beneficiary form that's acceptable

11        to the company?

12   A    Except in 10.2 it says the owner must be living --

13        while the insured is living.

14   Q    Are you familiar with an N freeze?

15   A    Yes.

16   Q    And can you describe what an N freeze is?

17   A    An N freeze freezes the policy in place while

18        there's a change going on to the record.

19   Q    And do you know whether an N freeze would be in

20        place during the period of time that there's a lock

21        transfer occurring to change the agent and the

22        agency?

23   A    Not usually an N freeze.  It's automatic -- you

24        input the change to the record, and it happens.

25        There wouldn't be any need to freeze the policy.



```
 1   Q    N freezes occur when there are changes to the
 2        policy?
 3   A    Yes.
 4   Q    Such as?
 5   A    A policy change to reduce the face amount of the
 6        policy and pay off a loan, policy change to remove
 7        a benefit or add a benefit.
 8   Q    So you don't have any knowledge that Northwestern
 9        changed the agent of Mr. Litt's policy based on his
10        request on 9/29/05 for a block transfer to change
11        his agent to Gil Elmaleh?
12                    MR. SAURACK:  Objection to form.
13                    THE WITNESS:  We know the agent did
14        change, and the home office did make that change.
15   BY MR. PESKIN:
16   Q    But you don't know what precipitated that change?
17   A    I believe it was a phone call from the agent's
18        office to the home office.
19   Q    And where did you get that information from?
20   A    From one of our case tracker events.  I believe it
21        was Colleen Mills' case.
22   Q    And the notation above Mr. Litt's signature on
23        Bates stamp 122, the network office block transfer
24        document where it's typed, I would like to change
25        the beneficiary on my policy to Tracy Copple, would
```



1       October 13, 2011?

2   A   No.

3   Q   It was a reprint of the 2005 letter?

4   A   Correct, on this date that she reprinted it.

5                   MR. PESKIN:  I don't think I have

6       anything else.

7   BY MR. PESKIN:

8   Q   One thing.  You did testify in a question that was

9       asked of you earlier that does Northwestern have

10      any discretion to accept change of beneficiary

11      forms other than on the form that we've been

12      looking at the designation of beneficiary by owner,

13      and you answered not usually.

14                  What would the circumstances be

15      under which Northwestern would accept a change of

16      beneficiary form on a document other than that?

17  A   Well, we would get a court order to tell us to

18      accept the document.

19  Q   Is that the only circumstance?

20  A   That I know of.

21  Q   And you also testified that the means or the manner

22      in which forms could be -- could be sent to the

23      home office could be by e-mail, fax or mail, and

24      then you said or through the agent's office?

25  A   Yes.

1  Q    Could you elaborate on that -- what you meant by

2       that?

3  A    We have a distribution system back and forth to the

4       agent's office through what we call pouch mail

5       where if you have mail for all of District 16 and

6       you put everything into one pouch mail, it will be

7       delivered together with everything for that GA16.

8  Q    And what's the difference between a writing agent

9       and a servicing agent?

10  A    The writing agent is the agent that sold the

11       policy.  And if the writing agent leaves the

12       company, dies, a servicing agent is assigned to

13       that policy, so someone is their agent.

14  Q    So a writing agent can never be changed?

15  A    It can be changed because the writing agent

16       requests it or there's a death or a termination.

17  Q    And your testimony was that an insured's signature

18       is not required to change the servicing agent on

19       the policy?

20           MR. SAURACK:  Could you repeat that?

21       (Record read.)

22           THE WITNESS:  That's correct.

23  BY MR. PESKIN:

24  Q    And would you know why the policy owners -- why

25       there's a policy owner signature line on a block

1       transfer request?

2   A   Your last question was about an insured.   The

3       policy owner is not necessarily the insured.

4   Q   But it would be the policy owner who has the right

5       to change the servicing agent, correct?

6   A   Correct.

7   Q   So the policy owner's signature is -- is the policy

8       owner's signature required in order to change a

9       servicing agent?

10  A   On certain situations.

11  Q   And what are they?

12  A   If you're reassigning an agent within a network,

13      you don't need a signature.   If it's outside --

14      assigning to a different area of the country, you

15      may need a signature.

16  Q   Those assignments, are they done at the request of

17      the policy owner?

18  A   They can be.

19  Q   And if those -- what I'm trying to get at is if a

20      request is made by a policy owner as opposed to an

21      internal assignment of a new agent by the company,

22      is the policy owner's signature required?

23  A   Or they can call the home office and request so by

24      phone.

25  Q   Verbally?



1    A      Verbally.

2                    MR. PESKIN:   Okay.

3                    MR. SAURACK:   I have a couple questions.

4                         EXAMINATION

5    BY MR. SAURACK:

6    Q      I'd like to turn your attention to Exhibit 8.

7    A      To where?

8    Q      Exhibit 8.

9    A      Yes.

10   Q      This is the handout for the training session you

11          testified about earlier?

12   A      Um-hum.

13   Q      Can you take a look at Bates page 628, page 11 to

14          this handout?   Are you there?

15   A      628, yes.

16   Q      And now provision six, you would agree, says, A

17          naming or change of beneficiary will be made on

18          receipt at the home office of a written request

19          that is acceptable to the company?

20   A      Yes.

21   Q      So that that statement is in the handout for the

22          training that you testified earlier, correct?

23   A      Correct.

24   Q      Is it ever acceptable for Northwestern's purposes

25          to have a change of beneficiary form received by an

1       agent as opposed to the home office?

2   A   It does happen.

3   Q   Would Northwestern recognize the change of

4       beneficiary if the home office didn't get the form?

5   A   They would send it to the home office, and we would

6       review whether it was acceptable on its form.

7   Q   It would have to be sent to the home office first

8       though?

9   A   Yes.

10  Q   And in this circumstance, was there a signature

11      required in order to change the agent to Gil

12      Elmaleh?

13  A   No.

14  Q   Why not?

15  A   It was changed within its own network.

16                  MR. SAURACK:   I have no further

17      questions.

18                  MR. PESKIN:   I have one more.

19                      EXAMINATION

20  BY MR. PESKIN:

21  Q   If you could look at the facilitator guide again.

22      It's Exhibit 7.  And if you would turn to page 10,

23      which is Bates numbered NM32.  I'm going to read to

24      you what's under provision six, Effective Date.

25                  All acceptable beneficiary changes



```
 1   BY MR. SAURACK:
 2   Q      In order for the completed form to be acceptable,
 3          it has to be received by the home office at the
 4          time that the insured is alive, correct?
 5   A      Correct.
 6                    MR. SAURACK:   I have no further
 7          questions.
 8                    MR. PESKIN:   Okay.  We'll leave it at
 9          that.
10                    MR. GREENE:   We're all done?
11                    MR. PESKIN:   Yep.
12                    MR. GREENE:   I certainly have nothing,
13          but the witness will read and sign.
14                    (Deposition concluded at 12:20 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```



```
 1        STATE OF WISCONSIN )
                            ) SS:
 2        MILWAUKEE COUNTY   )

 3

 4              I, Dawn M. Lahti, RPR, Certified

 5        Realtime Reporter, and Notary Public in and for the

 6        State of Wisconsin, do hereby certify that the

 7        preceding deposition was recorded by me and reduced

 8        to writing under my personal direction.

 9              I further certify that said

10        deposition was taken at 731 North Jackson Street,

11        Milwaukee, Wisconsin, on the 20th day of November,

12        2012, commencing at 9:20 a.m.

13              I further certify that I am not a

14        relative or employee or attorney or counsel of any

15        of the parties, or a relative or employee of such

16        attorney or counsel, or financially interested,

17        directly or indirectly, in this action.

18              In witness whereof, I have hereunto

19        set my hand and affixed my seal of office on this

20        26th day of November, 2012.

21

22                                  _____

23                                  DAWN M. LAHTI, RPR
                                    Certified Realtime Reporter
                                    Notary Public
24

25  My commission expires April 17, 2016.
```



CORRECTIONS TO DEPOSITION

The witness, _Gail C. Junemann_, states he/she wishes to make the following
changes in testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 12 | 11 | Piotrowski | Spelling of name |
| 15 | 1 | Mark Sisti | |
| 15 | 3-4 | He is on a Transactions Conversions team | He made the replica. |
| 20 | 15 | does not include my team | My team is the Special Handling Research Center |
| 22 | 20 | 2010 | not 2011 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

RECEIVED
DEC - 5 2012
By GRL

_Gail C. Junemann_     12-04-12
Signature                         Date



Junemann.txt

9       I further certify that said

10    deposition was taken at 731 North Jackson Street,

11    Milwaukee, Wisconsin, on the 20th day of November,

12    2012, commencing at 9:20 a.m.

13            I further certify that I am not a

14    relative or employee or attorney or counsel of any

15    of the parties, or a relative or employee of such

16    attorney or counsel, or financially interested,

17    directly or indirectly, in this action.

18            In witness whereof, I have hereunto

19    set my hand and affixed my seal of office on this

20    26th day of November, 2012.

21

22                          _____

23                          DAWN M. LAHTI, RPR
                            Certified Realtime Reporter
                            Notary Public

24    My commission expires April 17, 2016.

25


            Deposition of GAIL C. JUNEMANN, 11/20/12        100

1     STATE OF _Wisconsin_ )
                           ) SS.
2     _Milwaukee_ COUNTY   )

3

4           I, GAIL C. JUNEMANN, do hereby certify that

5     I have read the foregoing transcript of proceedings,

6     taken on the 20th day of November, 2012 at 731 North

7     Jackson Street, Milwaukee, Wisconsin, and the same is

8     true and correct except for the list of corrections, if

9     any, noted on the annexed errata sheet.

10

11          Dated at _Northwestern Mutual_

                        Page 90

12    this  4th  day of  _December_ , 2012.

13

14                              _Gail C. Junemann_

15                              GAIL C. JUNEMANN

16

17

18

19

20

21

22

23

24

25

RECEIVED
DEC - 5 2012
By GRL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

THE NORTHWESTERN MUTUAL LIFE INSURANCE          :
COMPANY,                                                                                 12 Civ. 2514 (PKC)(HBP)

                                           Plaintiff,          :

               - against -                                    :      **SUBPOENA DUCES TECUM
                                                              :      AND AD TESTIFICANDUM**

STEVEN LITT and TRACY COPPLE-LITT,          :

                                           Defendants.    :
------------------------------------------------------------------------x

TO:      The Northwestern Mutual Life Insurance Company
         720 East Wisconsin Avenue
         Milwaukee, Wisconsin 53202

         YOU ARE HEREBY COMMANDED, pursuant to of Fed. R. Civ. P. 45 and Rule

45 (d) and (e), to produce the documents listed on the attached Schedule A, at Malley &

Zimmerman, SC 731 North Jackson Street, Suite 900, Milwaukee, WI 53202 on October 17,

2012 at 9:30 am, or at any recessed or adjourned date.

         YOU ARE HEREBY COMMANDED, pursuant to Fed. R. Civ. P. 45, Rule

30(b)(6) and Rule 45 (d) and (e), to appear to testify at a deposition at at Malley & Zimmerman,

SC 731 North Jackson Street, Suite 900, Milwaukee, WI 53202 on October 31, 2012 at 9:30 am,

or at any recessed or adjourned date, through a person(s) you designate as most knowledgeable

with respect to the topics listed in Schedule B.

         The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person

subject to subpoena, and Rule 45(d) and (e), relating your duty to respond to this subpoena and

the potential consequences of not doing so, are attached.



1510967_2

Dated: New York, New York
      October 2, 2012

SATTERLEE STEPHENS BURKE & BURKE LLP

By:  _____
            Walter A. Saurack
Attorney for Defendant – Steven Litt
230 Park Avenue – Suite 1130
New York, New York  10169

2

## SCHEDULE A

## INSTRUCTIONS

A.    These document requests (the "Requests") are intended to cover all documents in your possession, custody or control, and the custody, possession, or control of any agents, assistants, or other persons or entities acting for or on your behalf.

B.    These Requests for documents and things are continuing in nature and you shall produce in the form of supplementary productions any documents or things requested herein which information, document or thing is unavailable to you at the time of your responses hereto but which becomes available to you up until the time of trial.

C.    If you claim privilege as to some or all of the material requested in these Requests, you must identify the nature of the privilege claimed and describe the general topic of the information claimed to be privileged to the extent possible in a manner consistent with the claimed privilege.  With respect to each document as to which a privilege is claimed, please identify the person or persons who prepared such document, the person or persons to whom the document was directed or who received the document, the type of document (letter, memorandum, etc.), the person in whose custody the documents rest, the date or approximate date of the documents preparation, the length of such document, and its present location.

D.    These Requests call for the production of both copies and originals of documents, unless specified otherwise.

## DEFINITIONS

A.    "Communication" shall mean any transmission or exchange of information between two or more persons, whether orally or in writing, including without limitation, any conversation or discussion face-to-face or by means of letter, note, memorandum, telephone,

3

telegraph, telex, telecopier, cable, e-mail, or other medium, and whether by chance or prearranged formally or informally.

B.     "You" or "your" and "Northwestern" shall mean plaintiff and its employees, contractors, agents, officers and/or directors.

C.     The "Policy" shall mean the Northwestern policy of individual life insurance benefits arising from the death of David M. Litt ("Decedent"), bearing policy no. 165679951

D.     "Concerning" shall be construed in its broadest sense to mean, directly or indirectly describing, setting forth, discussing, commenting upon, supporting, containing, evidencing, identifying, contradicting, referring, or relating to the subject in question, either in whole or in part.

E.     As used herein, the term "including" is used to emphasize the type of information requested and does not limit, and should not be construed as limiting, the Requests in any way.

F.     "Document" or "documents" shall have the broadest possible meaning ascribed to it under Fed. R. Civ. P. 45 and Rule 45 (d) and (e), and shall mean every original writing and draft of any nature whatsoever, and all non-identical copies thereof (whether different from the original because of notes made on such copies or otherwise) of all written, printed, typed, pictorial, or recorded matter of any kind and description, including all attachments or addenda annexed thereto, whether inscribed by hand or mechanical, electronic, microfilm, photographic or other means, as well as reproductions thereof, in your possession, custody or control, regardless of where located and includes, but is not limited to, advices, annual, monthly or weekly reports and statements, inventories, business records, checks, correspondence, emails or other electronic or digital correspondence, contracts, prospective contracts, agreements, partnership agreements, financial statements, appraisals, corporate or partnership structure,

4

charts, records, studies, summaries, memoranda, interoffice and intra-office memoranda, memoranda of conferences and meetings, memoranda of telephone conversations, memoranda to files, time sheets, calendars, diaries, date books, journals, handwritten notes, working papers, worksheets, diagrams, minutes, agendas, bulletins, notices, announcements, prospectuses, instructions, charts, manuals, brochures, pamphlets and other publications, schedules, telegrams, teletypes, photographs, audio tapes, video tapes, electronic recordings, facsimile transmissions, electronic transmissions, information stored or backed up on computer disk and all other forms for preservation of information. In all cases where original and/or non-identical copies are not available, "documents" also shall mean identical copies of original documents and copies of non-identical copies.  Electronic information should be produced in native format and, if necessary, You shall provide access to and proprietary software for review of such electronic information.

G.      The "Relevant Period" is October 20, 2003 to September 11, 2011.

## DOCUMENT REQUESTS

A.      All documents concerning changing account or client information for the Policy, including but not limited to any requests for transfer of records, network office block/transfer requests, or transmittals regarding change of beneficiary.

B.      All documents concerning changing Decedent's Northwestern agent relating to the Policy.

C.      All communications between Northwestern and the Decedent regarding the named beneficiary of the Policy.

D.      All communications between Northwestern and the Decedent regarding a change of beneficiary of the Policy.

5

E.     All communications with Northwestern seeking payment of the Death Benefits under the Policy.

F.     All documents reflecting if and when Northwestern was sent a "Designation of Beneficiary by Owner for Death Proceeds Only" form and/or a "Change of Client Information" form that purportedly set forth "Tracy Lynn Copple" as Decedent's "Wife" and as the Direct Beneficiary under the Policy.

G.     All documents reflecting if and when Northwestern received the "Designation of Beneficiary by Owner for Death Proceeds Only" form and the "Change of Client Information" form that purportedly sets forth "Tracy Lynn Copple" as Decedent's "Wife" and as the Direct Beneficiary under the Policy.

H.     All documents reflecting Decedent's intentions concerning who should be the Direct Beneficiary under the Policy.

I.     All documents sent to Decedent in connection with the Policy, including all statements and change of beneficiary forms, and policy notices.

J.     All telephone records reflecting discussions between Northwestern, Gil Elmaleh John D. Blumberg General Agency, or any other Northwestern Agent, and/or Decedent relating to the Policy.

K.     All communications between Gil Elmaleh, on one hand, and Northwestern and/or Decedent, on the other hand, concerning changing the designation of the Beneficiary on the Policy and/or the Policy.

L.     All communications between Gil Elmaleh and any other person concerning changing the designation of the Beneficiary on the Policy and/or the Policy.

6

M.     All communications between the John D. Blumberg General Agency or any other Northwestern agent, on one hand, and Northwestern and/or Decedent and/or any other person, on the other hand, concerning changing the designation of the Beneficiary on the Policy and/or the Policy.

N.     All communications between defendants and Northwestern concerning changing the designation of the Beneficiary on the Policy and/or the Policy.

O.     All communications between Northwestern and any other person concerning changing the designation of the Beneficiary on the Policy and/or the Policy.

P.     All documents reflecting the relationship, if any, between John D. Blumberg General Agency and Northwestern, including, but not limited to agreements and/or contracts.

Q.     All documents reflecting the scope and extent of John D. Blumberg General Agency's authority to act on behalf of Northwestern in connection with the Policy.

R.     All documents reflecting the scope and extent of Gil Elmaleh's authority to act on behalf of Northwestern in connection with the Policy.

S.     All documents relating to Northwestern's policies and procedures on changing beneficiaries on whole life, adjustable term protection, policies during the Relevant Period.

T.     All documents relating to the "effective date" when a Northwestern beneficiary is changed on whole life, adjustable term protection, policies during the Relevant Period.

U.     All documents relating to Gil Elmaleh being made an agent in relation to Decedent and/or the Policy during the Relevant Period.

V.     All claims and underwriting files for the Policy.

## Schedule B

## SUBJECTS FOR EXAMINATION

A.  The Policy, including, but not limited to Section 10's provisions on changing beneficiaries and the effective date when a beneficiary is changed under the Policy.

B.  The allegations in Northwestern's Complaint, a copy of which is annexed at Exhibit A.

C.  Whether and when Northwestern was sent a "Designation of Beneficiary by Owner for Death Proceeds Only" form and/or a "Change of Client Information" form that purportedly set forth "Tracy Lynn Copple" as Decedent's "Wife" and as the Direct Beneficiary under the Policy.

D.  Whether and when Northwestern received the "Designation of Beneficiary by Owner for Death Proceeds Only" form and the "Change of Client Information" form that purportedly sets forth "Tracy Lynn Copple" as Decedent's "Wife" and as the Direct Beneficiary under the Policy.

E.  Northwestern policies and procedures for changing agents in relation to whole life, adjustable term protection, policies during the Relevant Period.

F.  Northwestern policies and procedures for changing beneficiaries on whole life, adjustable term protection, policies during the Relevant Period.

G.  Gil Elmaleh's appointment as an agent in connection with the Policy.

H.  The scope of John D. Blumberg General Agency's authority to act on behalf of Northwestern, if any, during the Relevant Period.

I.  Gil Elmaleh's relationship to John D. Blumberg General Agency during the Relevant Period.

1510967_2

J.  John D. Blumberg General Agency's relationship with Northwestern during the Relevant Period.

K.  The scope of Gil Elmaleh's authority to act on behalf of Northwestern, if any, during the Relevant Period.

1510967_2

# EXHIBIT "A"

McELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP
1300 Mount Kemble Avenue
P. O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100
Attorneys for Plaintiff
The Northwestern Mutual Life Insurance Company

| | |
|---|---|
| **THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,**<br><br>                              **Plaintiff,**<br><br>**vs.**<br><br>**STEVEN LITT and TRACY COPPLE-LITT,**<br><br>                              **Defendants.** | **UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY**<br><br>**Civil Action No.:** |

## CIVIL ACTION – COMPLAINT SEEKING INTERPLEADER RELIEF ON BEHALF OF THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

Plaintiff The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), a mutual insurance company maintaining its principal place of business at 720 East Wisconsin Avenue, City of Milwaukee, State of Wisconsin, by way of complaint seeking interpleader relief against defendants Steven Litt ("Litt") and Tracy Copple-Litt ("Copple-Litt"), alleges and says as follows:

1.       This action involves the entitlement to life insurance benefits arising from the death of David M. Litt ("Decedent").

2.       Northwestern Mutual issued a policy of individual life insurance insuring Decedent's life, bearing policy number 16579951 ("The Policy"). The net benefit due under the Policy as of the date of death of Decedent ("Death Benefit") is $1,145,405.07.

3.      Northwestern Mutual has good cause to believe that it may be subject to competing claims for the life insurance proceeds due under the Policy as a result of the death of Decedent, and cannot determine the proper beneficiary or beneficiaries of those proceeds. Northwestern Mutual has good cause to believe it may be exposed to potential multiple and/or conflicting liabilities.  Northwestern Mutual is bringing this lawsuit for interpleader relief to avoid being vexed and harassed by these potential conflicting and multiple claims.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1332 (a) in that this action for interpleader relief is between citizens of different states and the amount in controversy exceeds $75,000.00.

5.      Additionally, jurisdiction is based upon 28 U.S.C. § 1335, in that this is an action for interpleader relief where the amount at issue exceeds $500.00 and two claimants of diverse citizenship are claiming or may claim to be entitled to the benefits at issue.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1397 as one of the potential claimants resides in this District.

## THE PARTIES

7.      Northwestern Mutual is an insurance company organized and existing under the laws of the State of Wisconsin with its principal place of business located at 720 East Wisconsin Avenue, Milwaukee, Wisconsin.  Northwestern Mutual is a citizen of the State of Wisconsin within the meaning and intent of 28 U.S.C. § 1332 (a).  At all times relevant, Northwestern Mutual was and is in the business of underwriting policies of life insurance and is authorized to transact the business of life insurance.

8.      Decedent's primary residence at the time of his death was 253 West 73rd Street, Apartment 13H, New York, New York 10023, and he was a citizen of the State of New York

within the meaning and intent of 28 U.S.C. § 1332 (a) and 28 U.S.C. § 1335.

9.      Litt maintains a primary residence and domiciliary located at 5255 Donald Street;
Eugene, Oregon 97405, and is a citizen of the state of Oregon within the meaning and intent of
28 U.S.C. § 1332 (a) and 28 U.S.C. §1335.

10.     Copple-Litt maintains a primary residence and domiciliary located at 45 West
Beechcroft Avenue, Short Hills, New Jersey 07078, and is a citizen of the state of New Jersey
within the meaning and intent of 28 U.S.C. § 1332 (a) and 28 U.S.C. §1335.

11.     On October 20, 2003, Northwestern Mutual issued the Policy insuring the life of
Decedent.

12.     When Decedent applied for the Policy, he designated Litt as Direct Beneficiary.
The application states that Litt is Decedent's brother.

13.     On September 11, 2011, Decedent died.

14.     At the time of his death, Decedent was married to Copple-Litt, but, upon
information and belief, they were living separately and apart.

15.     Litt forwarded to Northwestern Mutual a Beneficiary Claim Statement executed
on September 23, 2011, seeking payment of the Death Benefit under the Policy.

16.     In correspondence to Northwestern Mutual dated September 29, 2011, counsel for
Defendant Copple-Litt asserted that "there exists a legitimate issue as to the last signed
beneficiary designation as well as the circumstances surrounding the execution of any purported
change of beneficiary form."

17.     The September 29, 2011, correspondence from Copple-Litt's counsel also
enclosed a "Designation of Beneficiary by Owner For Death Proceeds Only" form and a
"Change of Client Information" form.

18.     The "Change of Client Information" form included with the September 29, 2011,

3

correspondence states that "I would like to change the beneficiary of my policy to Tracy Copple" and was purportedly signed by Decedent on September 29, 2005.

19.   The "Designation of Beneficiary by Owner For Death Proceeds Only" form included with the September 29, 2011, correspondence sets forth the Direct Beneficiary as "Tracy Lynn Copple," as Decedent's "Wife," and the Contingent Beneficiary as "Steven P. Litt," as Decedent's "Brother," and was purportedly executed by the Decedent on September 29, 2005.

20.   Northwestern Mutual did not receive the "Designation of Beneficiary by Owner For Death Proceeds Only" form and the "Change of Client Information" form included in the September 29, 2011, correspondence during Decedent's lifetime.

21.   Litt claims entitlement to receive the Death Benefit to the exclusion of all other claimants including Copple-Litt.

22.   Copple-Litt claims entitlement to receive the Death Benefit to the exclusion of all other claimants including Litt.

23.   Northwestern Mutual asserts no interest in the proceeds of the Policy and does not dispute that the proceeds are due.  Accordingly, Northwestern Mutual is a mere disinterested stakeholder to this action, with no interest in the controversy between defendants.

24.   Northwestern Mutual seeks, by way of this interpleader, certainty regarding the parties' respective rights to the life insurance proceeds due under the Policy as a result of the death of Decedent.

25.   Based on the foregoing, there is presently an actual, justifiable controversy as to the life insurance proceeds, and Northwestern Mutual as a disinterested stakeholder is entitled to the relief requested herein.

WHEREFORE, Northwestern Mutual prays that this Court take jurisdiction over this matter, and issue an order or orders:

(1)     Granting Northwestern Mutual's request for interpleader relief;

(2)     Granting Northwestern Mutual judgment for its reasonable fees and costs, to be paid from the life insurance proceeds under the Policy and permitting and directing Northwestern Mutual to deposit the remaining life insurance proceeds into the Registry of the Court;

(3)     Upon Northwestern Mutual's deposit of the life insurance proceeds, plus interest, into the Registry of the Court, dismissing Northwestern Mutual from this action with prejudice, and discharging Northwestern Mutual from any further liability in connection with the Policy as a result of the death of Decedent;

(4)     Granting Northwestern Mutual an injunction barring defendants and their successors and assigns from instituting any action, prosecution, or proceeding in any State or United States Court, concerning the Policy; and

(5)     Requiring all Defendants to answer this Complaint in Interpleader, and to proceed to determine the proper disposition of the remaining funds.

Dated: November 2, 2011                McELROY, DEUTSCH, MULVANEY
                                       & CARPENTER, LLP
                                       Attorneys for Plaintiff
                                       The Northwestern Mutual Life Insurance Company


                                       ___/s/ Valerie G. Pennacchio___
                                       By:   VALERIE G. PENNACCHIO

**From:** MARKHAM, JILL
**Sent:** Monday, October 15, 2012 3:41 PM
**To:** JUNEMANN, GAIL
**Subject:** Policy 16579951


Below is a summary of financial representatives that were assigned to this policy.

10/20/2003 – 10/20/2004 – Deryk Rhodes (GA 056) (left NM 01/31/2004)
10/20/2004  - 10/02/2005 – Ilyssa Wexler (GA 056) (left NM 08/01/2005)
10/02/2005 – 10/12/2005 – Client Relations Center (GA 056)
10/12/2005 -  02/01/2012 -  Gil Elmaleh (GA 052) (left NM 02/01/2012) (policy showed Gil Elmaleh as FR until 03/20/2012)


Jill Markham



EXHIBIT 10

GRAMANN REPORTING, LTD.





## FULL-TIME SPECIAL OR SOLICITING AGENT'S CONTRACT

**Robert Seery**, a **General Agent** of The Northwestern Mutual Life Insurance Company, hereinafter called "First

Party", and **Gil Elmaleh CLU** of **Rye Brook**, in the County of **Westchester**, and State of **NY**, hereinafter called

"Agent", agree as follows:

**1. Effective Date** —This agreement shall take effect on
**April 01, 2009**

### AUTHORITY OF AGENT

**2. Territory**— Agent is appointed to solicit Applications for insurance policies and annuity contracts issued by The Northwestern Mutual Life Insurance Company (the "Company") within

_____

**See page 5**

_____

_____

_____ (the "Territory").

**3. Solicitation Outside of Territory**— Whenever Agent wishes to solicit an Application in an area outside the Territory he must first secure through the Company an agent's license from the proper state authority. Solicitation outside the Territory shall be governed by regulations of the Company as from time to time published and amended.

**4. Relationship**— Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company, General Agent or First Party. Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of Agent.

**5. Alteration of Policies**—Agent shall have no power, personally or on behalf of the Company or First Party, to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract.

**6. Exclusive Dealing**— (a) Agent shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, except in connection with Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be

insurable only at higher than standard premium rates which are unacceptable to the applicants.

(b) The requirement of 6(a) is waived for Applications for life insurance policies solicited by Agent if his present term of Continuous Service commenced prior to January 1, 1956, provided any such Application is for insurance acceptable by the Company only at rates higher than the standard rates.

**7. No Brokerage**— Agent shall not accept business from, nor pay any commissions or other remuneration to, any person.

### DUTIES OF AGENT

**8. General Duties** — Agent shall solicit Applications within the territory, and shall procure the issuance of insurance policies and annuity contracts in an aggregate amount and on a number of lives satisfactory to First Party and at least equal to the minimum requirements established by the Company for licensure. He shall collect the initial premiums on such policies and contracts. He shall not engage in any business other than that covered by this agreement except with the consent of First Party.

**9. Responsibility**— Agent shall be responsible to First Party and the Company for all business done by or entrusted to his agents or persons employed by him. He shall indemnify and save First Party, District Agent, General Agent and the Company harmless from any and all expenses, costs, causes of action and damages resulting from or growing out of acts or transactions by himself or his employees or agents.

**10. Remittances** — Agent shall be responsible to General Agent, First Party and the Company for all amounts received for the account of the Company, General Agent or First Party by him, his employees or agents. All such amounts, and any promissory notes taken in payment of initial premiums on prepaid Applications, shall be deposited with First Party.

**11. Records** — Agent shall hold and preserve all records relating to transactions by or for the Company, and all other property of the Company which at any time shall come into his possession or under his control, and shall surrender them to the Company or First Party upon demand.

EXHIBIT _12_
_11-20-12_
GRAMANN REPORTING, LTD.

NM-000066   Page 1 of 4 FE
Confidential

1243

12. Bond – Agent shall maintain a fidel..., bond acceptable to the Company.

13. Expenses – Agent shall pay all expenses incurred by him in the performance of this agreement.

14. Conduct – Agent shall comply with all applicable laws and regulations and shall so conduct himself as not to affect adversely the business, good standing or reputation of himself, First Party or the Company.

15. Confidential Materials– All Agents' training, Agency development and sales promotion materials and other items labeled "Confidential — Not for Publication" are furnished to Agent in confidence, and Agent agrees that he shall refrain from publishing or disclosing such material other than in the ordinary course of his business and that such items shall be returned to the Company upon demand or upon termination of this agreement.

## COMMISSIONS AND FEES

16. Schedules – (a) First Party shall pay commissions to Agent at the rates, and subject to the regulations, set forth in the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, published by the Company from time to time, and in effect on the date of Part I of the Application for the policy or contract with respect to which commissions are to be paid.

(b) The Company reserves the right to change the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, in whole or in part, subject to the following limitations:

(i)    No such changes shall operate to reduce the first year, additional or renewal commissions payable on any policy or contract theretofore issued.

(ii)   The Company shall give Agent not less than 30 days' advance written notice of the effective date of any reduction in commission rates, unless immediate change is required by statute or by administrative order of any governmental regulatory authority.

17. Level Payment of Commissions after Termination– If and when Agent shall have fulfilled the Company's production requirements and shall have filed with First Party, on the Company form provided for the purpose, his election to have payment of his commissions after termination of this or any subsequent agreement controlled by this Paragraph 17, then the following provision shall govern:

(a) Upon termination, by reason of Agent's death, incapacity, or retirement (as defined in the Agents Retirement Plan in effect on July 1, 1969), of this or any subsequent agreement the commissions then accrued or thereafter accruing which Agent would otherwise be entitled to receive shall not be paid to Agent, but shall be retained by the Company and amounts equal thereto shall be credited to an account on its books (the "Account"). Interest shall accrue on the balance from time to time in the Account at a rate per annum equal to the rate then currently used by the Company in crediting interest on non-contingent settlement option balances as certified by the Actuary of the Company, and shall be credited by the Company to the Account at least annually. Amounts standing to the credit of the Account shall be carried as an indebtedness of the Company payable in accordance with (b) of this provision. Agent shall have no interest in the Account, which is established merely as an accounting

convenience and shall not operate to segregate any balance therein from the general assets of the Company.

(b) The Company shall, subject to the provision for setoff in Paragraph 21, make payments from the Account to Agent in monthly installments in the amount, and for the number of years, elected by Agent prior to the aforesaid termination. The elected number of years shall be 15 or 20, or such other number of years as permitted by the Company at the time of the election. Installments shall commence within 60 days after the aforesaid termination and shall be payable monthly thereafter, but no such installment shall exceed the balance in the Account at the time such installment is payable. In the event this agreement is terminated by Agent's death or his death occurs thereafter, payments pursuant to the terms of this provision shall be made in like manner in accordance with Paragraph 18. All payments pursuant to (b) of this provision shall be charged against the Account.

(c) Agent shall have no power to assign, encumber, commute or anticipate his interest in any amounts standing to the credit of the Account or in any payment pursuant to (b) of this provision.

(d) Commissions accrued upon termination of this agreement or thereafter accruing shall be valued by application of the Evans' Commission Valuation Table elected by Agent, without interest.

18. Beneficiaries – Agent shall have the right to designate beneficiaries to receive commissions and other remuneration accrued at his death and thereafter accruing. Any such designation of beneficiaries shall be subject to the following provisions:

(a) CLASSES —Beneficiaries shall be of the same classes as provided in life insurance policies of the series issued by the Company on the date of this agreement.

(b) SUCCESSION—The succession in interest of the beneficiaries shall be as stated in the Settlement Option Provisions of life insurance policies of said series. If no beneficiary is designated or if no beneficiary survives Agent, amounts accrued at Agent's death and thereafter accruing shall be paid to his executor or administrator or to the persons entitled thereto under applicable law.

(c) WHEN EFFECTIVE–All designations, revocations and changes in beneficiaries shall be duly made in writing and shall be effective upon receipt at the Home Office of the Company.

(d) ASSIGNMENT— No assignment by Agent of his rights hereunder shall require the consent of any beneficiary, and the interest of any beneficiary shall be subject to any such assignment.

## TERMINATION

19. Term of Agreement –This agreement shall terminate upon the first to occur of the following:

(a) The death of Agent;

(b) If First Party is a General Agent, termination of the present contract between the General Agent and the Company;

(c) If First Party is a District Agent or Field Director, termination of his contract with General Agent (except as such contract may be extended through an Endorsement by the Company, in which case this agreement shall terminate upon expiration of the extension); or

(d) The end of the month in which Agent attains age 65.

It may be terminated by First Party upon written notice to Agent, by reason of:

(i) Legislation, court decision or insurance department or other governmental ruling or requirement which in the opinion of the Company either contravenes any provisions of this agreement or renders it expedient for the Company to withdraw from the whole or any part of the Territory; or

(ii) Failure of Agent to comply with any of the terms hereof; or

(iii) Agent's becoming, in the opinion of First Party and the Company (of which they shall be the sole judges), incapacitated for any reason so that he cannot fully perform this agreement.

It may be terminated by Mutual Consent of Agent and First Party at any time.

It may be terminated by either party at any time, without cause, upon thirty days' written notice.

**19A. Replacement** – (This paragraph applies only if First Party is a Field Director.)

If this contract shall have remained in force until _____ (MM/DD/YYYY) it shall as of that date be replaced by an Agent's contract, in the then current form, between Agent and General Agent or District Agent.

**20. Commissions After Termination** – (a) If on termination of this agreement Agent has less than 15 years of Continuous Service, the renewal commission after such termination shall be payable as follows:

| Complete Years of Continuous Service | Policy Years For Which Renewal Commissions Are Payable |
| --- | --- |
| Less than 2 | None |
| 2-9 | 2nd thru 4th |
| 10 | 2nd thru 5th |
| 11 | 2nd thru 6th |
| 12 | 2nd thru 7th |
| 13 | 2nd thru 8th |
| 14 | 2nd thru 9th |

provided, however, that:

(i) If termination was caused by Agent's death or by his becoming incapacitated, in the opinion of First Party and the Company (of which they shall be the sole judges), or if Agent had at least two years of Continuous Service and termination occurred after attainment of age 60, the number of policy years for which renewal commissions are payable shall not be reduced; and

(ii) If Agent continues under another Agency contract or becomes an employee of the Company, the number of such renewals shall not be reduced so long as such status continues.

(b) If renewal commissions are not payable to Agent because of termination with less than 2 years of Continuous Service, such renewals arising from second, third and fourth policy year premiums shall be retained by First Party (unless First Party is a Field Director, in which case they shall be retained by the General Agent or District Agent contracting with the Field Director) and those arising from fifth and subsequent policy years shall be retained by the Company.

(c) If termination of this agreement was for violation of Paragraph 6, 7, 10 or 14 thereof, then in addition to any reductions set forth in other portions of this Paragraph 20 there shall be deducted from all commissions otherwise payable on renewal premiums collected after such termination 1% of such premiums.

(d) If on any July 1 occurring two years or more after the date of termination of this agreement (by reason other than death, incapacity, employment by the Company or entering into another Agency contract), the gross value of commissions which might be payable after such July 1 is estimated, in accordance with the policies and procedures of the Company as from time to time amended, to be $1,000 or less, such commissions shall not be paid to Agent when due, but rather, in lieu thereof, on such July 1 First Party shall pay to Agent an amount equal to 80% of such estimated gross value.

(e) Except as set forth in Subparagraphs (a), (b), (c) and (d) above, Agent's right to commissions shall not be affected by termination of this agreement.

### GENERAL

**21. Setoff** – First Party, District Agent, General Agent or the Company may at any time set off against any commissions or other remuneration due or to become due under this or any prior agreement to Agent, or anyone claiming through or under him, any debt or debts due from Agent to First Party, District Agent, General Agent or the Company.

**22. No Waiver** – No forbearance or neglect on the part of First Party, General Agent or the Company to enforce any of the provisions of this agreement shall be construed as a waiver of any of his or its rights or privileges hereunder or affect his or its rights arising from any default or failure of performance by Agent.

**23. Notice** – Any notice required by this agreement shall be in writing, and shall be delivered in person or by mail to the party at his last known post office address.

**24. No Assignment** – This agreement is not transferable. Except for the designation of beneficiaries as provided in Paragraph 18, and subject to the limitation of Paragraph 17(c), no rights or interests arising hereunder shall be assignable without the Company's prior written consent.

**25. Definitions** – The following terms shall have the indicated meanings:

(a) APPLICATION – an Application to the Company for an annuity contract, life insurance policy, or disability income insurance policy.

(b) CONTRACT YEAR – a period of one year commencing on the effective date of this agreement or any anniversary thereof.

(c) CONTINUOUS SERVICE – the total continuous time served in the employ of the Company, under leave of absence in the armed forces of the United States and under any Agency contract. Any intervals of not more than 2 months, and any interval of not more than 6 months immediately following such military leave of absence, shall be included. Service as a part-time agent shall be included only if it is immediately followed by entering into a full-time Agency contract or employment by the Company.

(d) SOLICITOR – the person under an Agency contract in effect on the date of Part I of an Application solicited by him whose signature appears on the Agent's Certificate of such Application.

26. **Interpretation** — This agreement shall not become effective until approved by the Company at its Home Office in Milwaukee, Wisconsin and shall be governed by and construed in accordance with the laws of the State of Wisconsin. If First Party or General Agent is a partnership, the words "he," "his," and "him" shall be understood to refer to the partnership unless it is apparent that they are used in a different sense.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the effective date set forth above.

FIRST PARTY            GENERAL AGENT
                       DISTRICT AGENT
                       FIELD DIRECTOR/COLLEGE UNIT DIRECTOR

SPECIAL AGENT
SOLICITING AGENT

## ENDORSEMENT
(To be executed if First Party is a District Agent or Field Director)

**1. (To apply if First Party is a District Agent or Field Director under contract directly with a General Agent.)**

The undersigned General Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between General Agent and First Party is terminated.

**2. (To apply if First Party is a Field Director under contract with a District Agent.)**

The undersigned District Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between District Agent and First Party is terminated.

DISTRICT AGENT            GENERAL AGENT

FIELD DIRECTOR

## ENDORSEMENT BY COMPANY

The Company and Agent hereby agree as follows:

1. **Cashiership** — If the above agreement is terminated by reason of the termination of the General Agent's contract with the Company, Agent, if a Special Agent, without further act or notice may continue to solicit and procure Applications for policies and contracts and submit them to the representative appointed by the Company until the effective date of a General Agent's contract between the Company and a successor general agent. Commissions and other remuneration payable on any policies and contracts issued on such Applications written during such interim, shall be upon the terms and conditions stipulated in the above agreement.

2. **Compensation** — The Company hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder, whenever the contract between General Agent and the Company is terminated.

3. **Retirement Program** — Agent shall participate in the Agents Retirement Plan of the Company and shall participate in the Agents Retirement Investment Fund Plan of the Company upon satisfying the conditions for participation specified therein, as from time to time amended.

4. **Limitation of Liability** — The Company shall not be liable to Agent in any manner, except as specifically set forth in this Endorsement.

The Northwestern Mutual Life Insurance Company

SOLICITING AGENT
SPECIAL AGENT

By _____
SENIOR VICE PRESIDENT- AGENCIES

NM-0000  Page 4 of 4   FE
Confidential

TERRITORY
White Plains, New York
General Agency 052
April 1, 2009


**IN THE STATE OF NEW YORK:**
For the purposes of development, residency, and solicitation the Counties of **Bronx, Columbia, Dutchess, Greene, Kings (Brooklyn), Nassau, New York (Manhattan), Orange, Putnam, Queens, Richmond (Staten Island), Rockland, Suffolk, Sullivan, Ulster and Westchester.**

**IN THE STATE OF NEW JERSEY:**
For the purposes of development, residency, and solicitation the Counties of **Bergen, Essex, Hudson, Morris, Passaic, Sussex** and **Union.** Also, **Somerset** County except for the townships of Branchburg, Franklin, Hillsboro, and Montgomery and the boroughs of Manville, Millstone, Raritan, Rocky Hill, and Somerville. **Middlesex** County except the townships of Cranbury, East Brunswick, Monroe, North Brunswick, Plainsboro, and South Brunswick, the boroughs of Helmetta, Jamesburg, Milltown, South River, and Spottswood, and the city of New Brunswick. **Monmouth** County except the townships of Freehold, Howell, Manalapan, Millstone, and Upper Freehold; and the boroughs of Allentown, Englishtown, Farmingdale, Roosevelt and Freehold.

**IN THE STATE OF CONNECTICUT:**
For the purposes of development, residency, and solicitation the County of **Fairfield.** For the purposes of residency and solicitation the Counties of **Litchfield** and **New Haven.**


Solicitation is defined as the authority to solicit new business and place that business with the agent's primary General Agency.
Residency is defined as the authority to contract and retain agents residing in an area, but not to open offices in a territory.
Development is defined as the authority to office agents in a territory.


Page 5

NM-000060
Confidential





Northwestern Mutual®
720 East Wisconsin Avenue
Milwaukee, WI 53202

## STATE OF NEW YORK AMENDMENT
## TO FULL-TIME SPECIAL OR SOLICITING AGENT'S CONTRACT

First Party and Agent to the Full-Time Special or Soliciting Agent's Contract (the "Contract") to which this Amendment is attached agree as follows:

1. Section 6(a) of the Contract is deleted and the following paragraph inserted:

   "**6. Exclusive Dealing — (a)**   Agent agrees to submit to the Company for approval all Applications secured by him/her for life insurance, annuity contracts or disability income insurance policies, except Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the applicants.   However, this provision shall not apply to Applications for Section 79 group term life insurance, individual or group health insurance, credit life, liability, fidelity, surety and travel accident insurance or mutual fund shares.   Agent is deemed to be a full-time life insurance salesperson and is expected to concentrate his/her sales efforts on behalf of the Company."

2. The last sentence of Section 8 of the Contract is deleted.

3. Except as provided above the Contract remains in full force and effect.

**In witness thereof,** the parties hereto have executed this agreement as of the effective date of the contract.

| | |
|---|---|
| **Gil Elmaleh CLU** | |
| Name of Agent | Signature of Agent |
| **Robert Seery** | |
| Name of First Party | Signature of First Party |

**Approved by (if First Party is a District Agent or Field Director):**

| | |
|---|---|
| Signature of General Agent | Signature of District Agent |

**Approved by:**

**The Northwestern Mutual Life Insurance Company**

by _____
         Senior Vice President - Agencies

NM-000061
Confidential

 Northwestern Mutual®

# FULL-TIME SPECIAL OR SOLICITING
# AGENT'S CONTRACT

_John Blumberg_____ , a ( ☒ General Agent ☐ District Agent ☐ Field Director) of
The Northwestern Mutual Life Insurance Company, hereinafter called "First Party," and _Gil Elmaleh_____

of _Rye Brook_____ , in the County of

_Westchester_____ , and State of _New York_____ , hereinafter called "Agent," agree as follows:

**1. Effective Date** — This agreement shall take effect on _DEC 10 2008_ (mm/dd/yyyy).

**AUTHORITY OF AGENT**

**Territory** — Agent is appointed to solicit Applications for insurance policies and annuity contracts issued by The Northwestern Mutual Life Insurance Company (the "Company") within _____

_____

_____(See attached)_____

_____

_____ (the "Territory").

**3. Solicitation Outside of Territory** — Whenever Agent wishes to solicit an Application in an area outside the Territory he must first secure through the Company an agent's license from the proper state authority. Solicitation outside the Territory shall be governed by regulations of the Company as from time to time published and amended.

**Relationship** — Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company, General Agent or First Party. Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of Agent.

**5. Alteration of Policies** — Agent shall have no power, personally or on behalf of the Company or First Party, to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract.

**6. Exclusive Dealing** – (a) Agent shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, except in connection with Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the applicants.

(b) The requirement of 6(a) is waived for Applications for life insurance policies solicited by Agent if his present term of Continuous Service commenced prior to January 1, 1956, provided any such Application is for insurance acceptable by the Company only at rates higher than the standard rates.

**7. No Brokerage** – Agent shall not accept business from, nor pay any commissions or other remuneration to, any person.

**DUTIES OF AGENT**

**8. General Duties** – Agent shall solicit Applications within the territory, and shall procure the issuance of insurance policies and annuity contracts in an aggregate amount and on a number of lives satisfactory to First Party and at least equal to the minimum requirements established by the Company for licensure. He shall collect the initial premiums on such policies and contracts. He shall not engage in any business other than that covered by this agreement except with the consent of First Party.

**9. Responsibility** – Agent shall be responsible to First Party and the Company for all business done by or entrusted to his agents or persons employed by him. He shall indemnify and save First Party, District Agent, General Agent and the Company harmless from any and all expenses, costs, causes of action and damages resulting from or growing out of acts or transactions by himself or his employees or agents.

**10. Remittances** – Agent shall be responsible to General Agent, First Party and the Company for all amounts received for the account of the Company, General Agent or First Party by him, his employees or agents. All such amounts, and any promissory notes taken in payment of initial premiums on prepaid Applications, shall be deposited with First Party.

**11. Records** – Agent shall hold and preserve all records relating to transactions by or for the Company, and all other property of the Company which at any time shall come into his possession or under his control, and shall surrender them to the Company or First Party upon demand.

RECEIVED

DEC 0 5 2008

CONTRACT & LICENSE

NM-000062
Confidential

12.   Bond -- Agent shall maintain a fidelity bond acceptable to the Company.

13.   Expenses -- Agent shall pay all expenses incurred by him in the performance of this agreement.

14.   Conduct -- Agent shall comply with all applicable laws and regulations and shall so conduct himself as not to affect adversely the business, good standing or reputation of himself, First Party or the Company.

15.   Confidential Materials -- All Agents' training, Agency development and sales promotion materials and other items labeled "Confidential – Not for Publication" are furnished to Agent in confidence, and Agent agrees that he shall refrain from publishing or disclosing such material other than in the ordinary course of his business and that such items shall be returned to the Company upon demand or upon termination of this agreement.

### COMMISSIONS AND FEES

16.   Schedules -- (a) First Party shall pay commissions to Agent at the rates, and subject to the regulations, set forth in the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, published by the Company from time to time, and in effect on the date of Part I of the application for the policy or contract with respect to which commissions are to be paid.

(b) The Company reserves the right to change the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, in whole or in part, subject to the following limitations:

(i)   No such changes shall operate to reduce the first year, additional or renewal commissions payable on any policy or contract theretofore issued.

(ii)   The Company shall give Agent not less than 30 days' advance written notice of the effective date of any reduction in commission rates, unless immediate change is required by statute or by administrative order of any governmental regulatory authority.

17.   Level Payment of Commissions after Termination -- If and when Agent shall have fulfilled the Company's production requirements and shall have filed with First Party, on the Company form provided for the purpose, his election to have payment of his commissions after termination of this or any subsequent agreement controlled by this Paragraph 17, then the following provision shall govern:

(a) Upon termination, by reason of Agent's death, incapacity, or retirement (as defined in the Agents Retirement Plan in effect on July 1, 1969), of this or any subsequent agreement the commissions then accrued or thereafter accruing which Agent would otherwise be entitled to receive shall not be paid to Agent, but shall be retained by the Company and amounts equal thereto shall be credited to an account on its books (the "Account"). Interest shall accrue on the balance from time to time in the Account at a rate per annum equal to the rate then currently used by the Company in crediting interest on non-contingent settlement option balances as certified by the Actuary of the Company, and shall be credited by the Company to the Account at least annually. Amounts standing to the credit of the Account shall be carried as an indebtedness of the Company payable in accordance with (b) of this provision. Agent shall have no interest in the Account, which is established merely as an accounting convenience and shall not operate to segregate any balance therein from the general assets of the Company.

(b) The Company shall, subject to the provision for setoff in Paragraph 21, make payments from the Account to Agent in monthly installments in the amount, and for the number of years, elected by Agent prior to the aforesaid termination. The elected number of years shall be 15 or 20, or such other number of years as permitted by the Company at the time of the election. Installments shall commence within 60 days after the aforesaid termination and shall be payable monthly thereafter, but no such installment shall exceed the balance in the Account at the time such installment is payable.  In the event this agreement is terminated by Agent's death or his death occurs thereafter, payments pursuant to the terms of this provision shall be made in like manner in accordance with Paragraph 18.  All payments pursuant to (b) of this provision shall be charged against the Account.

(c) Agent shall have no power to assign, encumber, commute or anticipate his interest in any amounts standing to the credit of the Account or in any payment pursuant to (b) of this provision.

(d) Commissions accrued upon termination of this agreement or thereafter accruing shall be valued by application of the Evans' Commission Valuation Table elected by Agent, without interest.

18.   Beneficiaries -- Agent shall have the right to designate beneficiaries to receive commissions and other remuneration accrued at his death and thereafter accruing.  Any such designation of beneficiaries shall be subject to the following provisions:

(a) CLASSES -- Beneficiaries shall be of the same classes as provided in life insurance policies of the series issued by the Company on the date of this agreement.

(b) SUCCESSION -- The succession in interest of the beneficiaries shall be as stated in the Settlement Option Provisions of life insurance policies of said series.  If no beneficiary is designated or if no beneficiary survives Agent, amounts accrued at Agent's death and thereafter accruing shall be paid to his executor or administrator or to the persons entitled thereto under applicable law.

(c) WHEN EFFECTIVE -- All designations, revocations and changes in beneficiaries shall be duly made in writing and shall be effective upon receipt at the Home Office of the Company.

(d) ASSIGNMENT -- No assignment by Agent of his rights hereunder shall require the consent of any beneficiary, and the interest of any beneficiary shall be subject to any such assignment.

### TERMINATION

19.   Term of Agreement -- This agreement shall terminate upon the first to occur of the following:

(a) The death of Agent;

(b) If First Party is a General Agent, termination of the present contract between the General Agent and the Company;

(c) If First Party is a District Agent or Field Director, termination of his contract with General Agent (except as such contract may be extended through an Endorsement by the Company, in which case this agreement shall terminate upon expiration of the extension); or

NM-000063
Confidential

(d) The end of the month in which Agent atta___ age 65.

It may be terminated by First Party upon written notice to Agent, by reason of:

(i)   Legislation, court decision or insurance department or other governmental ruling or requirement which in the opinion of the Company either contravenes any provisions of this agreement or renders it expedient for the Company to withdraw from the whole or any part of the Territory; or

(ii)  Failure of Agent to comply with any of the terms hereof; or

(iii) Agent's becoming, in the opinion of First Party and the Company (of which they shall be the sole judges), incapacitated for any reason so that he cannot fully perform this agreement.

It may be terminated by Mutual Consent of Agent and First Party at any time.

It may be terminated by either party at any time, without cause, upon thirty days' written notice.

**19A. Replacement –** (This paragraph applies only if First Party i_ _ Field Director.)

_his contract shall have remained in force until _____ (MM/DD/YYYY) it shall as of that date be replaced by an Agent's contract, in the then current form, between Agent and General Agent or District Agent.

**20.   Commissions After Termination –** (a) If on termination of this agreement Agent has less than 15 years of Continuous Service, the renewal commission after such termination shall be payable as follows:

| Complete Years of Continuous Service | Policy Years For Which Renewal Commissions Are Payable |
|---|---|
| Less than 2 | None |
| 2-9 | 2nd thru 4th |
| 10 | 2nd thru 5th |
| 11 | 2nd thru 6th |
| 12 | 2nd thru 7th |
| 13 | 2nd thru 8th |
| 14 | 2nd thru 9th |

_ided, however, that:

(i)   If termination was caused by Agent's death or by his becoming incapacitated, in the opinion of First Party and the Company (of which they shall be the sole judges), or if Agent had at least two years of Continuous Service and termination occurred after attainment of age 60, the number of policy years for which renewal commissions are payable shall not be reduced; and

(ii)  If Agent continues under another Agency contract or becomes an employee of the Company, the number of such renewals shall not be reduced so long as such status continues.

(b) If renewal commissions are not payable to Agent because of termination with less than 2 years of Continuous Service, such renewals arising from second, third and fourth policy year premiums shall be retained by First Party (unless First Party is a Field Director, in which case they shall be retained by the General Agent or District Agent contracting with the Field Director) and those arising from fifth and subsequent policy years shall be retained by the Company.

(c) If termination o_ _s agreement was for violation of Paragraph 6, 7, 10 or 14 thereof, then in addition to any reductions set forth in other portions of this Paragraph 20 there shall be deducted from all commissions otherwise payable on renewal premiums collected after such termination 1% of such premiums.

(d) If on any July 1 occurring two years or more after the date of termination of this agreement (by reason other than death, incapacity, employment by the Company or entering into another Agency contract), the gross value of commissions which might be payable after such July 1 is estimated, in accordance with the policies and procedures of the Company as from time to time amended, to be $1,000 or less, such commissions shall not be paid to Agent when due, but rather, in lieu thereof, on such July 1 First Party shall pay to Agent an amount equal to 80% of such estimated gross value.

(e) Except as set forth in Subparagraphs (a), (b), (c) and (d) above, Agent's right to commissions shall not be affected by termination of this agreement.

## GENERAL

**21.   Setoff –** First Party, District Agent, General Agent or the Company may at any time set off against any commissions or other remuneration due or to become due under this or any prior agreement to Agent, or anyone claiming through or under him, any debt or debts due from Agent to First Party, District Agent, General Agent or the Company.

**22.   No Waiver –** No forbearance or neglect on the part of First Party, General Agent or the Company to enforce any of the provisions of this agreement shall be construed as a waiver of any of his or its rights or privileges hereunder or affect his or its rights arising from any default or failure of performance by Agent.

**23.   Notice –** Any notice required by this agreement shall be in writing, and shall be delivered in person or by mail to the party at his last known post office address.

**24.   No Assignment –** This agreement is not transferable. Except for the designation of beneficiaries as provided in Paragraph 18, and subject to the limitation of Paragraph 17(c), no rights or interests arising hereunder shall be assignable without the Company's prior written consent.

**25.   Definitions –** The following terms shall have the indicated meanings:

(a) APPLICATION – an Application to the Company for an annuity contract, life insurance policy, or disability income insurance policy.

(b) CONTRACT YEAR – a period of one year commencing on the effective date of this agreement or any anniversary thereof.

(c) CONTINUOUS SERVICE – the total continuous time served in the employ of the Company, under leave of absence in the armed forces of the United States and under any Agency contract. Any intervals of not more than 2 months, and any interval of not more than 6 months immediately following such military leave of absence, shall be included. Service as a part-time agent shall be included only if it is immediately followed by entering into a full-time Agency contract or employment by the Company.

(d) SOLICITOR – the person under an Agency contract in effect on the date of Part I of an Application solicited by him whose signature appears on the Agent's Certificate of such Application.

NM-000064
Confidential

26.   Interpretation – This agreement    not become effective until approved by the Company at its Home Office in Milwaukee, Wisconsin and shall be governed by and construed in accordance with the laws of the State of Wisconsin.  If First

Party or General Age   , a partnership, the words "he," "his," and "him" shall be understood to refer to the partnership unless it is apparent that they are used in a different sense.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the effective date set forth above.

_____   _____
FIRST PARTY        GENERAL AGENT
DISTRICT AGENT
FIELD DIRECTOR/COLLEGE UNIT DIRECTOR

_____
SPECIAL AGENT
SOLICITING AGENT

## ENDORSEMENT
(To be executed if First Party is a District Agent or Field Director)

**1. (To apply if First Party is a District Agent or Field Director under contract directly with a General Agent.)**

The undersigned General Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between General Agent and First Party is terminated.

**2. (To apply if First Party is a Field Director under contract with a District Agent.)**

undersigned District Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between District Agent and First Party is terminated.

_____   _____
DISTRICT AGENT        GENERAL AGENT

_____
FIELD DIRECTOR

## ENDORSEMENT BY COMPANY

The Company and Agent hereby agree as follows:

1.   **Cashiership** – If the above agreement is terminated by reason of the termination of the General Agent's contract with the Company, Agent, if a Special Agent, without further act or notice may continue to solicit and procure Applications for policies and contracts and submit them to the representative appointed by the Company until the effective date of a General Agent's contract between the Company and a successor general agent.  Commissions and other remuneration payable on any policies and contracts issued on such Applications written during such interim, shall be upon the terms and conditions stipulated in the above agreement.

2.   **Compensation** – The Company hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder, whenever the contract between General Agent and the Company is terminated.

3.   **Retirement Program** – Agent shall participate in the Agents Retirement Plan of the Company and shall participate in the Agents Retirement Investment Fund Plan of the Company upon satisfying the conditions for participation specified therein, as from time to time amended.

4.   **Limitation of Liability** – The Company shall not be liable to Agent in any manner, except as specifically set forth in this Endorsement.

The Northwestern Mutual Life Insurance Company

_____   _____
SOLICITING AGENT        SENIOR VICE PRESIDENT - AGENCIES
SPECIAL AGENT

NM-000065
Confidential

# NETWORK OFFICE 052 - John D. Blumberg, CLU

**John D. Blumberg, CLU**
**#87858**
**(1 March 2002)**

**John D. Blumberg Network Office**

**In the State of New York:** For the purposes of development, residency, and solicitation the Counties of **Bronx, Kings (Brooklyn), Nassau, New York (Manhattan), Queens, Richmond (Staten Island), Rockland, Suffolk, and Westchester.**

**In the State of New Jersey:** For the purposes of development, residency, and solicitation the Counties of **Bergen, Essex, Hudson, Morris, Passaic, Sussex** and **Union.** Also, Somerset County except for the townships of Branchburg, Franklin, Hillsboro, and Montgomery; the boroughs of Manville, Millstone, Raritan, Rocky Hill, and Somerville. **Middlesex** County except the townships of Cranbury, East Brunswick, Monroe, North Brunswick, Plainsboro, and South Brunswick, the boroughs of Helmetta, Jamesburg, Milltown, South River, and Spottswood, and the city of New Brunswick. **Monmouth** County except the townships of Freehold, Howell, Manalapan, Millstone, and Upper Freehold; and the boroughs of Allentown, Englishtown, Farmingdale, Roosevelt and Freehold.

**In the State of Connecticut:** For the purposes of development, residency and solicitation, the County of **Fairfield.** For the purposes of residency and solicitation, the Counties of **Litchfield** and **New Haven.**

Solicitation is defined as the authority to solicit new business and place that business with the agent's primary Network Office.

Residency is defined as the authority to contract and retain agents residing in an area, but not to open offices in a territory.

Development is defined as the authority to office agents in a territory.

NM-000066
Confidential



Northwestern Mutual®

720 East Wisconsin Avenue
Milwaukee, WI  53202

## State of New York Amendment
## to Full-Time Special or Soliciting Agent's Contract

First Party and Agent to the Full-Time Special or Soliciting Agent's Contract (the "Contract") to which this Amendment is attached agree as follows:

1.  Section 6(a) of the Contract is deleted and the following paragraph inserted:

    **"6. Exclusive Dealing – (a)** Agent agrees to submit to the Company for approval all Applications secured by him/her for life insurance, annuity contracts or disability income insurance policies, except Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the applicants.  However, this provision shall not apply to Applications for Section 79 group term life insurance, individual or group health insurance, credit life, liability, fidelity, surety and travel accident insurance or mutual fund shares. Agent is deemed to be a full-time life insurance salesperson and is expected to concentrate his/her sales efforts on behalf of the Company."

2.  The last sentence of Section 8 of the Contract is deleted.

3.  Except as provided above the Contract remains in full force and effect.

**In witness thereof,** the parties hereto have executed this agreement as of the effective date of the contract.

Gil  Elmaleh
_____          _____
Name of Agent                    Signature of Agent

John  Blumberg
_____          _____
Name of First Party              Signature of First Party

**Approved by (if First Party is a District Agent or Field Director):**

_____          _____
Signature of General Agent       Signature of District Agent

**Approved by:**

**The Northwestern Mutual Life Insurance Company**

By _____Todd M. Schoon_____
       Senior Vice President – Agencies

RECEIVED

DEC 0 5 2008

CONTRACT & LICENSING   FE

NM#000067
Confidential

 Northwestern Mutual®

## FULL-TIME SPECIAL OR SOLICITING AGENT'S CONTRACT

Samuel J. Waller , a ( ☐ General Agent ☒ District Agent ☐ Field Director) of
The Northwestern Mutual Life Insurance Company, hereinafter called "First Party," and **Gil Elmaleh**

of **Rye Brook** , in the County of

**Westchester** , and State of **New York** , hereinafter called "Agent," agree as follows:

**1. Effective Date** — This agreement shall take effect on

4 1 05 (MM/DD/YYYY).

### AUTHORITY OF AGENT

**2. Territory** — Agent is appointed to solicit Applications for insurance policies and annuity contracts issued by The Northwestern Mutual Life Insurance Company (the "Company") within _____

See attached

_____ (the "Territory").

**3. Solicitation Outside of Territory** — Whenever Agent wishes to solicit an Application in an area outside the Territory he must first secure through the Company an agent's license from the proper state authority. Solicitation outside the Territory shall be governed by regulations of the Company as from time to time published and amended.

**4. Relationship** — Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company, General Agent or First Party. Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of Agent.

**5. Alteration of Policies** — Agent shall have no power, personally or on behalf of the Company or First Party, to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract.

**6. Exclusive Dealing** – (a) Agent shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, except in connection with Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be

insurable only at higher than standard premium rates which are unacceptable to the applicants.

(b) The requirement of 6(a) is waived for Applications for life insurance policies solicited by Agent if his present term of Continuous Service commenced prior to January 1, 1956, provided any such Application is for insurance acceptable by the Company only at rates higher than the standard rates.

**7. No Brokerage** – Agent shall not accept business from, nor pay any commissions or other remuneration to, any person.

### DUTIES OF AGENT

**8. General Duties** – Agent shall solicit Applications within the territory, and shall procure the issuance of insurance policies and annuity contracts in an aggregate amount and on a number of lives satisfactory to First Party and at least equal to the minimum requirements established by the Company for licensure. He shall collect the initial premiums on such policies and contracts. He shall not engage in any business other than that covered by this agreement except with the consent of First Party.

**9. Responsibility** – Agent shall be responsible to First Party and the Company for all business done by or entrusted to his agents or persons employed by him. He shall indemnify and save First Party, District Agent, General Agent and the Company harmless from any and all expenses, costs, causes of action and damages resulting from or growing out of acts or transactions by himself or his employees or agents.

**10. Remittances** – Agent shall be responsible to General Agent, First Party and the Company for all amounts received for the account of the Company, General Agent or First Party by him, his employees or agents. All such amounts, and any promissory notes taken in payment of initial premiums on prepaid Applications, shall be deposited with First Party.

**11. Records** – Agent shall hold and preserve all records relating to transactions by or for the Company, and all other property of the Company which at any time shall come into his possession or under his control, and shall surrender them to the Company or First Party upon demand.

RECEIVED

APR 0 1 2005

CONTRACT & LICENSE

Page 1 of 4  FE

NM-000068
Confidential

12. Bond – Agent shall maintain a fidelity L...d acceptable to the Company.

13. Expenses – Agent shall pay all expenses incurred by him in the performance of this agreement.

14. Conduct – Agent shall comply with all applicable laws and regulations and shall so conduct himself as not to affect adversely the business, good standing or reputation of himself, First Party or the Company.

15. Confidential Materials – All Agents' training, Agency development and sales promotion materials and other items labeled "Confidential – Not for Publication" are furnished to Agent in confidence, and Agent agrees that he shall refrain from publishing or disclosing such material other than in the ordinary course of his business and that such items shall be returned to the Company upon demand or upon termination of this agreement.

## COMMISSIONS AND FEES

16. Schedules – (a) First Party shall pay commissions to Agent at the rates, and subject to the regulations, set forth in the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, published by the Company ..n time to time, and in effect on the date of Part I of the Application for the policy or contract with respect to which commissions are to be paid.

(b) The Company reserves the right to change the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, in whole or in part, subject to the following limitations:

   (i)   No such changes shall operate to reduce the first year, additional or renewal commissions payable on any policy or contract theretofore issued.

   (ii)  The Company shall give Agent not less than 30 days' advance written notice of the effective date of any reduction in commission rates, unless immediate change is required by statute or by administrative order of any governmental regulatory authority.

17. Level Payment of Commissions after Termination – If and when Agent shall have fulfilled the Company's production requirements and shall have filed with First Party, on the Company form provided for the purpose, his election to have payment of his commissions after termination of this or any subsequent agreement controlled by this Paragraph 17, then the following provision shall govern:

(a) Upon termination, by reason of Agent's death, incapacity, or retirement (as defined in the Agents Retirement Plan in effect on July 1, 1969), of this or any subsequent agreement the commissions then accrued or thereafter accruing which Agent would otherwise be entitled to receive shall not be paid to Agent, but shall be retained by the Company and amounts equal thereto shall be credited to an account on its books (the "Account"). Interest shall accrue on the balance from time to time in the Account at a rate per annum equal to the rate then currently used by the Company in crediting interest on non-contingent settlement option balances as certified by the Actuary of the Company, and shall be credited by the Company to the Account at least annually. Amounts standing to the credit of the Account shall be carried as an indebtedness of the Company payable in accordance with (b) of this provision. Agent shall have no interest in the Account, which is

established merely as an accounting convenience and shall not operate to segregate any balance therein from the general assets of the Company.

(b) The Company shall, subject to the provision for setoff in Paragraph 21, make payments from the Account to Agent in monthly installments in the amount, and for the number of years, elected by Agent prior to the aforesaid termination. The elected number of years shall be 15 or 20, or such other number of years as permitted by the Company at the time of the election. Installments shall commence within 60 days after the aforesaid termination and shall be payable monthly thereafter, but no such installment shall exceed the balance in the Account at the time such installment is payable.  In the event this agreement is terminated by Agent's death or his death occurs thereafter, payments pursuant to the terms of this provision shall be made in like manner in accordance with Paragraph 18.  All payments pursuant to (b) of this provision shall be charged against the Account.

(c) Agent shall have no power to assign, encumber, commute or anticipate his interest in any amounts standing to the credit of the Account or in any payment pursuant to (b) of this provision.

(d) Commissions accrued upon termination of this agreement or thereafter accruing shall be valued by application of the Evans' Commission Valuation Table elected by Agent, without interest.

18. Beneficiaries – Agent shall have the right to designate beneficiaries to receive commissions and other remuneration accrued at his death and thereafter accruing.  Any such designation of beneficiaries shall be subject to the following provisions:

(a) CLASSES – Beneficiaries shall be of the same classes as provided in life insurance policies of the series issued by the Company on the date of this agreement.

(b) SUCCESSION – The succession in interest of the beneficiaries shall be as stated in the Settlement Option Provisions of life insurance policies of said series.  If no beneficiary is designated or if no beneficiary survives Agent, amounts accrued at Agent's death and thereafter accruing shall be paid to his executor or administrator or to the persons entitled thereto under applicable law.

(c) WHEN EFFECTIVE – All designations, revocations and changes in beneficiaries shall be duly made in writing and shall be effective upon receipt at the Home Office of the Company.

(d) ASSIGNMENT – No assignment by Agent of his rights hereunder shall require the consent of any beneficiary, and the interest of any beneficiary shall be subject to any such assignment.

## TERMINATION

19. Term of Agreement – This agreement shall terminate upon the first to occur of the following:

(a) The death of Agent;

(b) If First Party is a General Agent, termination of the present contract between the General Agent and the Company;

(c) If First Party is a District Agent or Field Director, termination of his contract with General Agent (except as such contract may be extended through an Endorsement by the Company, in which case this agreement shall terminate upon expiration of the extension); or

(d) The end of the month in which Agent attains age 65.

It may be terminated by First Party upon written notice to Agent, by reason of:

(i)   Legislation, court decision or insurance department or other governmental ruling or requirement which in the opinion of the Company either contravenes any provisions of this agreement or renders it expedient for the Company to withdraw from the whole or any part of the Territory; or

(ii)   Failure of Agent to comply with any of the terms hereof; or

(iii)   Agent's becoming, in the opinion of First Party and the Company (of which they shall be the sole judges), incapacitated for any reason so that he cannot fully perform this agreement.

It may be terminated by Mutual Consent of Agent and First Party at any time.

It may be terminated by either party at any time, without cause, upon thirty days' written notice.

**19A. Replacement –** (This paragraph applies only if First Party is a Field Director.)

If this contract shall have remained in force until _____ (MM/DD/YYYY) it shall as of that date be replaced by an Agent's contract, in the then current form, between Agent and General Agent or District Agent.

**20. Commissions After Termination – (a)** If on termination of this agreement Agent has less than 15 years of Continuous Service, the renewal commission after such termination shall be payable as follows:

| Complete Years of Continuous Service | Policy Years For Which Renewal Commissions Are Payable |
|---|---|
| Less than 2 | None |
| 2-9 | 2nd thru 4th |
| 10 | 2nd thru 5th |
| 11 | 2nd thru 6th |
| 12 | 2nd thru 7th |
| 13 | 2nd thru 8th |
| 14 | 2nd thru 9th |

provided, however, that:

(i)   If termination was caused by Agent's death or by his becoming incapacitated, in the opinion of First Party and the Company (of which they shall be the sole judges), or if Agent had at least two years of Continuous Service and termination occurred after attainment of age 60, the number of policy years for which renewal commissions are payable shall not be reduced; and

(ii)   If Agent continues under another Agency contract or becomes an employee of the Company, the number of such renewals shall not be reduced so long as such status continues.

(b) If renewal commissions are not payable to Agent because of termination with less than 2 years of Continuous Service, such renewals arising from second, third and fourth policy year premiums shall be retained by First Party (unless First Party is a Field Director, in which case they shall be retained by the General Agent or District Agent contracting with the Field Director) and those arising from fifth and subsequent policy years shall be retained by the Company.

(c) If termination of this agreement was for violation of Paragraph 6, 7, 10 or 14 thereof, then in addition to any reductions set forth in other portions of this Paragraph 20 there shall be deducted from all commissions otherwise payable on renewal premiums collected after such termination 1% of such premiums.

(d) If on any July 1 occurring two years or more after the date of termination of this agreement (by reason other than death, incapacity, employment by the Company or entering into another Agency contract), the gross value of commissions which might be payable after such July 1 is estimated, in accordance with the policies and procedures of the Company as from time to time amended, to be $1,000 or less, such commissions shall not be paid to Agent when due, but rather, in lieu thereof, on such July 1 First Party shall pay to Agent an amount equal to 80% of such estimated gross value.

(e) Except as set forth in Subparagraphs (a), (b), (c) and (d) above, Agent's right to commissions shall not be affected by termination of this agreement.

### GENERAL

**21. Setoff –** First Party, District Agent, General Agent or the Company may at any time set off against any commissions or other remuneration due or to become due under this or any prior agreement to Agent, or anyone claiming through or under him, any debt or debts due from Agent to First Party, District Agent, General Agent or the Company.

**22. No Waiver –** No forbearance or neglect on the part of First Party, General Agent or the Company to enforce any of the provisions of this agreement shall be construed as a waiver of any of his or its rights or privileges hereunder or affect his or its rights arising from any default or failure of performance by Agent.

**23. Notice –** Any notice required by this agreement shall be in writing, and shall be delivered in person or by mail to the party at his last known post office address.

**24. No Assignment –** This agreement is not transferable. Except for the designation of beneficiaries as provided in Paragraph 18, and subject to the limitation of Paragraph 17(c), no rights or interests arising hereunder shall be assignable without the Company's prior written consent.

**25. Definitions –** The following terms shall have the indicated meanings:

(a) APPLICATION – an Application to the Company for an annuity contract, life insurance policy, or disability income insurance policy.

(b) CONTRACT YEAR – a period of one year commencing on the effective date of this agreement or any anniversary thereof.

(c) CONTINUOUS SERVICE – the total continuous time served in the employ of the Company, under leave of absence in the armed forces of the United States and under any Agency contract. Any intervals of not more than 2 months, and any interval of not more than 6 months immediately following such military leave of absence, shall be included. Service as a part-time agent shall be included only if it is immediately followed by entering into a full-time Agency contract or employment by the Company.

(d) SOLICITOR – the person under an Agency contract in effect on the date of Part I of an Application solicited by him whose signature appears on the Agent's Certificate of such Application.

NM-000070
Confidential

26.   Interpretation – This agreement s. . i not become effective until approved by the Company at its Home Office in Milwaukee, Wisconsin and shall be governed by and construed in accordance with the laws of the State of Wisconsin. If First Party or General Agent is a partnership, the words "he," "his," and "him" shall be understood to refer to the partnership unless it is apparent that they are used in a different sense.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the effective date set forth above.

| FIRST PARTY | GENERAL AGENT | SPECIAL AGENT |
| | DISTRICT AGENT | SOLICITING AGENT |
| | FIELD DIRECTOR/COLLEGE UNIT DIRECTOR | |

## ENDORSEMENT
(To be executed if First Party is a District Agent or Field Director)

**1. (To apply if First Party is a District Agent or Field Director under contract directly with a General Agent.)**

The undersigned General Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between General Agent and First Party is terminated.

**To apply if First Party is a Field Director under contract with a District Agent.)**

The undersigned District Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between District Agent and First Party is terminated.

| DISTRICT AGENT | GENERAL AGENT |
| FIELD DIRECTOR | |

## ENDORSEMENT BY COMPANY

The Company and Agent hereby agree as follows:

1. **Cashiership –** If the above agreement is terminated by reason of the termination of the General Agent's contract with the Company, Agent, if a Special Agent, without further act or notice may continue to solicit and procure Applications for policies and contracts and submit them to the representative appointed by the Company until the effective date of a General Agent's contract between the Company and a successor general agent. Commissions and other remuneration payable on any policies and contracts issued on such Applications written during such interim, shall be upon the terms and conditions stipulated in the above agreement.

2. **Compensation –** The Company hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder, whenever the contract between General Agent and the Company is terminated.

3. **Retirement Program --** Agent shall participate in the Agents Retirement Plan of the Company and shall participate in the Agents Retirement Investment Fund Plan of the Company upon satisfying the conditions for participation specified therein, as from time to time amended.

4. **Limitation of Liability –** The Company shall not be liable to Agent in any manner, except as specifically set forth in this Endorsement.

The Northwestern Mutual Life Insurance Company

| SOLICITING AGENT | By | EXECUTIVE VICE PRESIDENT - AGENCIES |
| SPECIAL AGENT | | |

Page 4 of 4   FE
NM-000071
Confidential

# TERRITORY
## NEW YORK, NEW YORK
### General Agency 52
### April 1, 2000

**IN THE STATE OF NEW YORK:**

For the purposes of development, residency, and solicitation the Counties of Bronx, Kings (Brooklyn), Nassau, New York (Manhattan), Queens, Richmond (Staten Island), Rockland, Suffolk, and Westchester.

**IN THE STATE OF NEW JERSEY:**

For the purposes of development, residency, and solicitation and the Counties of Bergen, Essex, Hudson, Morris, Passaic, and Union. Also, Somerset County except for the townships of Branchburg, Franklin, Hillsborough, and Montgomery; the boroughs of Manville, Millstone, Rocky Hill, and Somerville, and the towns of Somerset, and Raritan. Middlesex County except the townships of Cranbury, East Brunswick, Heathcote, Kendall Park, Kingston, Monroe, North Brunswick, Old Bridge, Plainsboro, and South Brunswick, the boroughs of Clearbrook Park, Concordia, Dayton, Helmetta, Jamesburg, Milltown, Monmouth Junction, Old Bridge, South River, and Spottstown, and the city of New Brunswick. Monmouth County except the townships of Colts Neck, Freehold, Howell, Manalapan, Millstone, and Upper Freehold; and the boroughs of Allentown, East Freehold, Englishtown, Farmingdale, Lincroft, Roosevelt, Robertsville, Tinton Falls, West Freehold, Yorketown, and Freehold.

**IN THE STATE OF CONNECTICUT:**

For the purposes of residency, and solicitation the County of Fairfield.

Solicitation is defined as the authority to solicit new business and place that business with the agent's primary General Agency.

Residency is defined as the authority to contract and retain agents residing in an area, but not to open offices in a territory.

Development is defined as the authority to office agents in a territory.

Accepted:

NM-000072
Confidential

# FULL TIME SPECIAL
# OR SOLICITING
# AGENT'S CONTRACT



**Northwestern Mutual Life**

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

_John D. Blumberg_       (General Agent)

     (District Agent)

     (Field Director)

of The Northwestern Mutual Life Insurance Company, hereinafter called "First Party," and _____

_Gil Elmaleh_ of _Rye Brook_ , in the County of

_Westchester_ and State of _New York_ , hereinafter called "Agent," agree as follows: :

**1. Effective Date** — This agreement shall take effect on _04/15/2004_ .

## AUTHORITY OF AGENT

**2. Territory** — Agent is appointed to solicit Applications for insurance policies and annuity contracts issued by The Northwestern Mutual Life Insurance Company (the "Company") within _____

_____

_____ (the "Territory").

**3. Solicitation Outside of Territory** — Whenever Agent wishes to solicit an Application in an area outside the Territory he must first secure through the Company an agent's license from the proper state authority. Solicitation outside the Territory shall be governed by regulations of the Company as from time to time published and amended.

**4. Relationship** — Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company, General Agent or First Party. Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of Agent.

**5. Alteration of Policies** — Agent shall have no power, personally or on behalf of the Company or First Party, to waive any forfeiture or to alter or discharge or waive any of the terms and conditions of any policy or contract.

**6. Exclusive Dealing** — (a) Agent shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, except in connection with Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only

at higher than standard premium rates which are unacceptable to the applicants.

(b) The requirement of 6(a) is waived for Applications for life insurance policies solicited by Agent if his present term of Continuous Service commenced prior to January 1, 1956, provided any such Application is for insurance acceptable by the Company only at rates higher than the standard rates.

**7. No Brokerage** — Agent shall not accept business from, nor pay any commissions or other remuneration to, any person.

## DUTIES OF AGENT

**8. General Duties** — Agent shall solicit Applications within the territory, and shall procure the issuance of insurance policies and annuity contracts in an aggregate amount and on a number of lives satisfactory to First Party and at least equal to the minimum requirements established by the Company for licensure. He shall collect the initial premiums on such policies and contracts. He shall not engage in any business other than that covered by this agreement except with the consent of First Party.

**9. Responsibility** — Agent shall be responsible to First Party and the Company for all business done by or entrusted to his agents or persons employed by him. He shall indemnify and save First Party, District Agent, General Agent and the Company harmless from any and all expenses, costs, causes of action and damages resulting from or growing out of acts or transactions by himself or his employees or agents.

**10. Remittances** — Agent shall be responsible to the General Agent, First Party and the Company for all amounts received for the account of the Company, General Agent or First Party by him, his employees or agents. All such amounts, and any promissory notes taken in payment of initial premiums on prepaid Applications, shall be deposited with First Party.

**11. Records** — Agent shall hold and preserve all records relating to transactions by or for the Company, and all other property of the Company which at any time shall come into his possession or under his control, and shall surrender them to the Company or First Party upon demand.

NM-000073
Confidential

12. Bond — Agent shall maintain fidelity bond acceptable to the Company.

13. Expenses — Agent shall pay all expenses incurred by him in the performance of this agreement.

14. Conduct — Agent shall comply with all applicable laws and regulations and shall so conduct himself as not to affect adversely the business, good standing or reputation of himself, First Party or the Company.

15. Confidential Materials — All Agents' training, Agency development and sales promotion materials and other items labeled "Confidential — Not for Publication" are furnished to Agent in confidence, and Agent agrees that he shall refrain from publishing or disclosing such material other than in the ordinary course of his business and that such items shall be returned to the Company upon demand or upon termination of this agreement.

## COMMISSIONS AND FEES

16. Schedules - (a) First Party shall pay commissions to Agent at the rates, and subject to the regulations, set forth in the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, published by the Company from time to time, and in effect on the date of Part I of each Application for the policy or contract with respect to which the commissions are to be paid.

) The Company reserves the right to change the Standard Full Time Special and Soliciting Agents' Commission and Fee Schedule, in whole or in part, subject to the following limitations:

(i) No such changes shall operate to reduce the first year, additional or renewal commissions payable on any policy or contract theretofore issued.

(ii) The Company shall give Agent not less than 30 days' advance written notice of the effective date of any reduction in commission rates, unless immediate change is required by statute or by administrative order of any governmental regulatory authority.

17. Level Payment of Commissions after Termination—If and when Agent shall have fulfilled the Company's production requirements and shall have filed with First Party, on the Company form provided for the purpose, his election to have payment of his commissions after termination of this or any subsequent agreement controlled by this Paragraph 17, then the following provision shall govern:

(a) Upon termination, by reason of Agent's death, incapacity, or retirement (as defined in the Agents' Retirement Plan in effect on July 1, 1969), of this or any subsequent agreement the commissions then accrued or thereafter accruing which Agent would otherwise be entitled to receive shall not be paid to Agent, but shall be retained by the Company and amounts equal thereto shall be credited to an account on its books (the "Account"). Interest shall accrue on the balance from time to time in the Account at a rate per annum equal to the rate then currently used by the Company in crediting interest on non-contingent settlement option balances as certified by the Actuary of the Company, and shall be credited by the Company to the Account at least annually. Amounts standing to the credit of the Account shall be carried as an indebtedness of the Company payable in accordance with (b) of this provision. Agent shall have no interest in the Account, which is established merely as an accounting

convenience and shall operate to segregate any balance therein from the general assets of the Company.

(b) The Company shall, subject to the provision for setoff in Paragraph 21, make payments from the Account to Agent in monthly installments in the amount, and for the number of years, elected by Agent prior to the aforesaid termination. The elected number of years shall be 15 or 20, or such other number of years as permitted by the Company at the time of the election. Installments shall commence within 60 days after the aforesaid termination and shall be payable monthly thereafter, but no such installment shall exceed the balance in the Account at the time such installment is payable. In the event this agreement is terminated by Agent's death or his death occurs thereafter, payments pursuant to the terms of this provision shall be made in like manner in accordance with Paragraph 18. All payments pursuant to (b) of this provision shall be charged against the Account.

(c) Agent shall have no power to assign, encumber, commute or anticipate his interest in any amounts standing to the credit of the Account or in any payment pursuant to (b) of this provision.

(d) Commissions accrued upon termination of this agreement or thereafter accruing shall be valued by application of the Evans' Commission Valuation Table elected by Agent, without interest.

18. Beneficiaries — Agent shall have the right to designate beneficiaries to receive commissions and other remuneration accrued at his death and thereafter accruing. Any such designation of beneficiaries shall be subject to the following provisions:

(a) CLASSES — Beneficiaries shall be of the same classes as provided in life insurance policies of the series issued by the Company on the date of this agreement.

(b) SUCCESSION — The succession in interest of the beneficiaries shall be as stated in the Settlement Option Provisions of life insurance policies of said series. If no beneficiary is designated or if no beneficiary survives Agent, amounts accrued at Agent's death and thereafter accruing shall be paid to his executor or administrator or to the persons entitled thereto under applicable law.

(c) WHEN EFFECTIVE — All designations, revocations and changes in beneficiaries shall be duly made in writing and shall be effective upon receipt at the Home Office of the Company.

(d) ASSIGNMENT—No assignment by Agent of his rights hereunder shall require the consent of any beneficiary, and the interest of any beneficiary shall be subject to any such assignment.

## TERMINATION

19. Term of Agreement — This agreement shall terminate upon the first to occur of the following:

(a) The death of Agent;

(b) If First Party is a General Agent, termination of the present contract between the General Agent and the Company; or

(c) If First Party is a District Agent or Field Director, termination of his contract with General Agent (except as such contract may be extended through an Endorsement by the Company, in which case this agreement shall terminate upon expiration of the extension); or

NM-000074
Confidential

(d) The end of the month in which Agent attains age 65.

It may be terminated by First Party upon written notice to Agent, by reason of:

(i) Legislation, court decision or insurance department or other governmental ruling or requirement which in the opinion of the Company either contravenes any provisions of this agreement or renders it expedient for the Company to withdraw from the whole or any part of the Territory; or

(ii) Failure of Agent to comply with any of the terms hereof, or

(iii) Agent's becoming, in the opinion of First Party and the Company (of which they shall be the sole judges), incapacitated for any reason so that he cannot fully perform this agreement.

It may be terminated by Mutual Consent of Agent and First Party at any time.

It may be terminated by either party at any time, without cause, upon thirty days' written notice.

**19A. Replacement** — (This paragraph applies only if First Party is a Field Director.)

If this contract shall have remained in force until _____ _____ it shall as of that date be replaced by an Agent's contract, in the then current form, between Agent and General Agent or District Agent.

**20.   Commissions After Termination** — (a) If on termination of this agreement Agent has less than 15 years of Continuous Service, the renewal commission after such termination shall be payable as follows:

| Complete Years of Continuous Service | Policy Years For Which Renewal Commissions Are Payable |
|---|---|
| Less than 2 | None |
| 2-9 | 2nd thru 4th |
| 10 | 2nd thru 5th |
| 11 | 2nd thru 6th |
| 12 | 2nd thru 7th |
| 13 | 2nd thru 8th |
| 14 | 2nd thru 9th |

provided, however, that:

(i) If termination was caused by Agent's death or by his becoming incapacitated, in the opinion of First Party and the Company (of which they shall be the sole judges), or if Agent had at least two years of Continuous Service and termination occurred after attainment of age 60, the number of policy years for which renewal commissions are payable shall not be reduced; and

(ii) If Agent continues under another Agency contract or becomes an employee of the Company, the number of such renewals shall not be reduced so long as such status continues.

(b) If renewal commissions are not payable to Agent because of termination with less than 2 years of Continuous Service, such renewals arising from second, third and fourth policy year premiums shall be retained by First Party (unless First Party is a Field Director, in which case they shall be retained by the General Agent or District Agent contracting with the Field Director) and those arising from fifth and subsequent policy years shall be retained by the Company.

(c) If termination of this agreement was for violation of Paragraph 6, 7, 10 or 14 thereof, then in addition to any reductions set forth in other portions of this Paragraph 20 there shall be deducted from all commissions otherwise payable on renewal premiums collected after such termination 1% of such premiums.

(d) If on any July 1 occurring two years or more after the date of termination of this agreement (by reason other than death, incapacity, employment by the Company or entering into another Agency contract), the gross value of commissions which might be payable after such July 1 is estimated, in accordance with the policies and procedures of the Company as from time to time amended, to be $1,000 or less, such commissions shall not be paid to Agent when due, but rather, in lieu thereof, on such July 1 First Party shall pay to Agent an amount equal to 80% of such estimated gross value.

(e) Except as set forth in Subparagraphs (a), (b), (c) and (d) above, Agent's right to commissions shall not be affected by termination of this agreement.

GENERAL

**21.   Setoff** — First Party, District Agent, General Agent or the Company may at any time set off against any commissions or other remuneration due or to become due under this or any prior agreement to Agent, or anyone claiming through or under him, any debt or debts due from Agent to First Party, District Agent, General Agent or the Company.

**22.   No Waiver** — No forbearance or neglect on the part of First Party, General Agent or the Company to enforce any of the provisions of this agreement shall be construed as a waiver of any of his or its rights or privileges hereunder or affect his or its rights arising from any default or failure of performance by Agent.

**23.   Notice** — Any notice required by this agreement shall be in writing, and shall be delivered in person or by mail to the party at his last known post office address.

**24.   No Assignment**—This agreement is not transferable. Except for the designation of beneficiaries as provided in Paragraph 18, and subject to the limitation of Paragraph 17(c), no rights or interests arising hereunder shall be assignable without the Company's prior written consent.

**25.   Definitions** — The following terms shall have the indicated meanings:

(a) APPLICATION — an application to the Company for an annuity contract, life insurance policy, or disability income insurance policy.

(b) CONTRACT YEAR — a period of one year commencing on the effective date of this agreement or any anniversary thereof.

(c) CONTINUOUS SERVICE — the total continuous time served in the employ of the Company, under leave of absence in the armed forces of the United States and under any Agency contract. Any intervals of not more than 2 months, and any interval of not more than 6 months immediately following such military leave of absence, shall be included. Service as a part-time agent shall be included only if it is immediately followed by entering into a full-time Agency contract or employment by the Company.

(d) SOLICITOR— the person under an Agency contract in effect on the date of Part I of an Application solicited by him whose signature appears on the Agent's Certificate of such Application.

NM-000075
Confidential

23. Interpretation - This agreement shall not become effective until approved by the Company at its Home Office in Milwaukee, Wisconsin and shall be governed by and construed in accordance with the laws of the State of Wisconsin. If First Party's General Agent is a partnership, the words "he," "his" and "him" shall be understood to refer to the partnership unless it is apparent that they are used in a difference sense.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the effective date set forth above.

_____
First Party        General Agent
                   District Agent
                   Field Director

_____
                   Special Agent
                   Soliciting Agent

## ENDORSEMENT
(To be executed if First Party is a District Agent or Field Director)

1. (To apply if First Party is a District Agent or Field Director under contract directly with a General Agent.)

The undersigned General Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between General Agent and First Party is terminated.

2. (To apply if First Party is a Field Director under contract with a District Agent.)

The undersigned District Agent hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder whenever the contract between District Agent and First Party is terminated.

_____
District Agent

_____
General Agent

_____
Field Director

## ENDORSEMENT BY COMPANY

The Company and Agent hereby agree as follows:

1. Cashiership — If the above agreement is terminated by reason of the termination of the General Agent's contract with the Company, Agent, if a Special Agent, without further act or notice may continue to solicit and procure Applications for policies and contracts and submit them to the representative appointed by the Company until the effective date of a General Agent's Contract between the Company and a successor general agent. Commissions and other remuneration payable on any policies and contracts issued on such Applications written during such interim, shall be upon the terms and conditions stipulated in the above agreement.

2. Compensation—The Company hereby approves the above agreement and, subject to the terms and conditions thereof, agrees to remit to Agent commissions and other remuneration to which he may become entitled thereunder, whenever the contract between General Agent and the Company is terminated.

3. Retirement Program—Agent shall participate in the Agents Retirement Plan of the Company and shall participate in the Agents Retirement Investment Fund Plan of the Company upon satisfying the conditions for participation specified therein, as from time to time amended.

4. Limitation of Liability —The Company shall not be liable to Agent in any manner, except as specifically set forth in this Endorsement.

_____
Soliciting Agent
Special Agent

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

By _____
Senior Vice President - Agencies

4

NM-000076
Confidential

# TERRITORY
## NEW YORK, NEW YORK
### General Agency 52
### April 1, 2000

**IN THE STATE OF NEW YORK:**
For the purposes of development, residency, and solicitation the Counties of Bronx, Kings (Brooklyn), Nassau, New York (Manhattan), Queens, Richmond (Staten Island), Rockland, Suffolk, and Westchester.

**IN THE STATE OF NEW JERSEY:**
For the purposes of development, residency, and solicitation and the Counties of Bergen, Essex, Hudson, Morris, Passaic, and Union. Also, Somerset County except for the townships of Branchburg, Franklin, Hillsborough, and Montgomery; the boroughs of Manville, Millstone, Rocky Hill, and Somerville, and the towns of Somerset, and Raritan; Middlesex County except the townships of Cranbury, East Brunswick, Heathcote, Kendall Park, Kingston, Monroe, North Brunswick, Old Bridge, Plainsboro, and South Brunswick, the boroughs of Clearbrook Park, Concordia, Dayton, Helmetta, Jamesburg, Milltown, Monmouth Junction, Old Bridge, South River, and Spottstown, and the city of New Brunswick. Monmouth County except the townships of Colts Neck, Freehold, Howell, Manalapan, Millstone, and Upper Freehold; and the boroughs of Allentown, East Freehold, Englishtown, Farmingdale, Lincroft, Roosevelt, Robertsville, Tinton Falls, West Freehold, Yorketown, and Freehold.

**IN THE STATE OF CONNECTICUT:**
For the purposes of residency, and solicitation the County of Fairfield.

Solicitation is defined as the authority to solicit new business and place that business with the agent's primary General Agency.

Residency is defined as the authority to contract and retain agents residing in an area, but not to open offices in a territory.

Development is defined as the authority to office agents in a territory.

Accepted:

NM-000077
Confidential

# STATE OF NEW YORK
# AMENDMENT TO FULL TIME
# SPECIAL OR SOLICITING
# AGENT'S CONTRACT

First Party and Agent to the Full Time Special or Soliciting Agent's Contract (the "Contract") to which this Amendment is attached agree as follows:

1.  Section 6 (a) of the Contract is deleted and the following paragraph inserted:

"6.   Exclusive Dealing - (a)   Agent agrees to submit to the Company for approval all Applications secured by him for life insurance, annuity contracts or disability income insurance policies, except Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the applicants. However, this provision shall not apply to Applications for Section 79 group-term life insurance, individual or group health insurance, credit life, liability, fidelity, surety and travel accident insurance or mutual fund shares. Agent is deemed to be a full-time life insurance salesman and is expected to concentrate his sales efforts on behalf of the Company."

2.  The last sentence of Section 8 of the Contract is deleted.

3.  Except as provided above the Contract remains in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the effective date of the Contract.

_____   _____
First Party                 Agent

Approved by:   (if First Party is a District Agent or Field Director)

_____   _____
General Agent               District Agent

Approved by The Northwestern Mutual Life Insurance Company

By _____
VICE PRESIDENT - AGENCIES

NM-000078
Confidential