Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
THE NORTHWESTERN MUTUAL LIFE INSURANCE:
COMPANY,                                              :          12 Civ. 2514 (PKC)(HBP)
                                                      :
                          Plaintiff,                  :
                                                      :
        - against -                                   :
                                                      :
STEVEN LITT and TRACY COPPLE-LITT,                    :
                                                      :
                          Defendants.                 :
------------------------------------------------------------------ x

### DEFENDANT STEVEN LITT'S DEPOSITION DESIGNATIONS PURSUANT TO RULE 29 OF THE COMMERCIAL DIVISION OF THE SUPREME COURT

Pursuant to Rule 29 of the Commercial Division of the Supreme, defendant Steven Litt

hereby designates and submits the following deposition testimony for use at trial.

### Deposition of Tracy Copple-Litt conducted October 26, 2012

| Page and Line of Designated Testimony |
| :---: |
| 4:1-25, 5:1 |
| 14:24-25, 15:1-25, 16:1-25, 17:1-25, 18:1-25, 19:1-25, 20:1-25, 21:1-25, 22:1-14 |
| 29:8-25, 30:1-25, 31:1-10 |
| 32:4-25, 33:1-21 |
| 37:3-25, 38:1-9 |
| 39:9-13 |
| 40:21-25, 41:1-9 |
| 41:13-18 |
| 41:22-25, 42:1-25, 43:1-7 |
| 44:22-25, 45:1-12 |
| 50:16-24 |

| Page and Line<br>of Designated Testimony |
|---|
| 51:18-25, 52:1-12 |
| 52:17-25, 53:1-3 |
| 55:20-25, 56:1-20 |
| 57:16-18 |
| 58:11-13 |
| 59:7-15 |
| 59:23-25, 60:1-6 |
| 62:23-25, 63:1-25, 64:1-12 |
| 65:23-25, 66:1-25, 67:1-25, 68:1-25, 69:1-25, 70:1-25, 71:1-25, 72:1-25, 73:1-5 |
| 74:6-25,<br>75:1-25, 76:1-25, 77:1-25, 78:1-25, 79:1-25, 80:1-25, 81:1-25, 82:1-20 |
| 83:16-25, 84:1-25, 85:1-21 |
| 93:1-25, 94:1-25, 95:1-25, 96:1-25 |

1                                                    1

2        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK        ORIGINAL
3        ---------------------------x

4        THE NORTHWESTERN MUTUAL LIFE INSURANCE
         COMPANY,
5
                    Plaintiff,
6
                 v.                    12 Civ. 2514
7                                      (PKC)(HBP)

8        STEVEN LITT and TRACY COPPLE-LITT,

9                    Defendants.

10       ---------------------------x
                              October 26, 2012
11                            10:00 a.m.

12

13

14            Deposition of TRACY COPPLE-LITT, taken

15       by co-defendant, pursuant to notice, at the

16       offices of Satterlee Stephens Burke & Burke

17       LLP, 230 Park Avenue, New York, NY 10169,

18       before Julia Liu, a Shorthand Reporter and

19       Notary Public of the State of New York.

20

21

22

23

24

25

```
1                                                        2
2          APPEARANCES:

3

4          SATTERLEE STEPHENS BURKE & BURKE LLP
5               Attorneys for defendant Steven Litt
6               230 Park Avenue
7               New York, NY 10169
8          BY:  MICHAEL H. GIBSON
9

10         RICHARD PESKIN, ESQ.
11              Attorney for defendant
12              Tracy Copple-Litt
13              6 East 39th Street
14              6th Floor
15              New York, NY 10016
16         BY:  RICHARD S. PESKIN
17
18
19
20
21
22
23
24
25
```

1                                                                3

2                              STIPULATIONS

3

4            IT IS HEREBY STIPULATED AND AGREED, by

5      and between counsel for the respective

6      parties hereto, that all objections, except

7      as to form, are reserved to the time of

8      trial.

9            IT IS FURTHER STIPULATED AND AGREED

10     that the deposition may be signed and sworn

11     to before any officer authorized to

12     administer an oath.

13           IT IS FURTHER STIPULATED AND AGREED

14     that the sealing and filing of the

15     deposition be waived.

16

17

18

19

20

21

22

23

24

25

1                            Copple-Litt                    4

2        TRACY COPPLE-LITT,

3             called as a witness, having been duly

4             sworn, testified as follows:

5        EXAMINATION

6        BY MR. GIBSON:

7             Q.     Good morning, Ms. Litt.

8             A.     Good morning.

9             Q.     My name is Mike Gibson.  I'm with

10       the firm of Satterlee Stephens Burke &

11       Burke and I represent Steven Litt in this

12       litigation.

13                   Can you state your full name for

14       the record?

15             A.     Tracy Lynn Copple-Litt.

16             Q.     And what's your current address,

17       Ms. Litt?

18             A.     I have two residences.

19             Q.     Okay.

20             A.     253 West 73rd Street, Apartment

21       13H.

22             Q.     Okay.

23             A.     New York, New York.

24             Q.     And your other residence?

25             A.     141 Bright Street, Jersey City,

```
 1                    Copple-Litt               5
 2     New Jersey.  And that's more of a business.
 3          Q.    Got you.  Got you.  And Ms. Litt,
 4     have you ever had your deposition taken
 5     before?
 6          A.    No.
 7          Q.    Okay.  I'm just going to go over
 8     some general ground rules that will make it
 9     easier for the court reporter, who I'll
10     talk about in a minute, to get an accurate
11     record of our discussion today and will
12     also get us through this quickly and on our
13     way.
14               Do you understand that your
15     testimony here is being taken under oath?
16          A.    I do.
17          Q.    Okay.  And do you understand that
18     even though we're in an informal setting in
19     my conference room here that your testimony
20     here is the equivalent as if you were
21     giving testimony in court today?
22          A.    I do.
23          Q.    Okay.  And as you see, there's a
24     court reporter sitting next to us and she's
25     going to be taking down everything we say
```

Copple-Litt                    14

1
2    administrator, that's my job is make sure
3    that there's -- any outstanding debt that
4    needs to get taken care of, so.
5         Q.    And the unopened mail that you
6    had mentioned, where did you find that?
7         A.    Well, there were boxes of bank
8    statements, boxes of life insurance
9    policies, boxes of unopened wage stubs,
10   medical bills for both myself and him.
11   They were all in the apartment.
12        Q.    Okay.
13        A.    In the city, if you wanted a
14   location.
15        Q.    And what was the address of that
16   apartment again?
17        A.    253 West 73rd Street.
18        Q.    And did you look through any
19   e-mails?
20        A.    No.
21        Q.    Okay.  You can hand that back to
22   the court reporter.  I don't think we need
23   that anymore.
24             And I'm going to show you now
25   what's been marked as Defendant Exhibit 2

```
1                         Copple-Litt                    15
2         and just ask you to also take a quick look
3         at that.
4                   (Defendant's Exhibit 2 marked for
5              identification)
6         Q.    And specifically -- again, feel
7         free to take all the time you want -- but
8         if you go about to the sixth page, after
9         the page with your attorney's signature on
10        it, you'll see the remainder of the -- the
11        remainder of the documents seem to be a
12        series of documents regarding the decedent.
13        Do you recognize these documents?
14        A.    I have not seen these, no.
15        Q.    Okay.  Are these -- again, take
16        all the time you want -- are these not
17        documents that you provided to your
18        attorney in response to the requests that
19        were in Exhibit 1?
20        A.    Oh, yes.  I did, actually.
21        Sorry.
22        Q.    Okay.  Okay.  Understood.  Are
23        you aware of any documents, and feel free
24        to go through them --
25        A.    Oh, yes.  These are, indeed,
```

```
 1                      Copple-Litt              16
 2      after I looked, yeah, these are.
 3           Q.    Great.
 4           A.    I must say I did not go through
 5      every single page.
 6           Q.    That's fine.  No, I understand.
 7                 Do you have any reason to believe
 8      that you located any documents that were
 9      responsive to the discovery requests in
10      Exhibit 1 that are not contained in the
11      responses in Exhibit 2?
12           A.    I don't understand the question.
13           Q.    Okay, sure.  So as we discussed,
14      Exhibit 1 was a set of requests that my
15      firm served on your attorney for responsive
16      documents.
17           A.    Okay.
18           Q.    And Exhibit 2, I'll represent,
19      are your attorney's responses to those
20      requests and the documents that we just
21      talked about are those responsive
22      documents.
23           A.    Correct.
24           Q.    Okay.  Do you have any reason to
25      believe that you located any documents in
```

```
 1                        Copple-Litt                    17

 2      response to the request that aren't

 3      contained in the response?

 4           A.    No.

 5           Q.    Okay.  Thank you.  And you can

 6      hand that back to the court reporter as

 7      well.

 8                 MR. PESKIN:  Off the record.

 9                 (Discussion off the record)

10           Q.    Ms. Litt, did you know the

11      decedent, David Litt?

12           A.    Yes, he was my husband.

13           Q.    And when did you get married to

14      him?

15           A.    2005.

16           Q.    Do you remember the exact date?

17           A.    September 4th.

18           Q.    And what was the decedent's

19      address when the two of you got married?

20           A.    253 West 73rd Street, Apartment

21      13H.

22           Q.    And is that where you're

23      currently residing?

24           A.    Yes.  We also had a home at 45

25      West Beechcroft Road in Short Hills that
```

1                    Copple-Litt                  18

2    was my primary residency.  Before we got

3    married, I owned the property, and then he

4    and I shared it as a couple.

5         Q.    Now, after you were married on

6    September 4th, 2005, did you move into the

7    apartment at 253 West 73rd Street with the

8    decedent?

9         A.    No.  We actually did not do that.

10   Our careers are pretty busy and at the

11   time, I was working in New Jersey and he

12   was working in Connecticut, so we kind of

13   maintained the same residency.  We were in

14   the process of selling both places and

15   looking for a place of our own but he, you

16   know, he was working in Connecticut, I was

17   working in New Jersey, our lives are very,

18   very hectic, and so we did look at a few

19   properties before we got married and after

20   we got married, but we did not decide on

21   anything.

22              But we did -- like, I did -- I

23   wouldn't say moved in, like, I mean, not

24   all my belongings were in the city, not all

25   of his belongings were in Short Hills but

2      yes, we did have, you know, clothes and

3      certain favorite personal things,

4      belongings that we had in both homes.

5           Q.     And from the time that you got

6      married to the time that your husband

7      passed away, would you say that you spent

8      more of your time at the apartment on 73rd

9      Street or more of your time at the home in

10     Short Hills?

11          A.     It depends.  I mean, he was there

12     in Short Hills or I was there in the city.

13     I mean, our basic routine was like Monday

14     through Friday, he'd be working in Darien

15     and I would be working in New Jersey.  That

16     was initially, when we got married.  And

17     then on the weekends, we would get

18     together, we'd go away.

19               David and I traveled a lot.  I

20     met David in 1996 and I was in college and

21     we traveled the world together and we were

22     definitely a couple that enjoyed traveling

23     and enjoyed each other's company.

24          Q.     Is it -- and please tell me if

25     I'm mischaracterizing your statement -- but

Copple-Litt                    20

1

2      is it fair to say that Monday through

3      Friday, you generally did not live

4      together?

5            A.     Well, maybe not physically, but

6      we were married and we talked and we text

7      and...

8            Q.     Right.  And I'm not suggesting at

9      all that you did not communicate with each

10     other.  But as far as where you physically

11     resided during the week, is it fair to say

12     that more often than not, you resided in

13     Short Hills and Mr. Litt resided at the

14     apartment on 73rd Street?

15            MR. PESKIN:  What period of time?

16            Q.     Well, can you answer that

17     question between the time of marriage and

18     the time of death?

19            A.     I would say I lived more with him

20     than not.

21            Q.     Okay.

22            A.     During my entire marriage.

23            Q.     Okay.  What if I asked you the

24     same question between the period of January

25     1st, 2008 through the time of Mr. Litt's

1                     Copple-Litt                    21

2       death, would you say you lived more

3       together or more apart, if you can --

4            A.    I think at that point, I was -- I

5       think that's about the period where I

6       became having a lot of health issues, and I

7       had a second open heart surgery and I had

8       two ankle surgeries and my doctors were in

9       Short Hills area, Livingston, and my

10      cardiologist was there.  So because of my

11      illness, it was much easier for me to be in

12      Short Hills and David would come and stay

13      in Short Hills with me to help me, you

14      know, recover when he could because he was

15      very, very -- he was like very busy.  That

16      was around the time he started his fund in

17      Connecticut.

18           Q.    Okay.  And again, dealing with

19      the time period of January 1st, 2008

20      through the time of Mr. Litt's death, are

21      there any other reasons why you may have

22      lived apart more often, other than your

23      health?

24           A.    No.

25           Q.    And when did Mr. Litt --

Copple-Litt                                    22

A.    Well, let me clarify.

Q.    Absolutely.

A.    Other than health and work.

Q.    Health and work, okay.  Yes.  I
apologize.  You did testify to that.

      And on what date did Mr. Litt
pass away?

A.    September 11th, 2011.

Q.    And where were you living at that
time?

A.    I was living in -- well, I had my
stuff in the city but at the time of his
death, I was actually in Jersey City.

Q.    Okay.  You had moved to Jersey
City from --

A.    No, that's pretty much my office.

Q.    Okay.

A.    And I was in transit because I
was in the process of selling Beechcroft
and we needed another place and so -- to
like store all the furniture because I had
rented out Beechcroft, 45 West Beechcroft,
so we needed, like, another place.  And
rentals here are very, like -- for

```
1                    Copple-Litt                  29

2        A.     No.

3        Q.     Can you approximate the year?

4        A.     No.   They were before me and

5   David, though.

6        Q.     If --

7        A.     In terms of our marriage.

8        Q.     Before your marriage.  Do you

9   recall after you were married, taking any

10  trips to Portland, Oregon with David?

11       A.     Yeah.  I told you, the bris.

12       Q.     Those, okay.

13       A.     And, you know, we went out a

14  couple of times to visit his father 'cause

15  his father was in the nursing home.  And I

16  mean, when his mom got cancer, I stayed in

17  Short Hills and he went to Oregon because

18  at the time, he decided that, you know, he

19  wanted to be with his mom.  And I went on a

20  family retreat after we got married in -- I

21  think it's Cannon Beach, Oregon.

22       Q.     And can you tell me when that

23  was?

24       A.     After we got married.  I don't

25  know.
```

```
 1                    Copple-Litt                  30
 2          Q.    Don't know the year?  When the
 3     decedent's mom was ill, why didn't you go
 4     on that trip?
 5          A.    He didn't -- he wanted to be with
 6     his mom.  He didn't say, you know -- I
 7     mean, I was working and I had to take care
 8     of Buddy and he just -- I think he was on a
 9     business trip anyway.  He was going to go
10     after that -- after his visit to a business
11     trip.
12          Q.    And did you offer to go?
13          A.    Yeah, of course.
14          Q.    Do you recall in or around April
15     2009 the decedent's father being diagnosed
16     as terminally ill?
17          A.    I do.  I recall his funeral and
18     David went to Oregon and he asked me to
19     e-mail all of his -- 'cause I asked if he'd
20     like me to attend, and he said no, I prefer
21     you just to stay there.  And he asked me to
22     e-mail all of his partners and give all of
23     his friends -- like he gave me a list of
24     e-mails of all of his friends and partners
25     -- and to let them know that he was --
```

```
1                    Copple-Litt                    31
2        where he was going to be and where they
3        could send donations.
4             Q.    But is it correct he did not ask
5        you to attend his father's funeral?
6             A.    No, he did not.
7             Q.    Did you offer?
8             A.    I did.  I really, really had a
9        great relationship with his father.  His
10       father was a very special guy.
11            Q.    Do you recall the decedent
12       traveling to Portland, Oregon for his
13       mother's 70th birthday party?
14            A.    He had mentioned it to me.  But
15       at the time, I believe I was doing
16       something and I was going to go to Montana.
17       So there was a conflict.
18            Q.    What were you going to Montana
19       for?
20            A.    My family was in Montana.
21            Q.    To visit your family.  Did he ask
22       you to attend that birthday party?
23            A.    He just said, you know, "Would
24       you like to go?"  And I said, "Well, I
25       think that I'm going to Montana," and but,
```

1                     Copple-Litt                    32

2     ~~you know, we were not -- he wasn't upset~~

3     ~~about it.~~

4          Q.     I'm going to show you a document

5     which has been marked as Exhibit 3.  And

6     just take your time and take a look at it.

7     Let me know when you're ready.

8                (Defendant's Exhibit 3 marked for

9                identification)

10         A.     Yes, I'm ready.

11         Q.     Okay.  And do you recognize this

12    document?

13         A.     I do.

14         Q.     And what is this?

15         A.     This is a designation of

16    beneficiary from Northwestern Mutual that

17    puts my name as the direct beneficiary.

18         Q.     Okay.  And how did you come into

19    possession of this document?

20         A.     It was in his files.

21         Q.     Which files?

22         A.     At his home.

23         Q.     Okay.

24         A.     He -- when we got married, after

25    we got back from our honeymoon, he had

Copple-Litt                    33

1

2    given me a key to this kind of chest thing

3    that he had, and he said to me, "If

4    anything happens to me, this is where you

5    need to go."  And it was within the

6    apartment and I had a key and he showed me

7    -- had a binder of all kinds of, you know,

8    insurance policies, bank statements, his

9    partnership agreements with, you know, his

10   -- his firms at the time, with Morgan

11   Stanley and Lehman Brothers was in there.

12   And, you know, he said, "This is where you

13   need to go."

14            And so I knew of the place to

15   look because he had told me when we got

16   married that this is where he put all of

17   his stuff.

18        Q.    And so is it fair to say that the

19   first time that you saw this document was

20   after Mr. Litt's death?

21        A.    Correct.

22        Q.    Okay.

23        A.    But I must state I was not -- I

24   was surprised that this is all happening

25   because, you know, when David and I got

1                       Copple-Litt                    37

2        ~~A.      It was in Africa.~~

3        Q.    And then at the very bottom of

4    the exhibit, where it says "For Home Office

5    Use," on the left, it says "Form Recorded

6    and Endorsement Waived," and there's a date

7    and it's blank.  Correct?

8        A.    Correct.

9        Q.    Have you ever seen a version of

10   this document with that date filled in?

11       A.    Not that I can recall, no.

12       Q.    Okay.  And also on the right side

13   of the bottom, it says -- there's a

14   signature line for the Northwestern Mutual

15   Life Insurance Company and that's blank as

16   well.  Correct?

17       A.    Correct.

18       Q.    Have you ever seen a version of

19   this document that was executed by

20   Northwestern?

21       A.    I think in the fax that I --

22   there was a fax that showed that he had

23   sent it to Northwestern.

24       Q.    Well, I don't think that's the

25   question I asked.  Let me rephrase and I

Copple-Litt                    38

1    apologize for that.

2          Have you ever seen a version of

3    this document that was signed by

4    Northwestern where this signature is filled

5    in, the bottom right?

6          A.    No, that I can recall.  But I

7    must point out something:  This is typed,

8    so.

9    Q.    Okay.

10          A.    I don't think David would type

11    this.  I mean, everything else is not

12    typed.

13          MR. PESKIN:  You just have to

14          answer the questions that are asked.

15          THE WITNESS:  Okay.

16    Q.    Do you recall having

17    conversations with the decedent regarding

18    his life insurance policy prior to

19    September 28th, 2005?

20          A.    Well, I knew that he -- I don't

21    know if -- yeah, because I mean, we were

22    married so yeah, shortly before we got

23    married, he had told me that he had this

24    policy and that his brother was on it and

```
 1                        Copple-Litt                    39
 2      he said that when we get married, I will,
 3      you know, I'm going to change it to you.
 4      And that's how that whole conversation came
 5      about with him telling me that he wanted me
 6      to, you know, make sure that his family was
 7      taken care of if something had happened to
 8      him.
 9           Q.    Okay.  Now, after you got
10      married, did you do anything to confirm
11      that Mr. Litt did indeed change the
12      beneficiary on his account?
13           A.    No.
14           Q.    Okay.  Did you ask him about it?
15           A.    No.  I -- he's my husband.  I
16      trust what he says.
17           Q.    Did you have, after the
18      conversation that you just described, did
19      you have any discussions with Mr. Litt
20      about his life insurance policy, that you
21      can recall, up to the time of his death?
22           A.    That's not one of the topics we
23      would discuss, no.  I mean, he did tell me
24      that -- he did say that he had spoken with
25      Gil or something, and -- and that he had
```

Copple-Litt                    40

2    done, like he had made a change.   But that

3    was after we came back from our honeymoon.

4         Q.    And when was that about?

5         A.    It was after September.   It was

6    probably in October of 2005.

7         Q.    And what change did he --

8         A.    He said that he was -- that he

9    had changed it into my name.

10        Q.    Did he show you any documents to

11   show that that had been done?

12        A.    No.

13        Q.    Did you ask him to see any

14   documents to confirm that had been done?

15        A.    No, why would I?

16        Q.    I'm just asking you if you asked?

17        A.    No.   I trusted my husband.   I

18   don't -- you know, David was a good guy.

19   He would not do something to -- like, he

20   wasn't somebody that you couldn't trust.

21        Q.    Did you ever receive any

22   documents from Northwestern that indicated

23   that you had been changed as the

24   beneficiary?

25             MR. PESKIN:   Excuse me.   Is the

```
 1                        Copple-Litt                41
 2            question whether the witness ever
 3            received any documents?
 4                 MR. GIBSON:   That's correct.
 5            A.    I'm sure there were documents in
 6       the apartment.
 7            Q.    So you've seen documents in your
 8       apartment?
 9            A.    I have not.
10            Q.    Okay.
11            A.    I mean, but I'm not through
12       everything either.
13            Q.    But I guess just to clarify your
14       answer:  Have you ever seen a document from
15       Northwestern that indicates that you were
16       the beneficiary on this life insurance
17       policy?
18            A.    Other than this, no.
19                 MR. GIBSON:   Could we go off the
20       record for a minute?
21                 (Discussion off the record)
22            Q.    Ms. Litt, going back to a
23       question that we had asked earlier about a
24       birth of the decedent's niece in Oregon, do
25       you recall traveling -- your husband
```

```
 1                    Copple-Litt              42
 2       traveling to Portland, Oregon for the birth
 3       of his niece, Mira Litt?
 4            A.    Yes.
 5            Q.    And did you attend that trip?
 6            A.    I did not.
 7            Q.    Why not?
 8            A.    I believe I had a business trip
 9       at the time.
10            Q.    Now, I'm going to show you a
11       document that's been marked as Exhibit 4.
12                 (Defendant's Exhibit 4 marked for
13                 identification)
14            Q.    Now, I think you had testified
15       earlier, and please tell me if I'm wrong,
16       that this was the document that you thought
17       was signed by Northwestern or did I
18       misunderstand, you were referring to a
19       confirmation?
20            A.    I don't know exactly what you're
21       trying to state.
22            Q.    Okay, okay.  Withdrawn.
23                 Do you recognize the document?
24            A.    I do.
25            Q.    Okay.  And what is this?
```

Copple-Litt                    43

1

2          A.     It's a confirmation fax to

3     Northwestern doing a change of client

4     information and it was done on the same

5     date as the change of beneficiary, which

6     was September 29th, 2005, from his

7     employer, Lehman, where he worked.

8          Q.     Okay.

9          A.     When we were married.

10          Q.     Okay.  Now, you testified that

11     this is a confirmation of a fax being sent

12     from Lehman to Northwestern?

13          A.     By David, yes.

14          Q.     How do you know that this was a

15     fax from Lehman to Northwestern?

16          A.     'Cause it says right there,

17     Lehman 919149464969.

18          Q.     Okay.

19          A.     And that's where he live -- he

20     worked.

21          Q.     Right.  I understand that.  But

22     how do you know that this was sent to

23     Northwestern?

24          A.     Because it has a message

25     confirmation of the number that he wrote

1          Copple-Litt                    44
2    down here.
3          Q.    So is it your testimony, do you
4    -- the number --
5          A.    This is not -- I don't know it
6    like 100 percent but just looking at this
7    document, that's what I would assume, as a
8    rational individual, that this was
9    something that he sent from work to
10   Northwestern to change his beneficiary or
11   client information.  That's what a rational
12   individual would assess.
13         Q.    Well, what on this document tells
14   you that this was sent to Northwestern?
15         A.    Because there's -- it says
16   "Pages, Result, Okay," and it has the
17   number that he wrote.
18         Q.    Which number are we talking
19   about?
20         A.    The 9149464969, that has it up
21   there.
22         Q.    And do you know if 9149464969 is
23   a fax number for Northwestern?
24         A.    No, I do not.  That was an
25   assumption by me.

```
1                      Copple-Litt                    45
2            Q.      Okay.  And how did you locate
3     this document?
4            A.      It was in his files.
5            Q.      And you said --
6            A.      He had a Northwestern file.
7            Q.      Okay.
8            A.      That had important stuff, like
9     there were tons and tons of unopened
10    Northwestern things but this was in things
11    that he made -- he thought was important,
12    he had in a file.
13           Q.      Well, let's talk about that.  You
14    talked about "tons and tons of Northwestern
15    things."  Are those -- were all of those
16    documents the documents that were produced
17    on Exhibit 2 that we looked at or were
18    there more documents having to do with
19    Northwestern?  I'm happy to give you
20    another copy of Exhibit 2 if you need to
21    look at it.
22           A.      No, this was probably -- anything
23    that had -- based upon what I've seen,
24    anything that had anything that was
25    relevant or significant or was important,
```

```
 1              Copple-Litt              50
 2      respond to counsel's representation
 3      regarding the policy statements.  I
 4      don't deny that we may have only
 5      produced one or two annual policy
 6      statements.  And again, the reason for
 7      that is that the remainder of each
 8      year's annual policy statements were
 9      produced directly by Northwestern.
10              MR. GIBSON:  Okay.
11              MR. PESKIN:  So that's why they
12      weren't duplicated by production.  By
13      all means, counsel can review this
14      prior to our leaving today.
15              MR. GIBSON:  Thank you, counsel.
16          Q.    So Ms. Litt, going back to
17      Exhibit 4, which is the confirmation sheet.
18      And we were talking about the -- halfway
19      down, the -- where it says Lehman and then
20      the arrow to 99149464969.  And your
21      testimony was that you assumed that that
22      would be the fax number for Northwestern.
23      Is that correct?
24          A.    Correct.
25          Q.    If I were to represent to you
```

1                        Copple-Litt                    51

2          that that's actually the fax number for

3          Bloomberg Group, would that refresh your

4          recollection as to what fax number that is

5          one way or the other?

6               A.    No.

7               Q.    Now, other than Exhibits 3 and 4

8          -- again, 4 is in front of you and 3 was

9          the actual change of beneficiary form which

10         we looked at -- are you aware of any other

11         documents that demonstrate that the

12         decedent intended to change his life

13         insurance policy so as to replace you as

14         the primary beneficiary?

15               MR. PESKIN:   Could I have that

16          read back, please?

17                    (Question read)

18               Q.    I'm going to rephrase that.  Are

19         you aware of any other documents that

20         demonstrate that the decedent intended to

21         change his life insurance policy so as to

22         name you as the primary beneficiary in

23         2005?

24               A.    Well, I mean, when we got

25         married, everything became joint.  Our

Copple-Litt                              52

1

2      Fidelity account became joint, our checking

3      accounts became joint, the policy was paid

4      out of a joint account.  Every year we had

5      $50,000 that came out of Fidelity and it

6      was a joint account.  So I would not think

7      that there would be any reason why he would

8      not.

9          Q.      But are there any other documents

10     that show that he did intend to name you as

11     the beneficiary that you're aware of?

12         A.      No.  I don't know.

13         ~~Q.      You can hand Exhibit 4 back to~~

14     ~~the court reporter.  And I'm now going to~~

15     ~~show you an exhibit which has been marked~~

16     ~~as Exhibit 5.~~

17              (Defendant's Exhibit 5 marked for

18         identification)

19         Q.      And I'll represent to you that

20     this is one of the annual statements that

21     your attorney and I have been recently

22     speaking about.  Do you recognize this

23     document?

24         A.      Only after I opened up mails.

25     I've never seen the statement of the life

```
 1                      Copple-Litt              53
 2      insurance policy other than when -- after
 3      his death.
 4           Q.   Okay.  So to be clear on that,
 5      before Mr. Litt passed away, you had never
 6      seen an annual statement on the account?
 7           A.    No.  I was not one to open his
 8      mail.
 9           Q.    Okay.  And looking at Exhibit 5,
10      again, life insurance annual policy
11      statement and then if you look about a
12      quarter of the way down, it says "All
13      Information is as of October 20, 2010."  Do
14      you see that?
15           A.    I do.
16           Q.    And that would be approximately
17      five years after your husband and you were
18      married.  Correct?
19           A.    Correct.
20           Q.    And that would also be
21      approximately five years after the alleged
22      change of beneficiary form was executed in
23      September of 2005.  Correct?
24           A.    Correct.
25           Q.   And going back up to the top,
```

1          Copple-Litt                    55

2     ~~responsive.~~

3          MR. GIBSON:  Well, my question

4     was "Do you have any idea?"  I believe

5     the answer was "I do not."

6          Am I correct, the answer was "I

7     do not"?

8          MR. PESKIN:  The question was

9     does she have any idea why the form

10    doesn't reflect her as the direct

11    beneficiary?

12         MR. GIBSON:  Correct.  And I

13    believe her answer was "I do not."  Is

14    that correct?

15         MR. PESKIN:  She was explaining

16    her answer.  I think her answer can

17    stand.  But we can move on.

18         MR. GIBSON:  Okay.  The objection

19    ~~is on the record.  Thanks.~~

20         Q.    Now, when you located -- how did

21    you locate this document?

22         A.    I discussed that earlier.  It was

23    after his death and I was going through the

24    apartment -- I was going in the apartment

25    as an executor, administrator and it was my

```
1                        Copple-Litt                    56
2        job to go through all of his mail and open
3        up things from 2008 and above and some even
4        1999 bank statements from Chemical Bank.
5        And so that's how I located it.  It was in
6        an envelope that was not opened.
7             Q.    Okay.  So this particular
8        document was in an envelope that was not
9        opened?
10            A.    Yes, it was.
11            Q.    Do you have the envelope?
12            A.    I don't think so.  I probably
13       threw it away.  I mean...
14            Q.    Would you -- you testified you
15       found a lot of documents that were
16       unopened.  Is that correct?
17            A.    Correct.
18            Q.    And was it your general practice
19       to discard those envelopes?
20            A.    Yes.
21            Q.    And this may ultimately get
22       resolved in my conversation with your
23       attorney afterwards, but do you recall in
24       your search and opening envelopes seeing
25       monthly annual statements for 2006?
```

```
 1                      Copple-Litt                    57
 2            A.       To be honest, I did not look at
 3       it.  I just -- I mean, you know, my husband
 4       had just died.  I didn't really care what I
 5       was opening up.  I just was trying to
 6       organize things and piles and, you know,
 7       figure out what's the most current and so I
 8       knew what I needed to pay.  It's not -- I
 9       really did not pay much attention.
10            Q.       Do you recall seeing any annual
11       statements that were not unopened?
12            A.       There were several that were not
13       unopened or that were...
14            Q.       Let me -- I'll withdraw the
15       question.
16                     Do you recall seeing any annual
17       statements that were not in an envelope?
18            A.       No.
19            Q.       And did the -- at anytime before
20       his death, did the decedent ever discuss
21       with you the fact that while he allegedly
22       named you as the beneficiary on his life
23       insurance policy, that his annual
24       statements was still showing Steven Litt as
25       the direct beneficiary?
```

```
 1                        Copple-Litt                    58
 2          A.       No.
 3          Q.       I just have a few more questions
 4     before we take a break to look at these
 5     documents that haven't been produced yet.
 6                   Ms. Litt, do you consume alcohol?
 7          A.       On occasion.
 8          Q.       Have you ever been treated for
 9     alcohol consumption?
10          A.       No.
11          Q.       Have you ever attended Alcoholics
12     Anonymous meetings?
13          A.       I did with David once.
14          Q.       Okay.  When you attended that
15     meeting with him, was that meeting for
16     yourself or for David?
17          A.       It was -- my mom died and I was
18     going through quite a period of time.  It
19     was hard for me.  And David, you know, knew
20     me since 1996, I haven't been someone who
21     consumes alcohol and so he was concerned
22     that I should, you know -- he was concerned
23     that I was drinking more than he thought --
24     he had ever, you know, like witnessed me
25     because as a wife, you know, it's -- in our
```

```
1              Copple-Litt              59
```

2    ~~industry, we go out with our clients and,~~

3    you know, we entertain people and I think

4    that, you know, he was a little concerned

5    because I had been drinking more frequently

6    ~~than I had previously to my mom's death.~~

7         Q.    And other than the one meeting

8    that you said that you attended with David,

9    did you attend any other counseling

10   sessions with regard to alcohol use?

11        A.    I did a couple of times on my own

12   but to me, I just felt like, you know, I

13   was in control of it and I didn't feel like

14   that was a place for me because it just

15   didn't feel right to me.

16        ~~Q.    And why did you attend those~~

17   meetings, then?

18        A.    Because David asked me to.

19        Q.    Did he attend them with you?

20        A.    No.

21        Q.    Or just the one?

22        A.    Just one.

23        Q.    Now, you testified that Mr. Litt

24   was concerned with your alcohol consumption

25   at that time.   Is that accurate?

```
 1                    Copple-Litt              60
 2          A.      Yeah 'cause he had never seen me
 3    drink.  I mean, like I said, we traveled
 4    the world together and even on our
 5    vacations and honeymoons, I was not a big
 6    drinker.
 7          Q.      And was the level of your alcohol
 8    consumption ever a basis for conflict in
 9    your marriage?
10          A.      How do I say this?  I think that
11    it was more of a third-party concern than
12    necessarily my husband's concern.
13          Q.      Can you elaborate on that a
14    little bit?  Who was the third party who
15    was concerned?
16          A.      I don't really care to state
17    that.
18          Q.      Are you refusing to answer the
19    question?
20          A.      I mean, I just think that, you
21    know, his -- third party would be people in
22    his family that were concerned.
23          Q.      Do you know specifically who the
24    person was or do you just have a general
25    belief that it was someone in his family?
```

PIROZZI & HILLMAN212-213-5858

```
                        Copple-Litt                    62

 1

 2          A.    I did --

 3          Q.    Just let me finish the question.

 4          A.    Sorry.

 5          Q.    It's okay.  Did he disagree with

 6    them that your alcohol consumption was an

 7    issue?

 8          A.    Yes.  He asked me to do it as a

 9    favor to him for his mother so that I --

10    that he was showing her that, you know,

11    he's trying to handle this situation.

12          Q.    Okay.

13          A.    So he asked me to do it as a

14    favor for him so that him and his mom would

15    not be, you know, in such conflict.

16          Q.    So to clarify, the meetings that

17    you attended for your alcohol consumption,

18    is it your testimony that you did those as

19    a favor to your husband so that he could

20    appease his family --

21          A.    I did.

22          Q.    -- is that your testimony?

23                Have you ever been arrested for

24    driving under the influence of alcohol?

25                MR. PESKIN:  I'm going to object
```

Copple-Litt                    63

1
2          to this whole line of questioning as
3          completely irrelevant to the issues
4          before us in this matter.
5                MR. GIBSON:  Are you going to
6          advise the witness not to answer?  I
7          don't have a lot left but if you're
8          going to advise the witness not to
9          answer, we're going to have to discuss
10         that.
11               MR. PESKIN:  Let's go off the
12         record and discuss it then.
13               (Discussion off the record)
14               MR. PESKIN:  So I'll note my
15         objection on the record and I'll permit
16         the witness to answer.
17          Q.    Okay.  Just going back to the
18   last question, Ms. Litt, have you ever been
19   arrested for driving under the influence of
20   alcohol?
21          A.    I have.
22          Q.    Okay.  How many times?
23          A.    I think -- I'm not -- I don't
24   recall.  I know...
25          Q.    Was it more than one?

```
 1                      Copple-Litt                   64
 2           A.    I believe so.  Twice.
 3           Q.    You -- I'm sorry, you have to
 4      keep your voice up.
 5           A.    I believe it was twice.
 6           Q.    You believe it was twice.
 7                 Is it possible it was more than
 8      twice?
 9           A.    No.
10           Q.    Was the decedent aware that you
11      had been arrested twice?
12           A.    Yes.  He came to get me.
13           Q.    Okay.  Were those arrests a
14      source of contention between you and your
15      husband?
16           A.    No.  He was very sad and he was
17      concerned.
18           Q.    Why?
19           A.    Because he was scared for me.
20           Q.    And despite his concern about
21      these situations, is it still your
22      testimony that he only wanted you to attend
23      Alcoholics Anonymous meetings as a favor to
24      his family?
25           A.    Yes.  Because it was a way long
```

Copple-Litt                    65

1

2    time ago.  It was like, I don't know,

3    beginning of 2006 and I didn't do this

4    until like 2010.  And it was -- his mom was

5    there at the apartment when I did it.

6         Q.    Just a few more questions --

7         A.    She was visiting New York.

8         Q.    Okay.

9         A.    And he had asked me to go and he

10   would go with me to appease her.

11              And just one more thing.  And

12   that was -- that was like during the --

13   like I went through about a year and a half

14   of a lot of pain because of my mom's death

15   and, you know, it was really hard for me

16   but I got over it.  You know, I saw what

17   was happening and I didn't like it

18   personally, myself.  And so like, you know,

19   in terms of me not being able to handle it.

20   And David was very instrumental in helping

21   me get through it and supporting me and

22   guiding me.

23         Q.    Okay.  Did you ever press any

24   criminal charges against the decedent?

25         A.    No.

Copple-Litt                          66

1

2       Q.      Did you ever tell the police that

3   the decedent had assaulted you?

4       A.      No.

5       Q.      Are you aware of the decedent

6   ever being arrested for assault?

7       A.      Yes.

8       Q.      Assault of who?

9       A.      Of me.

10      Q.      Do you know who pressed those

11  charges?

12      A.      I do.

13      Q.      Who was that?

14      A.      Well, there was an incident when

15  I was injured pretty badly in Short Hills

16  and it was a deal that David and I had

17  done, one of the clients of ours, and I

18  found out that the individual was

19  embezzling money from the company and I got

20  beat up.  And I had contacted David and I

21  contacted my friend, Jon, who lived in

22  Summit -- he was actually a professor of

23  mine at NYU -- and he came over and took me

24  to the hospital and I was like morphined

25  up.

```
1                    Copple-Litt                67
2              And my friend who's also an
3    attorney of mine was at the hospital with
4    me and Jon and him, and I was pretty doped
5    up and I guess the police came and they had
6    asked Jon and Nelson.
7         Q.    Who's Nelson, the lawyer?
8         A.    Yes.  They had asked Jon and
9    Nelson if they could -- if they knew of
10   anybody that would have caused harm to her.
11   And they said, "No."  And I don't know, I
12   guess -- I mean, they weren't that -- they
13   weren't big fans of David and so they said
14   the only person that has a key to this
15   house was David.  And so that's, I think,
16   how David's name was mentioned and, you
17   know, we went through months and months of
18   me getting him off of, like, having them
19   drop the charge because New Jersey's very,
20   very strict and they don't want, you know,
21   battered quote, unquote, wife to be, you
22   know, a victim.  And I actually had to
23   testify so I don't know if that -- I guess
24   -- I don't know if that deposition thing.
25        Q.    I understand.
```

```
 1                      Copple-Litt                  68
 2          A.    You know what I mean.
 3          Q.    I got you.
 4          A.    So I had to testify and, you
 5    know, I was able to get charges dropped
 6    from him and it was expunged from his
 7    record.  So it was a misunderstanding by
 8    the police.
 9          Q.    Okay.  The lawyer, Nelson, do you
10    know his last name?
11          A.    Yes.
12          Q.    It is?
13          A.    Ferreira.
14          Q.    Ferreira.  And who's the Jon that
15    you mentioned?
16          A.    Jon Herman.
17          Q.    And who was he?
18          A.    He was my professor at NYU and we
19    were just friendly.  Like afterwards --
20    well, we started a fund together -- not a
21    fund.  We had a business where I taught
22    people how to trade and he -- we wrote a
23    book, we co-authored a book together called
24    "Market Aims," and so we've been friendly
25    throughout the years.
```

Copple-Litt                    69

1
2        Q.     Now, did you ever tell the police
3    -- identify to the police who it was that
4    did assault you?
5        A.     No, I actually said that my
6    husband did not.
7        Q.     No, no.  I think you
8    misunderstood.  Did you ever tell the
9    police who it was that did assault you?
10        A.     I don't recall stating -- I mean,
11    I was pretty -- I mean, I thought it was
12    the guy, yeah.  I did think -- I did say
13    that I thought it was the CEO of the
14    company that had been -- that had -- that
15    we found out that was embezzling money.
16        Q.     You think it was him.  Is that
17    what you're saying?
18        A.     I thought it was him, yes.
19        Q.     How did you not know who it was
20    that assaulted you?
21        A.     Because I was not feeling well
22    and I had -- I was taking medication at the
23    time.
24        Q.     Was it prescription medication?
25        A.     Yes.

```
1                    Copple-Litt                70
2           Q.     Were you under the influence of
3      alcohol at the time?
4           A.     No.   I had NyQuil because I was
5      going to bed.
6           Q.     So this assault happened while
7      you were going to bed?
8           A.     No, I was asleep.
9           Q.     Okay.  I'm sorry.  Am I -- do you
10     need me to go back in time a little bit to
11     -- am I confusing you at all with the
12     questions?
13          A.     Yes.
14          Q.     Okay.  I'm sorry.  Let me
15     rephrase that.
16                 So you testified, if I'm correct,
17     that you think it was the CEO of a company
18     that you were working with who assaulted
19     you because you had discovered that he was
20     embezzling funds?
21          A.     I stated that it was him.
22          Q.     Okay.  That's where the --
23     because I thought you said that you thought
24     it was him.
25          A.     No I stated that it was him.
```

1                    Copple-Litt                    71

2          Q.      Okay.

3          A.      Because I had had a conversation

4    with him on April 13th -- Friday was the

5    13th -- I had talked to the CEO of a

6    company, Tommy Jones, and he provided me

7    with a statements -- bank statements of

8    counter withdrawals of like $20,000 plus

9    every single week.  And I confronted him

10   and he came over that night.  He had

11   confronted -- I confronted him and he beat

12   me up.

13         Q.      Okay.  And where did that take

14   place?  Where --

15         A.      At my house in Short Hills.

16         Q.      Okay.  And why was he coming to

17   your home?

18         A.      Because I had asked him, like, to

19   meet me at my house and then we were going

20   to go.

21         Q.      Go where?

22         A.      To a restaurant close by because

23   I wanted to talk to him in public.  But

24   when he arrived, I believe -- I speculate

25   that he had probably heard that -- from one

```
1                        Copple-Litt                  72

2         of the other investors that I knew what was

3         going on.

4              Q.    Why didn't you ask him to meet at

5         your office?

6              A.    Because at the time, our company

7         was -- we were renovating and there was no

8         -- like, we were working out of our home at

9         that time.

10             Q.    Got you.  Got you.  And just to

11        make sure the record's clear:  Is it

12        correct that you never told the police that

13        your husband beat you up?

14             A.    Definitely, 150 percent.

15             Q.    And you assisted in having those

16        charges dropped?

17             A.    I did.  And they would not have

18        been dropped unless I testified and stated

19        that he did not do that.

20             Q.    Isn't it true that they were

21        dropped because your husband obtained a

22        video showing that he was not with you at

23        the time that the assault allegedly

24        happened?

25             A.    Not that I know of.
```

```
 1                      Copple-Litt                  73
 2        Q.      Are you aware of any videotape
 3   that was used in connection with those
 4   charges?
 5        A.      No.
 6        Q.      Ms. Litt, did you ever have any
 7   extramarital affairs while you were married
 8   to your husband?
 9             MR. PESKIN:  Objection.
10        A.      No.
11             MR. GIBSON:  Subject to the
12   review of those documents, that's
13   really all I have.  Let me get someone
14   from my mailroom who can help you out
15   with getting whatever's -- I don't want
16   to take the whole folder because I know
17   it's not responsive.
18             MR. PESKIN:  You want copies?
19             MR. GIBSON:  Whatever.  Do you
20   want to give me the originals to
21   review, because you know, if they're
22   what they are, I doubt I have any
23   questions.  But if you want to hand me
24   the originals, I want to show them to
25   my colleague real quick and I may not
```

```
1                        Copple-Litt                    74

2        even copy them.

3                       (Recess)

4        EXAMINATION CONTINUED

5    BY MR. GIBSON:

6        Q.     Ms. Litt, you're aware you're

7    still under oath.  Correct?

8        A.     Yes.

9        Q.     Okay.  Now, Ms. Litt, you

10   testified that the person who assaulted you

11   was -- his name was Tommy Jones.  Is that

12   --

13       A.     No.

14       Q.     Okay.  I apologize.  His name

15   was?

16       A.     Sean Vanderpool (phonetic).

17       Q.     Sean?

18       A.     Vanderpool.

19       Q.     Vanderplume?  And do you know if

20   he was ever arrested?

21       A.     I have no idea.

22       Q.     Did you ever press charges

23   against him?

24       A.     Oh, I pressed charges against him

25   and I got a restraining order against him.
```

Copple-Litt                        75

1

2          Q.     Okay.

3          A.     I thought you meant prior to.

4          Q.     Got you.  Ms. Litt, do you know

5     anyone by the name of Anthony Catinella?

6          A.     No.

7               MR. GIBSON:  Okay.  Can you mark

8          this as 6.

9               (One-page State of New Jersey

10         document marked Defendant's Exhibit 6

11         for identification)

12         Q.     Ms. Litt, I'm showing you a

13    document that's been identified as

14    Defendant's Exhibit 6.  Just take a quick

15    moment to read it over and let me know when

16    you're done.  I know it's very hard to read

17    a lot of this and I'm not going to ask you

18    a lot of questions about it.

19         A.     I really can't read it.

20         Q.     Okay.  Have you ever seen this

21    before?

22         A.     Not that I can recall, no.

23         Q.     Okay.  Now, you testified that

24    you went to -- in words and substance --

25    you went to great lengths to help the

```
 1                  Copple-Litt                      76
 2      charges that were pressed against your
 3      husband for domestic abuse be dropped.
 4      Correct?
 5           A.    I did.
 6           Q.    Okay.  But you don't recall
 7      seeing this complaint?
 8           A.    I mean, perhaps it was part of
 9      the documents that...
10                MR. PESKIN:  Can I just have a
11           minute to read this?
12                MR. GIBSON:  Absolutely, counsel.
13           I apologize.
14                MR. PESKIN:  And what is your
15           representation that this is?
16                MR. GIBSON:  My representation is
17           that this is a public document in the
18           State of New Jersey versus David M.
19           Litt.
20                MR. PESKIN:  You're alleging that
21           this is the complaint?
22                MR. GIBSON:  I'm not alleging
23           anything.  I'm going to ask your client
24           if she has any information about it or
25           some of the contents of it, but I have
```

```
 1                    Copple-Litt                    77

 2          no independent knowledge.

 3                  MR. PESKIN:  Okay.  Proceed.

 4                  MR. GIBSON:  Okay.  Thank you,

 5          counsel.

 6          Q.      Now, Ms. Litt, if you look about

 7    a quarter of the way down Exhibit 6, you'll

 8    see -- it's cut off a little bit -- it says

 9    "Complainant Name:  Anthony Catinella."

10          A.      Okay.

11          Q.      Do you have any idea -- does that

12    refresh your recollection as to who Mr.

13    Catinella is?

14          A.      Actually, no.  I'm sorry.

15          Q.      And if you see in the middle --

16          A.      Go ahead.

17          Q.      I'm sorry.  Did you want to

18    clarify your answer?  Okay.

19                  If you look in the middle of the

20    document, there's a box that says "Domestic

21    Violence" and then there's an X in that.

22    And the defendant, correct, is David M.

23    Litt, that's at the top, the State of New

24    Jersey versus David M. Litt?

25          A.      Yes.
```

```
                       Copple-Litt                    78
 1
 2         Q.      And again, "Domestic Violence,"
 3    and the box is checked.   Correct?
 4         A.      Correct.
 5         Q.      Does this refresh your
 6    recollection as to whether this is the
 7    complaint that we've been discussing over
 8    the last few minutes?
 9         A.      I mean, the only thing I see is
10    the date of October 14th and that would be
11    the day after I was assaulted by Sean, the
12    CEO of the company that David and I had
13    invested in.
14         Q.      Okay.
15         A.      And as I stated before, I had a
16    restraining order placed against him and I
17    did bring charges up on him.   Therefore, I
18    do not understand why this is here and
19    there's no signature stating that I made
20    the complaint against my husband.
21         Q.      I'm not stating that there is.
22    I'm just asking you if --
23         A.      And I don't even think my name is
24    identified on here.
25         Q.      And if -- again, I understand and
```

Copple-Litt                    79

1

2      I apologize, this is the best copy we have

3      -- but if you look about halfway through

4      the body, it says, "Specifically during an

5      argument over finances, repeatedly strike

6      the victim in her face and causing injury

7      to her shoulder, leading to bleeding and

8      internal injury including low blood

9      pressure."

10              A.    Well --

11              Q.    Well, I haven't asked a question.

12              A.    Go ahead.

13              Q.    Does that describe the damages

14      that you suffered as a result of the

15      assault you allege was committed by Mr.

16      Vanderplume?

17              A.    Yes.  And it was over finances.

18              Q.    Okay.

19              A.    With Sean.

20              Q.    Okay.

21              A.    Because of -- I told you, he

22      embezzled money from David and I.

23              Q.    Okay.  But Sean wasn't your

24      husband.  Correct?

25              A.    No.  He was the CEO of a company

1
2    that we had invested in.

3         Q.    And it does say "Domestic

4    Violence" on this.   Correct?

5         A.    Yes.

6         Q.    The box is checked?

7         A.    But it has David as a defendant.

8         Q.    Okay.   I have no further

9    questions on that document.   And just --

10        A.    I want to say --

11             MR. PESKIN:   There's no question.

12        Q.    Is there an answer you want to

13   clarify or?

14        A.    I believe that this was taken

15   when I was in the hospital and I was under

16   heavily -- medication because of the bodily

17   injuries I did sustain.

18        Q.    And that was the day after the

19   assault.   Is that correct?

20        A.    Yes, it was around -- well, the

21   assault was done at like -- when I woke up

22   from being hurt so badly, it was around 4

23   o'clock in the morning.   And so that was

24   already the next day.

25             But I had met him on September --