Copple-Litt                    81

 1
 2      on Friday.  I got beat up, I passed out
 3      from all the, I guess, pain and whatever.
 4      And I woke up and I was bleeding, like
 5      there was blood all over the place.
 6           Q.   And --
 7           A.   And I could barely move.
 8           Q.   And what time the prior night,
 9      approximately, did the assault take place?
10           A.   Probably around 7:30 or 8 because
11      I recall we had a 7 o'clock appointment.
12           Q.   Okay.  And did you --
13           A.   It was supposed to be dinner.
14           Q.   I apologize.  And did you contact
15      Mr. Litt after that?
16           A.   When I woke up at 4 a.m. and I
17      couldn't barely move, I --
18           Q.   So --
19           A.   I contacted my husband and I
20      contacted my friend and told them what had
21      happened.
22           Q.   So is it correct that you were
23      assaulted the night before by a business
24      associate and you did not contact your
25      husband until you woke up the next day?

```
1                      Copple-Litt                    82

2          A.      I passed out.

3          Q.      Is that your testimony?  I'm just

4    asking you a question.  Is it correct that

5    you were assaulted the night before and you

6    did not contact your husband until the next

7    day?

8          A.      That was when I became coherent,

9    when I woke up from being beaten up.

10         Q.      Okay.

11         A.      I mean, I was completely

12   unconscious and I'm lucky I woke up.

13         Q.      And did your husband accompany

14   you to the hospital?

15         A.      No.  It was 4 a.m.

16         Q.      Okay.

17         A.      He was -- he came right away.

18         Q.      Okay.  Do you know whether he

19   spoke to the police about it?

20         A.      I don't know that.

21              MR. GIBSON:  That's all the

22   questions I have on that.

23              I just want the record to reflect

24   that counsel did produce additional

25   responsive material to our discovery
```

```
 1                      Copple-Litt              83
 2      request that was brought today by his
 3      client and I appreciate that.  And I
 4      just have a few quick questions on
 5      that.  Unfortunately -- I'm going to
 6      give the witness --
 7            MR. PESKIN:  I can look on with
 8      her.
 9            MR. GIBSON:  Yeah, and, you know,
10      I'm really -- I don't know that I'm
11      going to have to mark any of these, so
12      I'm just going to show them to you for
13      now.  And then you guys can -- if I
14      need to mark anything, I'll mark
15      anything.
16            Q.    Ms. Litt, you testified that you,
17      if you look specifically, there is a --
18      there are a couple of annual statements in
19      here that are much the same as Exhibit 5
20      that we looked at.  So specifically, I see
21      one for 2006, I see one for 2007, and then
22      there's the -- and there's one for 2009.
23      And I can -- if it makes it easier, you can
24      actually look at the originals.  They're
25      segregated right there.
```

1          Copple-Litt                    84

2              Is it your testimony that all

3     three of those documents were found in

4     sealed envelopes?

5          A.    Yes, sir.

6          Q.    Okay.  And again, you disregarded

7     those envelopes?

8              MR. PESKIN:  Discarded them?

9              MR. GIBSON:  Disregarded --

10    discarded them.  Poor choice of words.

11         A.    Yeah, I did.

12         Q.    Okay.  And was that done

13    immediately upon -- when you threw the

14    envelopes away, was that immediately upon

15    you finding them and opening them?

16         A.    It was just, you know, I had

17    opened up a ton and I just -- all the

18    envelopes that I'd opened up, I had

19    discarded or tore up.

20         Q.    And is it fair to say that that

21    took place obviously after your husband

22    passed away but before this lawsuit?

23         A.    Correct.

24         Q.    Now, there's some other documents

25    in here which are -- appear to be loan

Copple-Litt                              85

statements and loan pay stubs.  Do you know

whether these were also found in envelopes

or whether some of these were found open?

     A.    Most everything here is what I

had opened up.

     Q.    Okay.  And these were all in

sealed envelopes?

     A.    Yes.

     Q.    Okay.  I'm going to show you the

originals -- again, I won't mark them for

now -- but if you look at these loan

statements, and you see at the bottom,

there seems to be a stub ripped off.  Are

you sure that everything was in an

envelope?

     A.    I -- I'm sure -- I don't know.

     Q.    Well, would it be fair to say if

those documents were in a sealed envelope,

the bottoms couldn't have been ripped off?

     A.    Yeah.

     MR. GIBSON:  I have no further

questions.

     Counsel, any questions?

     MR. PESKIN:  Just a few.

| | |
|---|---|
| 1 | Copple-Litt                                    93 |
| 2 | |
| 3 | |
| 4 | |
| 5 | _Tracy L Copple Lott_ |
| 6 | TRACY COPPLE-LITT |
| 7 | |
| 8 | |
| 9 | Subscribed and sworn to |
| 10 | before me this 27th day |
| 11 | of November      2012 |

Richard S. Peskin
Notary Public, State of New York
No. 02PE4717475
Qualified in New York County
Commission Expires May 31, 2010

94

CERTIFICATE

STATE OF NEW YORK )

           ) ss.

COUNTY OF NEW YORK)

    I, Julia Liu, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

    That TRACY COPPLE-LITT, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

    I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

             _____

                  JULIA LIU

1                                                              95

2        October 26, 2012

3                            ERRATA

4

5        PAGE/LINE        CHANGE/REASON

6        61/8-9      delete "and his brother, Steven"

7        61/15       delete "and his brother"

8        65/3        change "do this" to "go to AA mtg"

9        65/14       insert after "because of" "a miscarriage
10                   between David & myself and because of"

11       66/14       delete "just friendly" insert "friends"

12       68/24       correct to "Market Games"

13       70/8        change "no but I was sleepy"

14       74/10       change date to April 25

15       80/25       delete "September"

16       13/7        change "unclosed" to "unopened"

17       51/3        change spelling "Bloomberg" to "Blumberg"

18

19

20

21

22

23                        [signature]

24

25

96

October 26, 2012

INDEX

| WITNESS | | EXAMINATION BY | PAGE |
|---|---|---|---|
| Tracy Copple-Litt | | Mr. Gibson | 4 |
| | | Mr. Peskin | 87 |

DEFENDANT'S   PAGE

Exhibit 1   11   Defendant Steven Litt's
First Request for
Production of Documents

Exhibit 2   15   Defendant Tracy
Copple-Litt's Response to
Co-Defendant's Request for
Production of Documents

Exhibit 3   32   Northwestern Mutual
Designation of
Beneficiaries by Owner for
Death Proceeds Only

Exhibit 4   42   Message Confirmation

Exhibit 5   52   Northwestern Mutual Life
Insurance Annual Policy
Statement as of October
20, 2010

Exhibit 6   75   One-page State of New
Jersey document

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
..................... ................................................X
THE NORTHWESTERN MUTUAL LIFE

INSURANCE COMPANY,

12 Civ. 2514 (PKC) (HBP)

Plaintiff,

- against -

**DEFENDANT TRACY
COPPLE- LITT'S RESPONSE
TO CO-DEFENDANT'S
REQUEST FOR
PRODUCTION OF
DOCUMENTS**

STEVEN LITT AND TRACY COPPLE-LITT,

Defendants.
..................... ................................................X

Defendant Tracy Copple-Litt hereby responds to co-Defendant's First Request for Production of

Documents as follows:

**1.       All documents relating to the Policy.**

1.  See attached 1/29/12 e mail from counsel to Plaintiff's counsel seeking a replacement Policy
and appended replica policy and application sent in response thereto. Also see October 20,
2003 Annual Policy Statement, 1 copy of a Designation of Beneficiaries by Owner form,
September 29, 2011 correspondence from counsel to Debbie Luther at Northwestern Mutual
Life Insurance Company and fax confirmation of same as well as her fax correspondence in
reply, 3 pages representing co-Defendant Steven Litt's Beneficiary Claim Statement, Election of
Fixed Income Plan by Beneficiary, September 8, 2004 Automatic Payment Reminder from
Northwestern Mutual Life to decedent, 5 pages including Change of Client Information and
Network Office Block Transfer form, Designation of Beneficiaries by Owner form, Additional
Beneficiary Provisions, Beneficiary Information, instructions and the fax cover sheet
evidencing confirmation it was received at the general agent's office along with the Intelius
reverse phone report.

Please note that throughout this Response as to each Demand for Production responded to
herein, the document production package previously produced by Plaintiff Northwestern
Mutual Life Insurance Company to both co-Defendants voluntarily and not in response to any
document demand is excluded merely for purposes of avoiding duplication of documents
already in the hands of each co-Defendant.

DEFENDANT'S
EXHIBIT
2
Blumberg No. 5114

2.      All documents relating to your allegation in your Answer that you are a beneficiary under the Policy.

2.  See attached.

3.      All communications between Co-Defendant and Northwestern seeking payment of the Death Benefit under the Policy.

3.  See attached.

4.      All documents reflecting when Co-Defendant or Decedent sent Northwestern a "Designation of Beneficiary by Owner for Death Proceeds Only" form and/or a "Change of Client Information" form that purportedly set forth "Tracy Lynn Copple" as Decedent's "Wife" and as the Direct Beneficiary under the Policy.

4.  See attached.

5.      All documents reflecting when Northwestern received the "Designation of Beneficiary by Owner for Death Proceeds Only" form and the "Change of Client Information" form that purportedly sets forth "Tracy Lynn Copple" as Decedent's "Wife" and as the Direct Beneficiary under the Policy.

5.  See attached.

6.      All communications between Co-Defendant and Decedent concerning the Policy.

6.  None exist.


**7.      All communications between Co-Defendant and Northwestern concerning the Policy.**


7.  See attached.


**8.      All communications between Co-Defendant and any other person concerning the Policy.**


8.  None exist.


**9.      All documents reflecting Decedent's intentions concerning who should be the Direct Beneficiary under the Policy.**


9.  See attached.


**10.     All communications between Decedent and Northwestern concerning the Policy.**


10.  See attached.

11.     **All communications between Decedent and Northwestern concerning changing the designation of the Beneficiary on the Policy.**

11.  See attached.

12.     **All communications between Co-Defendant and Northwestern concerning changing the designation of the Beneficiary on the Policy.**

12.  See attached.

13.     **All documents reflecting Decedent's marital status at the time of Decedent's death.**

13.  Marriage certificate not currently available but will be produced.

14.     **All documents produced or sent to Co-Defendant by Northwestern relating to the instant action.**

14.  None exist.

15.     **All documents upon which any expert witness retained by Co-Defendant relies in developing and/or giving an opinion on matters related to this action.**

15.  None exist.

16.  All documents that support Co-Defendant's claim for damages in this action.

16.  See attached.

17.  All documents upon which Co-Defendant intends to rely on at the trial of this action.

17.  See attached in addition to Northwestern Mutual Life voluntary production, Bate stamped by NML.

Dated: New York, New York
      October 15, 2012

**Richard Peskin, Esq. (RP/3524)**
6 East 39th Street-6th Floor
New York, New York 10016
(212) 867-2468
*Attorney for Defendant Tracy Copple-Litt*

To:  Walter A. Saurack, Esq.
     Attorneys for co-Defendant Steven Litt
     Satterlee Stephens Burke & Burke LLP
     230 Park Avenue
     New York, New York 10169

Subj:    **NML with E/O Litt**
Date:    1/29/2012 2:59:41 P.M. Eastern Standard Time
From:    Eskyre@aol.com
To:      vpennacchio@mdmc-law.com

Dear Valerie,

I received your case file but missing was a copy of the policy of insurance. Please provide a replacement policy.  Also it is necessary for me to obtain the file Gil Elmaleh maintained on David Litt.  As he is NML's agent, please obtain and supply.  Thank you.

To be clear, we are still awaiting the consent to transfer to Southern District of New York which I understood you are preparing.  Upon receipt, I stand ready to execute the release of NML on behalf of Tracy Copple-Litt.

Richard S. Peskin



REPLICA

The Northwestern Mutual Life Insurance Company agrees to pay the benefits provided in this policy, subject to its terms and conditions. Signed at Milwaukee, Wisconsin on the Date of Issue.

*Edward J. Zore*
President and CEO

*Robert J. Berdan*
Secretary

**WHOLE LIFE POLICY**
**WITH ADJUSTABLE TERM PROTECTION**

**Eligible For Annual Dividends.**

Basic Amount plus Adjustable Term Protection payable on death of Insured. Premiums payable for period shown on page 3.

**Right To Return Policy** -- Please read this policy carefully. The policy may be returned by the Owner for any reason within ten days after it was received. The policy may be returned to your agent or to the Home Office of the Company at 720 East Wisconsin Avenue, Milwaukee, WI 53202. If returned, the policy will be considered void from the beginning. Any premium paid will be refunded.

NN 3



Northwestern Mutual

| | | | | |
|---|---|---|---|---|
| INSURED | DAVID M LITT | AGE AND SEX | 37 | MALE |
| POLICY DATE | OCTOBER 7, 2003 | POLICY NUMBER | 16 579 951 | |
| PLAN | WHOLE LIFE - ADJUSTABLE | BASIC AMOUNT | $ | 1,000 |
| | | ADJUSTABLE TERM | | 1,411,396 |
| | | TOTAL INSURANCE AMOUNT | | 1,412,396 |

NN.3.(0197)

This policy is a legal contract between the Owner and The Northwestern Mutual Life Insurance Company. Read your policy carefully.

# GUIDE TO POLICY PROVISIONS

**BENEFITS AND PREMIUMS**

**SECTION 1. THE CONTRACT**

Life Insurance Benefit payable on death of Insured. Incontestability. Suicide. Definition of dates.

**SECTION 2. OWNERSHIP**

Rights of the Owner. Assignment as collateral.

**SECTION 3. ADJUSTABLE TERM PROTECTION**

Description of Adjustable Term Protection. Inflation Protection Option. Scheduled and unscheduled increases. Reduction.

**SECTION 4. PREMIUMS AND REINSTATEMENT**

Payment of premiums. Grace period of 31 days to pay premium. Amount of premium and premium adjustments. Unscheduled additional premium payments. How to reinstate the policy.

**SECTION 5. DIVIDENDS**

Annual dividends. Use of dividends. Dividend at death.

**SECTION 6. PAID-UP ADDITIONS**

Purchase of additions. Addition to reduce term insurance. Addition to increase paid-up insurance. Allocation of additional premiums and dividends.

**SECTION 7. CASH VALUES, EXTENDED TERM INSURANCE AND PAID-UP INSURANCE**

Cash surrender value. What happens if premium is not paid. Basis of values.

**SECTION 8. LOANS**

Policy loans. Premium loans. Effect of policy debt. Interest on loans.

**SECTION 9. CHANGE OF POLICY**

**SECTION 10. BENEFICIARIES**

Naming and change of beneficiaries. Marital deduction provision for spouse of Insured. Succession in interest of beneficiaries.

**SECTION 11. PAYMENT OF POLICY BENEFITS**

Payment of surrender or death proceeds. Payment plans for policy proceeds. Right to increase income under payment plans. Guaranteed payment tables.

**ADDITIONAL BENEFITS (if any)**

**APPLICATION**

NN 3

BENEFITS AND PREMIUMS

DATE OF ISSUE - OCTOBER 7, 2003

| PLAN AND ADDITIONAL BENEFITS | AMOUNT | SCHEDULED ANNUAL PREMIUM | PAYABLE FOR |
|---|---|---|---|
| WHOLE LIFE - ADJUSTABLE | $ | $ 50,000.01 | FIRST 28 YEARS |
| BASIC AMOUNT | 1,000 | 49,998.21 | NEXT 25 YEARS |
| ADJUSTABLE TERM PROTECTION | 1,411,396* | | |
| TOTAL INSURANCE AMOUNT | 1,412,396 | | |

* THIS AMOUNT OF ADJUSTABLE TERM PROTECTION IS GUARANTEED FOR THE FIRST 11 POLICY YEARS UNLESS THIS GUARANTEED PERIOD IS TERMINATED SOONER UNDER SECTION 3.4. TO CONTINUE THIS AMOUNT OF ADJUSTABLE TERM PROTECTION AFTER THE FIRST 11 POLICY YEARS, AN INCREASED PREMIUM MAY BE REQUIRED UNDER SECTION 4.2.

A PREMIUM IS PAYABLE ON OCTOBER 7, 2003 AND EVERY OCTOBER 7 AFTER THAT.

THE FIRST PREMIUM OF $50,000.01 INCLUDES A SCHEDULED ADDITIONAL PREMIUM OF $33,000.00.

THE MINIMUM ANNUAL PREMIUM IS $17,000.01 AND MAY INCREASE. SEE SECTION 4.2.

THE MAXIMUM CHARGE FOR EXPENSES THAT MAY BE DEDUCTED FROM EACH ADDITIONAL PREMIUM USED TO PURCHASE A PAID-UP ADDITION UNDER SECTION 6.1 IS 8%.

THE CURRENT ALLOCATION OF ADDITIONS PURCHASED BY SCHEDULED ADDITIONAL PREMIUMS IS:  ADDITIONS TO REDUCE TERM INSURANCE 100%
ADDITIONS TO INCREASE COVERAGE    00%

THE OWNER MAY ELECT THE SPECIFIED RATE OR THE VARIABLE RATE LOAN INTEREST OPTION. SEE SECTIONS 8.4 THROUGH 8.6 OF THE POLICY. THE SPECIFIED RATE LOAN INTEREST OPTION WAS SELECTED ON THE APPLICATION.

THIS POLICY IS ISSUED ON A CLASSIFIED (NON-TOBACCO USE) BASIS. IN ADDITION TO THE CHARGE DESCRIBED IN SECTION 6.1, THERE WILL BE A CHARGE FOR ADDITIONAL RISK ASSESSED AGAINST ANY ADDITIONAL PREMIUM OR DIVIDEND USED TO PURCHASE PAID-UP ADDITIONS.

DIVIDENDS ARE NOT GUARANTEED. THE COMPANY MAY CHANGE THE AMOUNT OF DIVIDEND CREDITED TO THIS POLICY RESULTING IN LOWER DIVIDEND CASH VALUES THAN ILLUSTRATED, OR, IF APPLICABLE, MORE PREMIUMS PAID IN CASH THAN ILLUSTRATED.

GUARANTEED VALUES ARE BASED ON AN ANNUAL EFFECTIVE INTEREST RATE OF 4%.

DIRECT BENEFICIARY  STEVEN LITT, BROTHER OF THE INSURED

OWNER          DAVID M LITT, THE INSURED

| | | AGE AND SEX | 37  MALE |
|---|---|---|---|
| INSURED | DAVID M LITT | POLICY NUMBER | 16 579 951 |
| POLICY DATE | OCTOBER 7, 2003 | BASIC AMOUNT | $  1,000 |
| PLAN | WHOLE LIFE - ADJUSTABLE | ADJUSTABLE TERM | 1,411,396 |
| | | TOTAL INSURANCE AMOUNT | 1,412,396 |

056

TABLE OF GUARANTEED VALUES
FOR $   1,000 BASIC AMOUNT

| END OF POLICY YEAR | OCTOBER 7, | CASH VALUE | PAID-UP INSURANCE |
|---|---|---|---|
| 1 | 2004 | $        0 | $        0 |
| 2 | 2005 | 12 | 44 |
| 3 | 2006 | 25 | 87 |
| 4 | 2007 | 39 | 128 |
| 5 | 2008 | 53 | 168 |
| 6 | 2009 | 67 | 206 |
| 7 | 2010 | 81 | 242 |
| 8 | 2011 | 96 | 277 |
| 9 | 2012 | 111 | 311 |
| 10 | 2013 | 127 | 343 |
| 11 | 2014 | 142 | 375 |
| 12 | 2015 | 159 | 405 |
| 13 | 2016 | 175 | 434 |
| 14 | 2017 | 192 | 461 |
| 15 | 2018 | 209 | 488 |
| 16 | 2019 | 226 | 514 |
| 17 | 2020 | 244 | 538 |
| 18 | 2021 | 262 | 561 |
| 19 | 2022 | 280 | 584 |
| 20 | 2023 | 298 | 605 |
| AGE 60 | 2026 | 354 | 665 |
| AGE 65 | 2031 | 451 | 748 |
| AGE 70 | 2036 | 547 | 815 |

VALUES ARE INCREASED BY PAID-UP ADDITIONS, DIVIDEND ACCUMULATIONS, AND
ADDITIONAL PREMIUMS.  VALUES ARE DECREASED BY POLICY DEBT AND SURRENDERS
OF PAID-UP ADDITIONS.  VALUES SHOWN AT END OF POLICY YEAR DO NOT REFLECT
ANY PREMIUM DUE ON THAT POLICY ANNIVERSARY.

| | | | |
|---|---|---|---|
| INSURED | DAVID M LITT | AGE AND SEX | 37   MALE |
| POLICY DATE | OCTOBER 7, 2003 | POLICY NUMBER | 16 579 951 |
| PLAN | WHOLE LIFE - ADJUSTABLE | BASIC AMOUNT | $       1,000 |
| | | ADJUSTABLE TERM | 1,411,396 |
| | | TOTAL INSURANCE AMOUNT | 1,412,396 |

NN.3.(0197)                    PAGE 4

1466

TABLE OF ANNUAL PREMIUMS PER $1,000 OF TERM INSURANCE
USED TO CALCULATE MINIMUM PREMIUMS
SEE SECTION 4.2.

| FOR POLICY YEAR BEGINNING OCTOBER 7, | PREMIUM |
|---|---|
| 2003 | $   12.01 |
| 2004 | 12.74 |
| 2005 | 13.52 |
| 2006 | 14.34 |
| 2007 | 15.21 |
| 2008 | 16.12 |
| 2009 | 17.08 |
| 2010 | 18.09 |
| 2011 | 19.17 |
| 2012 | 20.30 |
| 2013 | 21.49 |
| 2014 | 22.74 |
| 2015 | 24.06 |
| 2016 | 25.46 |
| 2017 | 26.95 |
| 2018 | 28.51 |
| 2019 | 30.15 |
| 2020 | 31.86 |
| 2021 | 33.65 |
| 2022 | 35.51 |
| 2023 | 37.43 |
| 2024 | 39.44 |
| 2025 | 41.53 |
| 2026 | 43.72 |
| 2027 | 46.00 |
| 2028 | 48.37 |
| 2029 | 50.83 |
| 2030 | 53.40 |
| 2031 | 56.08 |
| 2032 | 58.88 |
| 2033 | 61.79 |
| 2034 | 64.80 |
| 2035 | 67.93 |

| | | AGE AND SEX | 37   MALE |
|---|---|---|---|
| NSURED | DAVID M LITT | POLICY NUMBER | 16 579 951 |
| POLICY DATE | OCTOBER 7, 2003 | BASIC AMOUNT | $     1,000 |
| PLAN | WHOLE LIFE - ADJUSTABLE | ADJUSTABLE TERM | 1,411,396 |
| | | TOTAL INSURANCE AMOUNT | 1,412,396 |

NN.3.(0197)

PAGE 4A

1467

## TABLE OF CASH VALUES
### FOR $1.00 OF PAID-UP ADDITIONS

| END OF POLICY YEAR | OCTOBER 7, | CASH VALUE | END OF POLICY YEAR | OCTOBER 7, | CASH VALUE |
|---|---|---|---|---|---|
| 0 | 2003 | $ .26892 | 27 | 2030 | $ .58909 |
| 1 | 2004 | .27790 | 28 | 2031 | .60301 |
| 2 | 2005 | .28712 | 29 | 2032 | .61689 |
| 3 | 2006 | .29659 | 30 | 2033 | .63072 |
| 4 | 2007 | .30630 | 31 | 2034 | .64453 |
| 5 | 2008 | .31623 | 32 | 2035 | .65831 |
| 6 | 2009 | .32641 | 33 | 2036 | .67206 |
| 7 | 2010 | .33683 | 34 | 2037 | .68574 |
| 8 | 2011 | .34748 | 35 | 2038 | .69929 |
| 9 | 2012 | .35837 | 36 | 2039 | .71262 |
| 10 | 2013 | .36951 | 37 | 2040 | .72564 |
| 11 | 2014 | .38089 | 38 | 2041 | .73828 |
| 12 | 2015 | .39252 | 39 | 2042 | .75052 |
| 13 | 2016 | .40440 | 40 | 2043 | .76238 |
| 14 | 2017 | .41653 | 41 | 2044 | .77391 |
| 15 | 2018 | .42888 | 42 | 2045 | .78517 |
| 16 | 2019 | .44143 | 43 | 2046 | .79621 |
| 17 | 2020 | .45416 | 44 | 2047 | .80702 |
| 18 | 2021 | .46704 | 45 | 2048 | .81756 |
| 19 | 2022 | .48007 | 46 | 2049 | .82774 |
| 20 | 2023 | .49324 | 47 | 2050 | .83745 |
| 21 | 2024 | .50655 | 48 | 2051 | .84665 |
| 22 | 2025 | .52002 | 49 | 2052 | .85636 |
| 23 | 2026 | .53364 | 50 | 2053 | .86362 |
| 24 | 2027 | .54739 | 51 | 2054 | .87153 |
| 25 | 2028 | .56124 | 52 | 2055 | .87921 |
| 26 | 2029 | .57516 | 53 | 2056 | .88679 |

VALUES DURING A POLICY YEAR WILL REFLECT ANY PORTION OF THE YEAR'S PREMIUM PAID AND THE TIME ELAPSED IN THAT YEAR.  THESE CASH VALUES ARE NOT GUARANTEED FOR INCREASES IN SCHEDULED ADDITIONAL PREMIUMS OR UNSCHEDULED ADDITIONAL PREMIUMS PAID AFTER THE FIRST 20 POLICY YEARS.

| | | | |
|---|---|---|---|
| INSURED | DAVID M LITT | AGE AND SEX | 37   MALE |
| POLICY DATE | OCTOBER 7, 2003 | POLICY NUMBER | 16 579 951 |
| PLAN | WHOLE LIFE - ADJUSTABLE | BASIC AMOUNT | $ 1,000 |
| | | ADJUSTABLE TERM | 1,411,396 |
| | | TOTAL INSURANCE AMOUNT | 1,412,396 |

NN.3.(0197)                              PAGE 4B

1468

# SECTION 1. THE CONTRACT

## 1.1 LIFE INSURANCE BENEFIT

The Northwestern Mutual Life Insurance Company will pay a benefit on the death of the Insured. Subject to the terms and conditions of the policy:

- payment of the death proceeds will be made after proof of the death of the Insured is received at the Home Office; and
- payment will be made to the beneficiary or other payee under Sections 10 and 11.

The amount of the death proceeds when all premiums due have been paid will be:

- the Basic Amount shown on page 3; plus
- the amount of Adjustable Term Protection then in force under Section 3; plus
- the amount of any paid-up additions in force under Section 6.3; plus
- the amount of any dividend accumulations (Section 5.2); plus
- the amount of any premium refund (Section 4.1) and any dividend at death (Section 5.3); less
- the amount of any policy debt (Section 8.3).

These amounts will be determined as of the date of death.

The amount of the death proceeds when the Insured dies during the grace period following the due date of an unpaid premium will be:

- the amount determined above assuming the overdue premium had been paid; less
- the amount of the unpaid premium.

The amount of the death proceeds when the Insured dies while the policy is in force as extended term or paid-up insurance will be determined under Sections 7.2 or 7.3.

## 1.2 ENTIRE CONTRACT; CHANGES

This policy with the attached application is the entire contract. Statements in the application are representations and not warranties. A change in the policy is valid only if it is approved by an officer of the Company. The Company may require that the policy be sent to it for endorsement to show a change. No agent has the authority to change the policy or to waive any of its terms.

## 1.3 INCONTESTABILITY

The Company will not contest insurance under this policy after the insurance has been in force during the lifetime of the Insured for two years from the Date of Issue. In issuing insurance, the Company relies on the application. While insurance is contestable, the Company, on the basis of a material misstatement in the application, may rescind the insurance or deny a claim.

## 1.4 SUICIDE

If the Insured dies by suicide within one year from the Date of Issue, the amount payable by the Company will be limited to the premiums paid, less the amount of any policy debt.

## 1.5 DATES

The contestable and suicide periods begin with the Date of Issue. Policy months, years and anniversaries are computed from the Policy Date. Both dates are shown on page 3. The Date of Issue for any insurance issued under Increases Scheduled After Issue (Section 3.2), Unscheduled Increase of Adjustable Term Protection (Section 3.3), Additional Premiums Scheduled After Issue (Section 4.2), or Unscheduled Additional Premium Option (Section 4.3) will be shown on an amendment to the schedule of Benefits and Premiums.

## 1.6 MISSTATEMENT OF AGE OR SEX

If the age or sex of the Insured has been misstated, the amount payable will be the amount which the premiums paid would have purchased at the correct age and sex.

## 1.7 PAYMENT BY THE COMPANY

All payments by the Company under this policy are payable at its Home Office.

NN 3
New York

1469

# SECTION 2. OWNERSHIP

## 2.1 THE OWNER

The Owner is named on page 3. The Owner, his successor or his transferee may exercise policy rights without the consent of any beneficiary. After the death of the Insured, policy rights may be exercised only as provided in Sections 10 and 11.

## 2.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this policy. Written proof of transfer satisfactory to the Company must be received at its Home Office. The transfer will then take effect as of the date that it was signed. The Company may require that the policy be sent to it for endorsement to show the transfer.

## 2.3 COLLATERAL ASSIGNMENT

The Owner may assign this policy as collateral security. The Company is not responsible for the validity or effect of a collateral assignment. The Company will not be responsible to an assignee for any payment or other action taken by the Company before receipt of the assignment in writing at its Home Office.

The interest of any beneficiary will be subject to any collateral assignment made either before or after the beneficiary is named.

A collateral assignee is not an Owner. A collateral assignment is not a transfer of ownership. Ownership can be transferred only by complying with Section 2.2.

# SECTION 3. ADJUSTABLE TERM PROTECTION

## 3.1 ADJUSTABLE TERM PROTECTION

**Description.** Adjustable Term Protection consists of one year term insurance and paid-up additions. The amount of one year term insurance will be reduced by the amount of paid-up additions purchased under Section 6.2 by dividends or by the payment of additional premiums. One year term insurance will generally be in force for the entire policy term; however, as provided in Section 3.4, the one year term insurance may be terminated, or the amount of one year term insurance may be reduced during a policy year after the end of the guaranteed period.

**Amount.** The initial amount of Adjustable Term Protection is shown on page 3. The amount of Adjustable Term Protection may be increased as described in Sections 3.2 and 3.3. Decreases in Adjustable Term Protection are described in Section 3.4.

**Guaranteed Period.** The initial amount of Adjustable Term Protection is guaranteed for the period shown on page 3. Each time that the amount of Adjustable Term Protection is increased, the guaranteed period is redetermined under the schedule shown below. At the end of the guaranteed period, the Owner may extend the period by a written request received at the Home Office and the payment of a new minimum premium as determined by the Company.

Insured's Age On Policy
Anniversary When

| Guaranteed Period Is Determined | Guaranteed Period |
| --- | --- |
| up to 27 | 14 years |
| 27 to 28 | 13 years |
| 29 to 32 | 12 years |
| 33 to 40 | 11 years |
| 41 to 44 | 10 years |
| 45 to 48 | 9 years |
| 49 to 52 | 8 years |
| 53 to 56 | 7 years |
| 57 to 59 | 6 years |
| 60 to 62 | 5 years |
| 63 to 66 | 4 years |
| 67 to 69 | To age 70 |

If the guaranteed period is determined other than on a policy anniversary, the guaranteed period will be based on the Insured's age on the last policy anniversary.

If the Owner directs that dividends be used other than for the purchase of paid-up additions, the guaranteed period will be terminated and may not be renewed or extended, except as provided in Reduction If Dividend Option Changed in Section 3.4.

**Premium.** When the amount of Adjustable Term Protection is increased, the minimum premium for the policy will be redetermined. The new minimum premium will be payable for the remainder of the premium paying period. Any increased premium will be based on the Basic Amount, on the Insured's attained age and on the amount of one year term insurance that is part of the Adjustable Term Protection at the time of increase. When an increase takes effect during a policy year, the amount of the first premium due will be based on the time remaining in that year.

## 3.2 SCHEDULED INCREASES OF ADJUSTABLE TERM PROTECTION

**Inflation Protection Option.** If this option is in effect (as shown on page 3), the Total Insurance Amount will be indexed on each of the first twenty policy anniversaries to reflect increases in consumer price levels. Increases will not be made after the policy anniversary that is nearest to the Insured's 69th birthday. The Total Insurance Amount is the sum of the Basic Amount and the amount of Adjustable Term Protection then in force. The initial Total Insurance Amount is shown on page 3. When the Total Insurance Amount is indexed, the amount of Adjustable Term Protection will be increased so that it equals the difference between the Total Insurance Amount, as increased, and the Basic Amount.

NN.3.(0187).

6

An increase in the Total Insurance Amount will take effect as of a policy anniversary. The Amount for a policy year will be the Amount for the prior policy year multiplied by the Indexing Factor. The Indexing Factor is:

- the consumer price index for the current policy year; divided by
- the consumer price index for the prior policy year.

The maximum increase in Amount on any policy anniversary will be 8%. The Amount will not decrease as a result of a decrease in the consumer price index. If the Indexing Factor is less than one, a value of one will be used.

The "consumer price index for the current policy year" is the Consumer Price Index for All Urban Consumers, United States City Average, All Items (CPI-U) for the fourth month before the start of the current policy year. The "consumer price index for the prior policy year" is the CPI-U for the fourth month before the start of the prior policy year. The CPI-U is published by the Bureau of Labor Statistics. If the method for determining the CPI-U is changed, or if it is no longer published, it will be replaced by some other index found to serve the same purpose:

- by the Company; and
- the insurance supervisory official of the state in which this policy is delivered.

**Increases Scheduled At Issue.** This policy may have been issued with the amount of Adjustable Term Protection scheduled to increase in a specified amount on each policy anniversary. The amount of increase each year and the policy anniversaries on which increases take effect are shown on page 3.

**Increases Scheduled After Issue.** If the Inflation Protection Option is not in force on this policy, the Owner may request a scheduled series of increases of Adjustable Term Protection in a specified amount to be made in future policy years. Increases may be made for the balance of the first twenty policy years, but not after the policy anniversary that is nearest to the Insured's 69th birthday. Increases will be made only if, at the time the scheduled increases are applied for:

- the amount of each increase is not more than 10% of the Total Insurance Amount then in force;
- evidence of insurability is given that is satisfactory to the Company; and
- Company requirements place the Insured in an underwriting classification that is the same as, or is better than, the one for this policy.

The first increase will take effect on the Date of Issue shown on an amendment to the schedule of Benefits and Premiums. Later increases will take effect on the policy anniversaries that follow.

The Company may charge a fee for underwriting and issue expenses.

**Minimum Premium.** The minimum premium may increase when the amount of Adjustable Term Protection is increased. See Section 4.2.

**Terminating Right To Increases.** The right to increase coverage under Section 3.2 will terminate when:

- the Owner directs that dividends be used other than to purchase paid-up additions (except as provided in Section 3.4); or
- written notice of termination by the Owner is received at the Home Office.

### 3.3 UNSCHEDULED INCREASE OF ADJUSTABLE TERM PROTECTION

The Owner may request unscheduled increases of Adjustable Term Protection. Increases may not be made after the policy anniversary that is nearest to the Insured's 69th birthday. An increase will be made only if, at the time the increase is applied for:

- any increase in premium and any fee charged for underwriting and issue expenses are paid to the Company;
- the insurance in force, as increased, will be within the Company's issue limits;
- evidence of insurability is given that is satisfactory to the Company; and
- Company requirements place the Insured in an underwriting classification that is the same as, or is better than, the one for this policy.

An increase will take effect the later of:

- the date of the request for the increase; or
- the date of the medical examination (or the non-medical application).

### 3.4 REDUCTION OF ADJUSTABLE TERM PROTECTION

**Reduction Of Adjustable Term Protection By Company; Owner's Right To Continue Existing Protection.** At the end of any policy month after the end of the guaranteed period, the Company may reduce any remaining term insurance that is part of Adjustable Term Protection. The Company may do this if, at the attained age of the Insured, the minimum premium is not large enough to pay for the Basic Amount and the amount of term insurance that would be part of Adjustable Term Protection. The Company will send written notice of the reduction.

The Owner may prevent a reduction that would occur on or before the policy anniversary nearest to the Insured's 69th birthday. This may be done by a written request to start a new guaranteed period and the payment of an increased minimum premium. The amount of the increased minimum premium will be determined under Section 4.2. The Owner's request and the premium must be received at the Home Office within 31 days of the date the reduction would take effect. The new guaranteed period will be determined under the schedule shown in Section 3.1.

**Reduction If Dividend Option Changed.** If the Owner directs that dividends be used other than to purchase paid-up additions, the guaranteed period and any one year term insurance in force will terminate. The amount of Adjustable Term Protection will then be the amount of paid-up additions in force under Section 6.2. This restriction will not apply on a policy anniversary when the dividend is more than the scheduled premium (on an annual basis) and the Owner directs that dividends be used to pay premiums. The amount by which the dividend is more than the scheduled premium (on an annual basis) will be used to purchase paid-up additions under Section 6.2.

**Reduction If Additions Surrendered.** If additions under Section 6.2 are surrendered, the Adjustable Term Protection will be reduced by the amount of additions that are surrendered.

# SECTION 4. PREMIUMS AND REINSTATEMENT

## 4.1 PREMIUM PAYMENT

**Payment.** All premiums after the first are payable at the Home Office or to an authorized agent. A receipt signed by an officer of the Company will be furnished on request. A premium must be paid on or before its due date. The date when each premium is due and the number of years for which premiums are payable are described on page 3.

No premiums may be paid while the policy is in force as extended term or paid-up insurance under Sections 7.2 or 7.3, except as provided in Reinstatement (Section 4.4).

**Frequency.** Premiums may be paid every 3, 6 or 12 months at the published rates of the Company. A change in premium frequency will take effect when the Company accepts a premium on a new frequency. Premiums may be paid on any other frequency approved by the Company.

**Grace Period.** A grace period of 31 days will be allowed to pay a premium that is not paid on its due date. The policy will be in full force during this period. If the Insured dies during the grace period, any overdue premium will be paid from the proceeds of the policy.

If the premium is not paid within the grace period, the policy will terminate as of the due date unless it continues as extended term or paid-up insurance under Sections 7.2 or 7.3.

**Premium Refund At Death.** The Company will refund a portion of a premium which was due and was paid for the policy year in which the Insured dies. The refund will be the amount by which the premium paid is more than that premium on an annual basis multiplied by the fraction of the policy year that has elapsed at the time of death. Any premium amount used to purchase a paid-up addition will not be included in determining the refund. The refund will be part of the policy proceeds.

## 4.2 AMOUNT OF PREMIUM; ADJUSTMENTS

**Scheduled And Minimum Premiums.** The premium due on this policy is the scheduled premium. The scheduled premium is the sum of the minimum premium, any scheduled additional premium under Section 4.2, and any premium that is due for any additional benefit that is a part of this policy. These premium amounts are shown on page 3.

The minimum premium may increase each time the amount of Adjustable Term Protection is increased or a new guaranteed period is determined. An increased minimum premium will be determined by adding a premium for the Basic Amount to a premium for the amount of one year term insurance that is in force as part of Adjustable Term Protection as of the date used to determine the increased minimum premium. The premium rates for term insurance are shown on page 4A. The minimum premium will not be changed after the policy anniversary that is nearest to the Insured's 69th birthday.

The Owner may decrease the minimum premium to an amount not less than the sum of the premium for the Basic Amount and the premium for the amount of one year term insurance that is in force as part of Adjustable Term Protection. The decrease will take effect on the first policy anniversary that follows the receipt at the Home Office of the Owner's written request and any required fee.

**Additional Premiums Scheduled At Issue.** If requested on the application, this policy may have been issued with premiums that are larger than the minimum premium. These additional premiums may be level or may be scheduled to increase on each policy anniversary. The level amount, or the amount of increase each year, is shown on page 3. Annual increases may be made for the first 20 policy years, but not after the policy anniversary that is nearest to the Insured's 69th birthday.

**Additional Premiums Scheduled After Issue.** The Owner may pay additional premiums by requesting that the level premium payable on the policy be increased or that premiums increase on each policy anniversary by a specified amount. An increase in the level amount may be made at any time before the policy anniversary that is nearest to the Insured's 75th birthday. Annual increases may be made for the balance of the first 20 policy years, but not after the policy anniversary that is nearest to the Insured's 69th birthday. Additional premiums may be scheduled only if, at the time the increases are applied for:

- evidence of insurability is given that is satisfactory to the Company;
- Company requirements place the Insured in an underwriting classification that is the same as, or is better than, the one for this policy.
- the insurance in force after applying the scheduled additional premiums will be within the Company's issue limits; and
- the total amount of the scheduled additional premiums and other premiums paid to the Company under any policy for purchases of paid-up life insurance on the life of the Insured is within the Company's limits for such premiums; however, the Company may not set a limit below $1,000.

**Owner's Right To Decrease Scheduled Additional Premiums.** The Owner may decrease the level additional premium amount or the amount of annual increase in the additional premium. This may be done at any time by written request sent to the Home Office. Later increases in the level amount or in the amount of annual increase may be made only as provided in the preceding paragraph.

**Effective Date.** A premium change will take effect on the first premium due date that follows the receipt at the Home Office of the Owner's written request for change. When the Owner increases or decreases premiums, the Company will send an amendment to the schedule of Benefits and Premiums.

**Additional Premiums Used To Purchase Paid-Up Additions.** Each scheduled additional premium paid will be used, as of the due date of the premium, to purchase a paid-up addition as described in Section 6.

### 4.3 UNSCHEDULED ADDITIONAL PREMIUM OPTION

Unscheduled additional premiums may be paid to the Company at any time before the policy anniversary that is nearest to the Insured's 75th birthday. An unscheduled additional premium may be paid only if, at the time the premium is paid:

- evidence of insurability is given that is satisfactory to the Company;

- Company requirements place the Insured in an underwriting classification that is the same as, or is better than, the one for this policy;

- the insurance in force after applying the unscheduled additional premium will be within the Company's issue limits; and

- the total amount of the unscheduled additional premiums and other premiums paid to the Company under any policy for purchases of paid-up life insurance on the life of the Insured is within the Company's limits for such premiums; however, the Company may not set a limit below $1,000.

Each unscheduled premium may not be less than $1,000. Each unscheduled premium will be used, as of the date the premium is paid, to purchase a paid-up addition as described in Section 6.

### 4.4 REINSTATEMENT

The policy may be reinstated within five years after the due date of the overdue premium. All unpaid minimum premiums and premiums for any additional benefits that are a part of this policy (and interest as required below) must be received by the Company while the Insured is alive. The policy may not be reinstated if the policy was surrendered for its cash surrender value. Any policy debt on the due date of the overdue premium, with interest at the policy loan interest rate from that date, must be repaid or reinstated.

In addition, for the policy to be reinstated more than 31 days after the end of the grace period:

- evidence of insurability must be given that is satisfactory to the Company; and

- all unpaid minimum premiums and premiums for any additional benefits that are a part of this policy must be paid with interest from the due date of each premium. Interest is at an annual effective rate of 6%.

## SECTION 5. DIVIDENDS

### 5.1 ANNUAL DIVIDENDS

This policy will share in the divisible surplus of the Company. This surplus is determined each year. The policy's share will be credited as a dividend on the policy anniversary. This dividend will reflect the mortality, expense and investment experience of the Company and will be affected by any policy debt during the policy year.

### 5.2 USE OF DIVIDENDS

Annual dividends may be paid in cash or used for one of the following:

- **Paid-up Additions.** Dividends will purchase paid-up additional insurance as described in Section 6.

- **Dividend Accumulations.** Dividends will accumulate at interest. Interest is credited at an annual effective rate of not less than 3 1/2%. The Company may set a higher rate. Dividend accumulations increase the policy's cash value. They are payable as part of the policy proceeds. Accumulations may be withdrawn unless they are used for a loan, for extended term insurance, or for paid-up insurance.

- **Premium Payment.** Dividends will be used to reduce premiums. If the balance of a premium is not paid, or if this policy is in force as paid-up insurance, the dividend will purchase paid-up additions.

Other uses of dividends may be made available by the Company.

If no direction is given for the use of dividends, they will purchase paid-up additions.

### 5.3 DIVIDEND AT DEATH

A dividend for the period from the beginning of the policy year to the date of the Insured's death will be payable as part of the policy proceeds.

# SECTION 6. PAID-UP ADDITIONS

## 6.1 PURCHASE OF ADDITIONS: CHARGES

Paid-up additions are purchased by additional premiums and by dividends. Paid-up additions can be used to reduce term insurance (Section 6.2) or to increase coverage (Section 6.3). Paid-up additions increase the policy's cash value and will share in the divisible surplus. They may be surrendered unless they are used for a loan, for extended term insurance, or for paid-up insurance.

The Company may deduct a charge for expenses from each additional premium that is to be used to purchase a paid-up addition. The charge will not be more than 8% for scheduled additional premiums that were scheduled at issue or that are applied for in the first 20 policy years. The charge will not be more than 8% for unscheduled additional premiums that are paid during the first 20 policy years.

## 6.2 ADDITIONS TO REDUCE TERM INSURANCE

This type of paid-up addition will be part of the Adjustable Term Protection. Each addition will reduce the amount of one year term insurance that is in force as part of Adjustable Term Protection, and the amount of Adjustable Term Protection will remain unchanged.

## 6.3 ADDITIONS TO INCREASE COVERAGE

This type of paid-up addition will be used to provide paid-up insurance that is not included in the Adjustable Term Protection. Each addition will immediately increase the death proceeds payable under Section 1.1.

## 6.4 ALLOCATION OF ADDITIONAL PREMIUMS AND DIVIDENDS

When there is no one year term insurance in force as part of the Adjustable Term Protection, the dividends and the additional premiums will be applied under Section 6.3. When there is one year term insurance in force, the additional premiums will be allocated, as shown on page 3, between Sections 6.2 and 6.3; and the dividends that are used to purchase paid-up additions will be applied under Section 6.2. However, the Owner may choose to allocate the eligible dividend between Sections 6.2 and 6.3. The eligible dividend will be determined by the Company. The Owner may change these allocations. This may be done by written request that is sent to the Home Office, if:

- evidence of insurability is given that is satisfactory to the Company; and
- Company requirements place the Insured in an underwriting classification that is the same as, or is better than, the one for this policy.

An allocation must be in whole percentages. The Owner may choose different allocations for additional premiums (See Sections 4.2 and 4.3) and the eligible dividend.

# SECTION 7. CASH VALUES, EXTENDED TERM INSURANCE AND PAID-UP INSURANCE

## 7.1 CASH VALUE

The cash value for this policy, when all premiums due have been paid, will be the sum of:

- the cash value from the Table of Guaranteed Values;
- the cash value of any paid-up additions; and
- the amount of any dividend accumulations.

If premiums are not paid on this policy on an annual basis, the cash value will reflect a reduction for any premiums due later in the policy year.

The cash value within three months after the due date of any unpaid premium will be the cash value on that due date reduced by any later surrender of paid-up additions and by any later withdrawal of dividend accumulations. After that, the cash value will be the cash value of the insurance then in force, including the cash value of any paid-up additions and any dividend accumulations.

The cash value of any extended term insurance, paid-up insurance or paid-up additions will be the net single premium for that insurance at the attained age of the Insured.

## 7.2 EXTENDED TERM INSURANCE

If any premium is unpaid at the end of the grace period, this policy will be in force as extended term insurance. The amount of the death proceeds under this term insurance will be:

- the Basic Amount shown on page 3; plus
- the amount of Adjustable Term Protection then in force under Section 3; plus
- the amount of any paid-up additions in force under Section 6.3; plus
- the amount of any dividend accumulations (Section 5.2); less
- the amount of any policy debt (Section 8.3).

These amounts will be determined as of the due date of the unpaid premium; however, if the due date of the premium is a policy anniversary, the amount of Adjustable Term Protection then in force will not include any increase under Section 3 that would have been made on the policy anniversary. The term insurance will start as of the due date of the unpaid premium. The period of term insurance will be determined by using the cash surrender value as a net single premium at the attained age of the Insured. If the term insurance would extend to or beyond age 100, paid-up insurance will be provided instead. Extended term insurance does not share in divisible surplus.

If the extended term insurance is surrendered within 31 days after a policy anniversary, the cash value will not be less than the cash value on that anniversary.

NN.3.(0187)

## 7.3 PAID-UP INSURANCE

Paid-up insurance may be selected in place of extended term insurance. A written request must be received at the Home Office no later than three months after the due date of an unpaid premium. The amount of insurance will be determined by using the cash value as a net single premium at the attained age of the Insured. Any policy debt will continue. Paid-up insurance will share in divisible surplus.

The amount of the death proceeds when this policy is in force as paid-up insurance will be:

- the amount of paid-up insurance determined above; plus

- the amount of any in force paid-up additions purchased by dividends after the policy has become paid-up insurance (Section 6); plus

- the amount of any existing dividend accumulations (Section 5.2); plus

- the amount of any dividend at death (Section 5.3); less

- the amount of any policy debt (Section 8.3).

These amounts will be determined as of the date of death.

If paid-up insurance is surrendered within 31 days after a policy anniversary, the cash value will not be less than the cash value on that anniversary reduced by any later surrender of paid-up additions and by any later withdrawal of dividend accumulations.

## 7.4 CASH SURRENDER

The Owner may surrender this policy for its cash surrender value. The cash surrender value is the cash value less any policy debt. A written surrender of all claims, satisfactory to the Company, will be required. The date of surrender will be the date of receipt at the Home Office of the written surrender. The policy will terminate and the cash surrender value will be determined as of the date of surrender. The Company may require that the policy be sent to it.

## 7.5 TABLE OF GUARANTEED VALUES

Cash values and paid-up insurance for the Basic Amount are shown on page 4 for the end of the policy years indicated. These values assume that all premiums due have been paid for the number of years stated. They do not reflect paid-up additions, dividend accumulations or policy debt. Cash values for paid-up additions are shown on page 4B. Values during a policy year will reflect any portion of the year's premium paid and the time elapsed in that year.

Values for policy years not shown are calculated on the same basis as those on page 4. A list of these values will be furnished on request. A detailed statement of the method of calculation of all values has been filed with the insurance supervisory official of the state in which this policy is delivered. The Company will furnish this statement at the request of the Owner. All values are at least as great as those required by that state.

## 7.6 BASIS OF VALUES

The cash value for each policy year not shown on page 4 and the net single premiums are based on the Commissioners 1980 Standard Ordinary Mortality Table for the sex of the Insured; except that for extended term insurance, the Commissioners 1980 Extended Term Insurance Table for the sex of the Insured is used for the first 20 policy years. Interest is based on an annual effective rate of 4%. Calculations assume the continuous payment of premiums and the immediate payment of claims.

For increases in coverage or premium that occur under Sections 3 or 4 after the twentieth policy year, the Company may base cash values and premiums on the interest rates and mortality tables being used as the basis of values of whole life insurance then being issued by the Company.

1472

# SECTION 8. LOANS

## 8.1 POLICY AND PREMIUM LOANS

The Owner may obtain a loan from the Company in an amount that is not more than the loan value.

**Policy Loan.** The loan may be obtained on written request. No loan will be made if the policy is in force as extended term insurance. The Company may defer making the loan for up to six months unless the loan is to be used to pay premiums due the Company.

**Premium Loan.** If the premium loan provision is in effect on this policy, a loan will be made to pay an overdue scheduled premium. If the loan value is not large enough to pay the overdue scheduled premium, a scheduled premium will be paid for any other frequency permitted by this policy for which the loan value is large enough. If the loan value is not large enough to pay the overdue scheduled premium on any frequency permitted by this policy, the policy will continue in force or terminate as provided in Grace Period (Section 4.1). The Owner may elect or revoke the premium loan provision by written request received at the Home Office.

## 8.2 LOAN VALUE

The loan value is the smaller of a. or b., less any policy debt and any scheduled premium then due or billed; a. and b. are defined as:

a. the cash value one year after the date of the loan, assuming all scheduled premiums due within that year are paid, less interest to one year from the date of the loan.

b. the cash value on the due date of the first scheduled premium not yet billed that is due after the date of the loan, less interest from the date of the loan to that premium due date.

## 8.3 POLICY DEBT

Policy debt consists of all outstanding loans and accrued interest. It may be paid to the Company at any time. Policy debt affects dividends under Section 5.1. Any policy debt will be deducted from the policy proceeds.

If the policy debt equals or exceeds the cash value, this policy will terminate. Termination occurs 31 days after a notice has been mailed to the Owner and to any assignee on record at the Home Office.

## 8.4 LOAN INTEREST

Interest accrues and is payable on a daily basis from the date of the loan on policy loans and from the premium due date on premium loans. Unpaid interest is added to the loan.

The Specified Rate loan interest option or the Variable Rate loan interest option is elected on the application.

**Change To Variable Rate Loan Interest Option.** The Owner may request a change to the Variable Rate loan interest option at any time, with the change to take effect on the January 1st following receipt of a written request at the Company's Home Office.

**Change To Specified Rate Loan Interest Option.** The Owner may request a change to the Specified Rate loan interest option if the interest rate set by the Company under Section 8.6 for the year beginning on the next January 1st is less than 8%. The written request to change must be received at the Home Office between November 15th and the last business day of the calendar year; the change will take effect on the January 1st following receipt of the request at the Home Office.

## 8.5 SPECIFIED RATE LOAN INTEREST OPTION

Interest is payable at an annual effective rate of 8%.

## 8.6 VARIABLE RATE LOAN INTEREST OPTION

Interest is payable at an annual effective rate that is set by the Company annually and applied to new or outstanding policy debt during the year beginning each January 1st. The highest loan interest rate that may be set by the Company is the greater of 5% or a rate based on the Moody's Corporate Bond Yield Averages-Monthly Average Corporates for the immediately preceding October. This Average is published by Moody's Investor's Service, Inc. If it is no longer published, the highest loan rate will be based on some other similar average established by the insurance supervisory official of the state in which this policy is delivered.

The loan interest rate set by the Company will not exceed the maximum rate permitted by the laws of the state in which this policy is delivered. The loan interest rate may be increased only if the increase in the annual effective rate is at least 1/2%. The loan interest rate will be decreased if the decrease in the annual effective rate is at least 1/2%.

The Company will give notice:
- of the initial loan interest rate in effect at the time a policy or premium loan is made.
- of an increase in loan interest rate on outstanding policy debt no later than 30 days before the January 1st on which the increase takes effect.

This policy will not terminate during a policy year as the sole result of an increase in the loan interest rate during that policy year.

# SECTION 9. CHANGE OF POLICY

## 9.1 CHANGE OF PLAN

The Owner may reduce the amount of this policy, subject to the Company's minimum policy amount rules. The Owner also may change this policy to any permanent life insurance plan agreed to by the Owner and the Company by:

- paying the required costs; and

- meeting any other conditions set by the Company.

## 9.2 CHANGE OF INSURED

**Change.** The Owner may change the insured under this policy by:

- paying the required costs; and

- meeting any other conditions set by the Company, including the following:

  a. on the date of change, the new insured's age may not be more than 65;

  b. the new insured must have been born on or before the Policy Date of this policy;

c. the new insured must be insurable; and

d. the Owner must have an insurable interest in the life of the new insured.

**Date Of Change.** The date of change will be the later of:

- the date of the request to change; or

- the date of the medical examination (or the non-medical application).

**Terms Of Policy After Change.** The policy will cover the new insured starting on the date of change. When coverage on the new insured starts, coverage on the prior insured will terminate.

The contestable and suicide periods for the new insured start on the date of change.

The amount of insurance on the new insured will be set so that there will be no change in the cash value of the policy at the time of change. If the policy has no cash value, the amount will be set so that premiums do not change.

Any policy debt or assignment will continue after the change.

NN 3

13

1473